UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UBER TECHNOLOGIES, INC., | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| WINGATE, RUSSOTTI, SHAPIRO, MOSES & HALPERIN, LLP, JAY WECHSLER, BANILOV & ASSOCIATES, P.C., NICK BANILOV, THE LAW OFFICE OF DOMINICK W. LAVELLE d/b/a LAVELLE LAW FIRM, EMILY K. LAVELLE, MICHAEL GERLING, GERLING INSTITUTE, LEONID REYFMAN, AND PAIN PHYSICIANS NY PLLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**TABLE OF CONTENTS**

Page

SUMMARY OF THE ACTION....................................................................................1

THE PARTIES...........................................................................................................2

JURISDICTION AND VENUE.................................................................................3

FACTUAL BACKGROUND ....................................................................................4

I.      DEFENDANTS' SCHEME .........................................................................4

        A.      Personal Injury Plaintiff A.............................................................7

        B.      Personal Injury Plaintiff B............................................................24

        C.      Personal Injury Plaintiff C............................................................30

        D.      Personal Injury Plaintiff D............................................................35

II.     RACKETEERING ALLEGATIONS ........................................................39

        A.      Defendants' Respective Misconduct and Basis for Liability.........39

                1.      The Wingate Defendants...................................................39

                2.      The Banilov Defendants....................................................40

                3.      The Lavelle Defendants ....................................................41

                4.      The Gerling Defendants ....................................................41

                5.      The Reyfman Defendants...................................................44

        B.      Uber Is a Victim of the Scheme and Has Suffered Injury.............45

        C.      The RICO Enterprise......................................................................46

        D.      Pattern of Racketeering Activity...................................................49

        E.      Equitable Tolling............................................................................50

CAUSES OF ACTION............................................................................................50

PRAYER FOR RELIEF .........................................................................................57

JURY DEMAND .....................................................................................................59

Plaintiff Uber Technologies, Inc. ("Uber"), by its undersigned attorneys, hereby alleges as follows against Defendants Wingate, Russotti, Shapiro, Moses & Halperin, LLP, Jay Wechsler ("the Wingate Defendants"); Banilov & Associates, P.C., Nick Banilov (the "Banilov Defendants"); the Law Office of Dominick W. Lavelle d/b/a the Lavelle Law Firm, Emily K. Lavelle (the "Lavelle Defendants," and together with the Wingate and Banilov Defendants, the "Law Firm Defendants"); Michael Gerling, the Gerling Institute, Leonid Reyfman, and Pain Physicians NY PLLC ("Pain Physicians NY," together with Gerling, the Gerling Institute, and Reyfman, the "Doctor Defendants," and collectively with the Law Firm Defendants, "Defendants"):

## SUMMARY OF THE ACTION

1.      Hundreds of thousands of New Yorkers rely on Uber's ride-matching services every day to get door-to-door. The unscrupulous and fraudulent conduct of Defendants threatens to make those services more expensive and less available, harming the broader public as well as Uber, earners using the Uber application, and the other specific victims of this scheme. Defendants—personal injury attorneys and doctors who specialize in treating personal injury plaintiffs—are conspiring to exploit passengers in purported or actual minor vehicle collisions and provide them with medically unnecessary and/or causally unconnected "treatments," up to and including invasive and painful surgeries such as spinal fusions, for conditions that are fictitious, exaggerated, or that preexisted the purported accident. Lawyers, directly or indirectly, regularly pay for the treatments with the understanding that such payments will corruptly influence those providers into creating false medical documentation and supplying false testimony.

2.      Defendants have used and threaten to continue using into the future such fabricated medical evidence in an attempt to fraudulently induce settlements from Uber and others that bear no relationship with the actual injuries (if any) that the passengers experienced. To accomplish their scheme, Defendants knowingly and willfully misrepresent material facts at every turn—to

the passengers, to the courts, and to parties to such meritless litigation, including Uber. This scheme harms Uber and the many users of Uber's apps who are affected by increased costs caused by Defendants' widespread fraud.

3.      This case is not about litigation activity in a single or even a series of frivolous, fraudulent, or baseless lawsuits. Rather, these Defendants engaged in wide-ranging out-of-court actions to further their fraudulent scheme. These actions included a pattern of corrupt activity, including wire fraud, mail fraud, and bribery. Uber principally seeks equitable relief to remediate the fraudulent activity and to prevent such misconduct from occurring in the future, including injunctive relief and a monitorship of the corrupt medical practices and law firms. Uber also seeks monetary damages to hold Defendants accountable.

## **THE PARTIES**

4.      Plaintiff Uber is a Delaware corporation with its principal place of business in California.

5.      Defendant Wingate, Russotti, Shapiro, Moses & Halperin, LLP, is a limited liability partnership duly organized and existing under the laws of the State of New York. At all relevant times, the Wingate firm maintained its principal place of business in New York.

6.      Defendant Jay Wechsler resides in and is a citizen of New York. At all relevant times, Wechsler was an employee of the Wingate firm in New York.

7.      Defendant Banilov & Associates, P.C., is a professional service corporation duly organized and existing under the laws of the State of New York. At all relevant times, Banilov & Associates maintained its principal place of business in the State of New York.

8.      Defendant Nick Banilov resides in and is a citizen of New York. At all relevant times, Banilov was a named partner of Banilov & Associates.

2

9. Defendant the Law Office of Dominick W. Lavelle, d/b/a the Lavelle Law Firm, is a professional services corporation duly organized and existing under the laws of the State of New York. At all relevant times, the Lavelle Law Firm maintained its principal place of business in the State of New York.

10. Defendant Emily K. Lavelle resides in and is a citizen of New York. At all relevant times, Lavelle was a named partner of Lavelle Law Firm.

11. Defendant Michael Gerling resides in and is a citizen of New York. Gerling is a physician who specializes in spinal surgery.

12. Defendant the Gerling Institute is a New York medical professional corporation with its principal place of business in New York. The Gerling Institute at all relevant times was owned and controlled by Gerling.

13. Defendant Leonid Reyfman resides in and is a citizen of New York. Reyfman is a physician who specializes in pain management.

14. Defendant Pain Physicians NY is a New York medical professional corporation with its principal place of business in New York. Pain Physicians NY at all relevant times was owned and controlled by Reyfman.

## JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. § 1961, et seq. (the Racketeer Influenced and Corrupt Organizations Act, or "RICO").

16. This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interests and costs, exceeds $75,000, and the controversy is between citizens of different states.

17. This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

3

18.     Venue is proper pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in the Eastern District of New York and a substantial amount of the activities forming the basis of this Complaint occurred within the Eastern District of New York.

## FACTUAL BACKGROUND

### I.     DEFENDANTS' SCHEME

19.     Defendants conceived and implemented a fraudulent scheme to exploit passengers in purported or actual minor motor vehicle collisions, generating phony or exaggerated claims through delivery of unnecessary or unrelated medical treatment. Defendants' scheme involved a pattern of corrupt activity intended to manufacture claims that passengers in vehicle collisions suffered materially more severe injuries than they actually experienced (if any). While particulars varied from case to case, at its core the scheme involved (i) the referral of personal injury plaintiffs by their attorneys (the "Law Firm Defendants") to a particular program of medical care that ultimately involved the treating physicians (the "Doctor Defendants") and (ii) direct or indirect payments from the Law Firm Defendants to the Doctor Defendants as compensation for unnecessary medical treatment for the corrupt purpose of inducing false diagnoses, false statements, and false testimony by the Doctor Defendants that the injuries supposedly warranting such treatment were medically necessary and/or caused by the accidents in question.

20.     The pattern of corrupt activity spanned a wide range of misconduct, including falsified accident reports; medical examination reports used to justify unnecessary treatments and services; medically unnecessary imaging used to attribute any preexisting condition or injury to the alleged collision and to thereby inflate medical bills; invasive, expensive, and medically unnecessary and/or causally unconnected treatments and surgeries; and knowingly false statements and testimony made before, in the course of, and/or after the medical treatment by the Doctor Defendants that were then utilized by the Law Firm Defendants to effectuate the scheme.

21.     The Doctor Defendants received excessive and/or above-market compensation in exchange for providing false diagnoses, medically unnecessary treatments, and false statements and testimony regarding causation and medical necessity. Upon information and belief, the payments received far exceeded what the Doctor Defendants would have otherwise recovered from ordinary sources of reimbursement for delivery of legitimate medical care.

22.     Additionally, the Doctor Defendants understood and agreed that in exchange for these false diagnoses, unnecessary treatments, and false statements, the Law Firm Defendants would continue to funnel patients to the Doctor Defendants' offices, thus continuing the corrupt pattern.

23.     The Law Firm Defendants paid such excessive and/or above-market compensation to induce the Doctor Defendants to manufacture evidence, and the Doctor Defendants accepted such payments. The manufactured evidence was necessary to support a false and fraudulent claim of "serious injury" among personal injury plaintiffs from minor vehicle collisions who were, in truth, uninjured or only lightly injured, so that the Law Firm Defendants could pursue multi-million-dollar claims against Uber and others in New York state court. To establish such a claim, the Law Firm Defendants needed to allege entitlement to damages for pain and suffering, i.e., non-economic damages. Claims for such non-economic damages are restricted under New York law. Specifically, New York State Insurance Law § 5104(a) provides that, with respect to negligence claims involving the operation of a motor vehicle, there shall be no right of recovery for non-economic loss, except in the case of a "serious injury."

24.     A "serious injury" is defined under New York State Insurance Law § 5102(d) as follows:

> "Serious injury" means a personal injury which results in death; dis-
> memberment; significant disfigurement; a fracture; loss of a fetus;

5

permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

25.     Section 5104(a) further states that, with respect to motor vehicle negligence claims, there is no right to recover for "basic economic loss." A basic economic loss is defined under New York Insurance Law § 5102(a) in relevant part as follows:

"Basic economic loss" means, up to fifty thousand dollars per person of the following combined items . . . :

(1) All necessary expenses incurred for: (i) medical, hospital (including services rendered in compliance with article forty-one of the public health law, whether or not such services are rendered directly by a hospital), surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services; (ii) psychiatric, physical therapy (provided that treatment is rendered pursuant to a referral) and occupational therapy and rehabilitation (provided that treatment is rendered pursuant to a referral); (iii) any non-medical remedial care and treatment rendered in accordance with a religious method of healing recognized by the laws of this state; and (iv) any other professional health services; all without limitation as to time, provided that within one year after the date of the accident causing the injury it is ascertainable that further expenses may be incurred as a result of the injury. . . .

(2) Loss of earnings from work . . . .

(3) All other reasonable and necessary expenses incurred . . . .

26.     The availability of non-economic damages—which should not have been available at all because the plaintiffs did not in fact suffer any serious injury—substantially increased the potential claim that could be presented to a jury and hence the expected settlement value of such cases. Incurring medical expenses above the $50,000 threshold for basic economic loss also permits a plaintiff to litigate a motor vehicle negligence claim.

27.     The purpose of the scheme was to attempt to fraudulently induce larger settlements from the defendants to such litigation. Defendants intended to deprive Uber of its property and/or money. Uber was but one of the scheme's targets. The scheme and its resulting pattern of corrupt activity extended to many others as well.

28.     The scheme was employed in numerous cases against Uber and others. It involved a wide-ranging pattern of corrupt activity, including conduct in violation of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and N.Y. Penal Law §§ 215.00 and 215.05 (bribery) described in the following non-exhaustive sampling of cases against Uber and others.

## A.     Personal Injury Plaintiff A

29.     On July 4, 2020, Personal Injury Plaintiff A was a passenger in a vehicle after connecting with the driver via the Uber app when her driver had to slow down slightly because his vehicle hit a cardboard box containing a sofa cushion that fell out of the back of a pickup truck. Figure 1 below was taken from the forward-facing dashboard camera of the vehicle in which Personal Injury Plaintiff A was riding. It shows the moment before that event.



*Figure 1.*

30.    Neither the vehicle nor the sofa cushion was damaged when the vehicle hit the box. Personal Injury Plaintiff A did not report any pain or injury at the time. The vehicle had both forward-facing and passenger view cameras, which recorded both the vehicle hitting the sofa cushion and Personal Injury Plaintiff A's reaction. The video footage shows Personal Injury Plaintiff A talking on her phone before, during, and after the incident, and shows no injury to Personal Injury Plaintiff A or damage to the vehicle. Figure 2 below shows Personal Injury Plaintiff A immediately before the incident, and Figure 3 shows her shortly afterward.



*Figure 2.*

8



*Figure 3.*

31.     The vehicle in which Personal Injury Plaintiff A was riding did not collide with another vehicle. The police were not called, no ambulance came, and no airbags deployed.

32.     The driver of the pickup truck that lost the sofa cushion stopped to exchange information with the driver of the vehicle in which Personal Injury Plaintiff A was riding. Both the pickup truck driver who lost the cushion and Personal Injury Plaintiff A were Russian speakers. Because they were traveling in the same direction, the pickup truck driver gave Personal Injury Plaintiff A a ride home from the scene of the incident. As the pickup truck driver recorded in a subsequent email: "Throughout the ride she essentially discusses how she's going to ride the insurance claim and sue [] the driver. . . . She showed no signs of any physical distress, pain or injury. . . . Additionally, her chatty nature also noted that she's happy to use her prior medical

9

procedure to blame [a]nyone because everyone[] in New York is dishonest and it's her right to do so. . . ."

33.     Personal Injury Plaintiff A retained the Banilov Defendants to file a personal injury lawsuit. The Banilov Defendants executed on the scheme by fabricating evidence describing an accident between two vehicles that did not occur and injuries that did not occur for the purpose of bringing a lawsuit on Personal Injury Plaintiff A's behalf. The Wingate Defendants joined the representation on December 12, 2020, and, upon information and belief, were involved in the Banilov Defendants' orchestration of medical treatment for the purpose of fabricating a claim. Upon information and belief, the Wingate Defendants and Banilov Defendants agreed to share proceeds resulting from the scheme.

34.     On July 6, 2020, Personal Injury Plaintiff A signed a blank Report of Motor Vehicle Accident, MV-104. This is a standard form utilized in New York to report the circumstances of an accident. Though she signed the blank form, as she later admitted in sworn testimony, she never saw or reviewed the completed form.

35.     Upon information and belief, the Banilov Defendants or persons acting at their direction completed the blank Report of Motor Vehicle Accident that Personal Injury Plaintiff A had signed. In furtherance of the scheme, the form reflected fabricated facts about a supposed collision that simply did not occur. The completed form falsely stated that "V1 rear ended V2," that Vehicle 1 suffered damage to its front bumper, and that Vehicle 2 suffered damage to its rear bumper. It further falsely represented that Personal Injury Plaintiff A suffered "multiple" injuries. The statements that "V1 rear ended V2," that the vehicles suffered damage, and that Personal Injury Plaintiff A suffered "multiple" injuries were knowingly false when made given that there was no such vehicle collision or injury. On or about July 6, 2020, in furtherance of the fraud scheme and in

violation of 18 U.S.C. § 1343 (wire fraud), the Banilov Defendants caused the completed Form MV-104 to be transmitted to the New York Commissioner of Motor Vehicles by electronic means on Personal Injury Plaintiff A's behalf.

36.    Personal Injury Plaintiff A did not initially seek medical treatment after the incident. She was neither visibly injured at the time of the incident and did not complain to either driver about any injury. She did not seek medical care to treat any legitimate injury resulting from the incident. Instead, she sought medical care from the Doctor Defendants as part of the scheme to manufacture a false and fraudulent claim. As Personal Injury Plaintiff A testified at her deposition, "I only spoke with the attorney. I was recommended to do that and the attorney explained to me … where I could go."

37.    Upon information and belief, the Banilov Defendants directed Personal Injury Plaintiff A to an extensive program of unnecessary and expensive medical treatment in furtherance of the scheme.

38.    Over the ensuing months, Personal Injury Plaintiff A received an extensive range of medical treatments that were unnecessary and/or causally unconnected with the sofa cushion incident. Such medical treatment included treatment on or about the following dates:

- Acupuncture from July 8, 2020, through September 24, 2020;
- Gastrointestinal/gastroenterology from July 16, 2020, through November 5, 2020;
- Chiropractor treatment from July 22, 2020, through December 4, 2020;
- Orthopedic surgery and follow-up from July 29, 2020, through May 2, 2023;
- Pain management from August 6, 2020, through January 4, 2021;
- Physical therapy from July 8, 2020, through December 4, 2020.

39.     Pursuant to the fraudulent and corrupt scheme, the providers of these medical treatments purported to deliver services to address the non-existent injuries from the incident. In reality, the services were provided for the purpose of enabling Personal Injury Plaintiff A to pursue a claim in New York state court under the no-fault law and to increase the supposed value of such claim. To maximize the value of such claim, Personal Injury Plaintiff A received a range of unnecessary and expensive pain management and surgery treatments from medical providers. Such treatments were at the heart of the scheme.

40.     Upon information and belief, such treatments were coordinated by and funded through counsel, directly or indirectly. Such funding, including excessive payments for unnecessary medical services, was provided to persons who the Banilov and Wingate Defendants reasonably should have believed would be witnesses in the action and for the purpose of inducing false statements and testimony from the Reyfman and Gerling Defendants regarding medical necessity and/or causation in violation of N.Y. Penal Law § 215 (bribery).

41.     On August 6, 2020, Personal Injury Plaintiff A visited Reyfman's pain management practice. Reyfman is a medical professional who specializes in pain management and surgery. He routinely performs various medical procedures on patients, including lumbar discectomies, annuloplasties, and contrast injections, in addition to routine pain evaluation and management. As described further below, Reyfman has been named as a defendant in several lawsuits alleging that he engaged in fraudulent activity to fabricate and inflate no-fault insurance claims.

42.     With respect to Personal Injury Plaintiff A and pursuant to this scheme, Reyfman documented non-existent "soft tissue" injuries resulting from the incident and recommended an extensive program of medical treatment, including physical therapy and injections.

43.    Throughout the course of Personal Injury Plaintiff A's treatment at Pain Physicians NY, Reyfman and his staff produced fraudulent statements that falsely attributed such injuries to the claimed accident with the intent to defraud Uber. For example, on January 4, 2021, in violation of 18 U.S.C. § 1343 (wire fraud), Reyfman used an electronic patient records portal to electronically sign the following knowingly false causation statement in connection with an epidural steroid injection he performed that day:

> CAUSALITY:
>
> No pre-existing conditions exist that affects the causality. I feel that there is a direct causal r[e]lationship between the accident described and the patient's current injuries. The patient's symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas.

44.    The statement—which was purportedly based upon specialized knowledge—was knowingly false when made given that there was no such "accident" or resulting injury. Upon information and belief, Reyfman did not subjectively believe such statement or, to the extent he did, such statement omitted material facts, including the circumstances regarding the underlying incident.

45.    Using these false statements as justification, beginning in August 2020 and continuing through at least November 2020, Reyfman or his staff acting at his direction administered a series of spinal injections to Personal Injury Plaintiff A. In furtherance of the scheme, Reyfman's assistant incorporated identical false assertions regarding causation in medical records describing a "telemedicine" visit on November 10, 2020, and a follow-up visit on January 4, 2021. These false statements and the associated medical records were created for the purpose of litigation and were provided to defendants in that litigation in support of Personal Injury Plaintiff A's claim in furtherance of the scheme.

13

46.     Upon information and belief, Personal Injury Plaintiff A was next referred by counsel to Gerling.

47.     Gerling is a physician licensed to practice medicine in New York and New Jersey who owned and controlled several medical entities including the Gerling Institute. Gerling is alleged to have engaged in fraudulent and unlawful no-fault insurance billing through these entities in addition to an illegal patient brokering, referral, and self-referral scheme. The lawsuits describing such allegations are set forth in further detail below.

48.     During Personal Injury Plaintiff A's visits with Gerling, Gerling ordered a variety of unnecessary medical imaging, including MRIs and spinal x-rays. Gerling ordered an MRI and then recommended that Personal Injury Plaintiff A undergo neck surgery.

49.     As with Reyfman, Gerling made false and fraudulent statements regarding causation and medical necessity with respect to this neck surgery treatment in the medical records for Personal Injury Plaintiff A. In connection with a November 24, 2020 initial appointment, Gerling falsely described patient pain and injury and added:

> CAUSATION:
>
> As the patient was asymptomatic in the cervical spine prior to their injury, it is my professional opinion, within a reasonable degree of medical certainty, that the injuries above, recommended treatments above, and resultant disability are directly causally related to the above stated accident.

50.     Upon information and belief, such statement—which was by a person purporting to have specialized knowledge—was knowingly false when made given that there was no such "accident" or resulting injury. Upon information and belief, Gerling did not subjectively believe such statement or, to the extent he did, such statement omitted material facts, including the circumstances regarding the underlying incident. On November 24, 2020, in violation of 18 U.S.C.

14

§ 1343 (wire fraud), Gerling used an electronic patient records portal to electronically sign and transmit this knowingly false and fraudulent statement with the intent to defraud Uber.

51.    Gerling operated on Personal Injury Plaintiff A on February 1, 2021. Gerling performed a cervical discectomy and fusion, as well as a spinal graft. Gerling also inserted a titanium plate and screw system into Personal Injury Plaintiff A's spine.

52.    In connection with these surgeries, Gerling signed a statement regarding Personal Injury Plaintiff A's cervical spine—which at most reflected the ordinary wear and tear of a person of plaintiff's age rather than any acute injury—that it was "my professional opinion, within a reasonable degree of medical certainty, that the injuries above, recommended treatments above, and resultant disability are directly causally related to the above stated accident." Gerling signed an identical note concerning Personal Injury Plaintiff A's alleged lumbar spine injury. Both such statements were knowingly false when made given that there was no such accident or resulting injury. On August 17, 2021, in violation of 18 U.S.C. § 1343 (wire fraud), Gerling used an electronic patient records portal to electronically sign and transmit this knowingly false and fraudulent statement with the intent to defraud Uber.

53.    A medical expert retained by Uber reviewed Personal Injury Plaintiff A's pre-surgical imaging and did not identify any acute disc herniations or other injury that would indicate such aggressive surgical treatment. The expert noted that "[b]ased on the images, I am not quite sure of the indications for the claimant's cervical spine surgery, which clearly was degenerative in nature." Gerling's statements regarding causation, the associated medical records, and indeed the surgery itself were created and/or performed for the purpose of litigation. The medical records containing the false statements were provided to defendants in that litigation in support of Personal Injury Plaintiff A's fraudulent claim and in furtherance of the scheme.

54.     The Banilov and Wingate Defendants utilized the Doctor Defendants' treatment and false statements to advance the scheme through the litigation. The Banilov and Wingate Defendants knew that under New York State Insurance Law § 5104(a) and (b), their ability to attempt to fraudulently induce a large settlement out of Uber was dependent on their ability to establish a basic economic loss of greater than $50,000 or a "serious injury." Absent evidence of such loss or injury, they would have no state court claim. By directing Reyfman and Gerling to make false diagnoses, provide unnecessary and expensive treatments, and provide false statements regarding causation and necessity, the Banilov and Wingate Defendants were able to manufacture injuries and damages that supposedly resulted from Personal Injury Plaintiff A's vehicle hitting the sofa cushion. Upon information and belief, the Banilov and Wingate Defendants induced such conduct and false statements by paying Reyfman and Gerling for their services.

55.     For example, Personal Injury Plaintiff A's medical records from the day of the Gerling surgery memorialized that Personal Injury Plaintiff A had told the nurse that that "[p]atient has no health insurance and no PCP. She states any meds/needs related to this surgery will be covered by her payment through lawyer by way of her accident." Upon information and belief, such payment was made with the knowledge that Gerling would be a witness and with the agreement or understanding that it would corruptly influence Gerling's testimony regarding the necessity for such medical treatment and/or whether it was caused by the accident in question, in violation of N.Y. Penal Law § 215 (bribery). And upon information and belief, Gerling accepted such payment with the agreement or understanding that his testimony would be influenced thereby, in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness).

56.     On November 9, 2020, the Banilov Defendants filed a lawsuit on Personal Injury Plaintiff A's behalf against her driver and the driver of the pickup truck who lost the sofa cushion.

The complaint repeated the false statement from the accident report that one driver had rear-ended the other, stating that the box containing the sofa cushion caused the motor vehicle "in which plaintiff . . . was a lawful passenger to loss [sic] control and rear-end the motor vehicle, owned and operated by" the second driver defendant. The complaint also falsely stated that a collision had rendered Personal Injury Plaintiff A "sick, sore, lame and disabled," and that she was now "inca-pacitated from attending to her usual duties." Again, these statements were knowingly false when made given that there was no such vehicle collision or injury. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud). In violation of 18 U.S.C. § 1341 (mail fraud), copies of the complaint were served on defendants by U.S. mail on or about November 19, 2020, and December 19, 2021.

57.    On August 3, 2021, Wechsler and the Wingate firm entered an appearance in the case for Personal Injury Plaintiff A.

58.    On August 24, 2021, the Wingate Defendants filed an amended complaint that added Uber as a defendant and repeated the false and fraudulent allegations about the incident. The amended complaint repeated the false statements that the two vehicles "came into contact with each other" and that Personal Injury Plaintiff A "was severely injured." Upon information and belief, such statements were knowingly false when made given that there was no such "accident" involving a collision between two vehicles, or any resulting injury. The filing, which was in fur-therance of the fraud scheme, was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud). That same day, the Wingate Defendants also caused the amended complaint to be served on Uber and the other defendants by U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

59.    On or about November 16, 2021, in furtherance of the fraud scheme, and in viola-tion of 18 U.S.C. § 1343 (wire fraud), the Wingate Defendants electronically filed a verified bill

17

of particulars response providing information regarding the incident and a false statement that the "motor vehicles [came] into contact with one another." The bill of particulars provided a false laundry list of claimed injuries resulting from the purported collision between two vehicles and a list of surgeries that the Wingate Defendants falsely claimed were necessitated thereby:

> As a result of the accident the plaintiff sustained the following serious and permanent injuries:
>
> **Left Shoulder:**
>
> • Full thickness tear of the anterior supraspinatus tendon;
>
> • Partial rotator cuff tear;
>
> • Partial labral tear;
>
> • Glenohumeral joint effusion that extends into the subcortacoid;
>
> • Fluid within the subdeltoid bursa and within the biceps tendon sheath;
>
> • Loose bodies;
>
> • Chondromalacia of the posterior glenoid grade IV;
>
> • Adhesions;
>
> • Synovitis;
>
> • Impingement syndrome;
>
> • Traumatic internal derangement;
>
> • Traumatic induced pain;
>
> • Instability;
>
> • Weakness;
>
> • Sprain/strain secondary to trauma;
>
> • Restricted flexibility and range of motion;
>
> • Post traumatic arthritis;

18

**Surgical Procedure**: Necessity to undergo the following surgical procedure on September 8, 2020 performed by Aleksandr Khaimov, D.O.:

• Arthroscopy;

• Arthroscopic rotator cuff and labral debridement;

• Removal of loose bodies;

• Microfracture of the glenoid;

• Lysis of adhesions;

• Synovectomy;

• Permanent disfiguring scarring overlying the left shoulder secondary to the above surgical procedure.

**Right Shoulder:**

• Partial thickness tear, communicating with the articular surface; along the anterolateral margin of the supraspinatus tendon;

• Focal of the infraspinatus tendon consistent with a focal erosion at the lateral glenoid process;

• Post traumatic edema;

• Fluid in the subdeltoid bursa and in the glenohumeral joint space;

• Impingement syndrome;

• Traumatic internal derangement;

• Traumatic induced pain;

• Instability;

• Weakness;

• Sprain/strain secondary to trauma;

• Restricted flexibility and range of motion;

• Post traumatic arthritis.

19

**Cervical Spine:**

• C3-C4 central right paracentral herniation, the midline component of which flattens the thecal sac;

• C5-C6 broad-based posterior herniation involving the central and bilateral posterolateral disc margins, flattening the thecal sac;

• C6-C7 central left paracentral herniation causes moderate flattening the thecal sac;

• C6-C7 grade I anterolisthesis with endplate change;

• Reversal of the cervical lordosis;

• Cervical radiculopathy;

• Sprain/strain secondary to trauma;

• Post traumatic cervicalgia;

• Cervical myofascitis;

• Cervical displacement;

• Subluxation;

• Cervical stenosis;

• Chronic neck pain;

• Myalgia;

• Muscle spasms.

**Surgical Procedure:** Necessity to undergo the following surgical procedures on February 1, 2021 performed by Michael Gerling, M.D.:

• Anterior cervical diskectomy and fusion, including discectomy, arthrodesis and anterior instrumentation at C5-C6-C7;

• Partial Corpectomy: C6;

• Anterior Instrumentation: Accel spine VanGough Titanium plate and screw system;

• Biomechanical Device(s): peek cage x 2;

20

• Spinal Graft: Allograft, morselized, Autograft, local [through same incision];

• Imaging: Fluoroscopic Guidance;

• Neurologic Monitoring Type: SSEP, MEP, EKG;

• Permanent disfiguring scarring overlying the left side of the neck secondary to the above surgical procedure.

**Lumbar Spine:**

• Lumbar radiculopathy

• Muscle spasm;

• Lumbar post traumatic sprain/strain syndrome;

• Lumbar displacement;

• Lumbar spondylosis;

• Disc protrusions;

• Chronic back pain;

• Restricted range of motion;

• Lumbalgia;

• Lumbar Myalgia/Myositis.

**Procedure:** Necessity to undergo the following procedure on January 4, 2021 performed by Leonid Reyfman, M.D.:

• Interlaminar Epidural Steroid Injection at L5-S1

**Thoracic Spine:**

• T2-T3 posterior central herniation, flattening the thecal sac;

• T4-T5 posterior central herniation, flattening the thecal sac;

• Muscle spasms;

• Sprain/strain secondary to trauma;

• Thoracalgia;

21

• Thoracolumbar derangement[.]

60.     The bill of particulars further falsely and fraudulently stated that permanent, serious injuries were caused by the purported accident between two vehicles:

> [A]ll of the aforementioned injuries, manifestations and disabilities are associated with further soft tissue injury and traumatic arthritis to the areas traumatically affected including injury, tearing, derangement and damage to the associated muscle groups, ligaments, tendons, blood vessels, blood supply, nerves and nerve tissue, soft tissue, with resultant pain, deformity and disability, stiffness, tenderness, weakness and restriction and limitation of motion and pain on motion; all injuries were caused, aggravated, exacerbated and/or precipitated by the accident; possibility of future surgical repair to those parts of the body claimed to have been injured in this accident; and possible loss of use of above mentioned parts, atrophy, anxiety and mental anguish, all of which substantially prevents this Plaintiff from enjoying the normal fruits of activities [social, educational and economical] and Plaintiff's enjoyment of life has been permanently impaired, impeded and/or destroyed.
>
> All of the injuries referenced above are permanent and lasting in their nature and character, with permanent effects of pain, loss of motion, disability, atrophy, anxiety and mental anguish.
>
> By reason of the subject occurrence and the serious injuries sustained therein, Plaintiff has been intermittently confined to bed at various periods of time since the accident relative to the afore-mentioned disability caused by the subject accident.
>
> By reason of the subject occurrence and the serious injuries sustained therein, the Plaintiff remains significantly partially disabled with intermittent home confinement to date relative to the afore-mentioned disability caused by the subject accident.

61.     Plaintiff sought $5,000,000 for her claimed injuries.

62.     On or about January 5, 2022, in violation of 18 U.S.C. § 1343 (wire fraud), the Wingate Defendants electronically filed a copy of the motor vehicle report that Personal Injury Plaintiff A had signed in blank. As discussed above, the report falsely stated that a vehicle collision had occurred resulting in injury to Personal Injury Plaintiff A. Upon information and belief, the

Wingate Defendants knew that such statements were false but nevertheless placed the report on the docket in order to advance the litigation and defraud Uber.

63.     On or about June 9, 2023, in furtherance of the fraudulent scheme, and in violation of 18 U.S.C. § 1343 (wire fraud), the Wingate Defendants signed and electronically filed an affirmation in support of a motion to extend a note of issue deadline that repeated the false statement that Personal Injury Plaintiff A "was involved in a motor vehicle accident which resulted in multiple serious injuries." Upon information and belief, the Wingate Defendants knew this statement was false and made it with the intent to advance the litigation and defraud Uber.

64.     On October 16, 2023, and as described further below, a federal RICO lawsuit was filed in this District naming Gerling as a defendant and containing detailed factual allegations that Gerling had participated in a conspiracy to submit thousands of fraudulent and unlawful no-fault insurance charges through the Gerling Institute. Among other things, the lawsuit alleged that Gerling "was among the surgeons who, in exchange for payments from [an unlawful patient brokering entity] agreed to perform invasive, expensive, and medically unnecessary surgeries on automobile accident patients." The lawsuit was captioned *Government Employees Insurance Co., et al. v. Michael Gerling, M.D., et al.*, Case No. 1:23-cv-07693 (E.D.N.Y.).

65.     On February 2, 2024, Uber issued a subpoena on Gerling and the Gerling Institute asking for testimony in relation to the New York state court lawsuit of Personal Injury Plaintiff A. The subpoena further asked for testimony on the following topic:

> Further, we seek your testimony regarding the matter of GOVERN-MENT EMPLOYEES INSURANCE CO., et al. v. MICHAEL GERLING, M.D., et al. pending in the United States District Court Eastern District of New York Docket No. 1:23-cv-07693. We seek your testimony regarding whether [Personal Injury Plaintiff A]'s treatment with you is a subject of the pending lawsuit under EDNY Docket No. 1:23-cv-07693.

66.    Gerling was scheduled to appear for his deposition on March 7, 2024; however, Wechsler requested an adjournment.

67.    On March 8, 2024—the day after the Gerling deposition was scheduled to occur—the Wingate Defendants filed an order to show cause seeking leave to withdraw as counsel in the New York state court case.

68.    In arguing that order to show cause, a Wingate attorney represented to the New York state court judge: "[W]e are requesting to be relieved as counsel based on a video that was exchanged which makes us believe the accident didn't occur in the manner that the plaintiff claims it occurred, and it would be unethical for us to go forward with the case at this time." The stated excuse for withdrawal, however, was false and misleading given that the video had been available to the Wingate Defendants for well over a year and that the underlying false accident report had been manufactured by the attorneys and not by Personal Injury Plaintiff A.

69.    The motion to withdraw was granted. Following the Wingate firm's withdrawal, the New York state court dismissed Uber from the case. Nevertheless, Uber has suffered substantial defense costs as a result of this scheme.

**B.    Personal Injury Plaintiff B**

70.    On March 1, 2019, Personal Injury Plaintiff B was a restrained passenger in the rear middle seat of a vehicle in which she was riding after connecting with the driver through the Uber app. As that vehicle made a right turn, it was hit lightly on its side by a second vehicle that was also turning right alongside it. At the time of the accident, Personal Injury Plaintiff B did not report any pain or injury at the scene and refused medical treatment from the ambulance that arrived. The airbags did not deploy. Personal Injury Plaintiff B rode home afterward with the same driver in the same vehicle, which remained drivable.

71.    Personal Injury Plaintiff B later went to a hospital emergency room complaining only of neck pain. She was diagnosed with a neck sprain, prescribed an over-the-counter non-narcotic pain reliever, and discharged.

72.    Even though Personal Injury Plaintiff B did not complain of or seek treatment for any pain to her knees, back, or shoulders when she visited the emergency room, she brought a lawsuit against the other driver and, subsequently, Uber, alleging serious injuries to each of those body parts. Upon information and belief, those supposed injuries were fraudulently manufactured by her attorneys in collusion with the Doctor Defendants.

73.    On March 29, 2019, in furtherance of the fraud scheme, the Lavelle Defendants caused to be electronically filed a complaint against the driver, which Emily Lavelle verified. The verified complaint falsely states that as a result of the accident, Personal Injury Plaintiff B "was severely injured and damaged, rendered sick, sore, lame and disabled, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are permanent in nature and duration, and plaintiff [Personal Injury Plaintiff B] will be permanently caused to suffer pain, inconvenience and other effects of such injuries." The verified complaint further falsely states: "That as a result of the foregoing, this plaintiff [Personal Injury Plaintiff B] suffered a serious injury as defined by Section 5102(d) of the Insurance Law of the State of New York." Upon information and belief, each such statement was knowingly false when made. In violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud), the Lavelle Defend-ants caused to be electronically filed the complaint and used the U.S. Postal Service to serve it on the driver defendant.

74.    Over the ensuing months, Personal Injury Plaintiff B received an extensive range of medical treatments that were unnecessary and/or causally unconnected with the collision. Such

medical treatment included: physical therapy; acupuncture; massage; cervical facet joint injections; diskectomy and spinal fusion; shoulder arthroscopy; and knee meniscectomy and synovectomy. Upon information and belief, Personal Injury Plaintiff B was directed to the providers for such medical treatment by her lawyers. Gerling was one such provider.

75.    On or about May 21, 2019, Personal Injury Plaintiff B visited Gerling for treatment. The medical records for such visit described no mechanism for injury and contained no objective findings. Nevertheless, Gerling recommended expensive and invasive neck surgery.

76.    On August 28, 2019, Gerling performed a cervical diskectomy and fusion at two levels, C5-6 and C6-7, on Personal Injury Plaintiff B.

77.    According to an independent examination, Personal Injury Plaintiff B's cervical MRI revealed no injury that required a cervical fusion to be repaired.

78.    The Lavelle Defendants paid for Gerling's surgery either in whole or in part. Personal Injury Plaintiff B's admission paperwork for such surgery listed "The Lavelle Firm," with the date of her accident as the policy number, as the payment source alongside the driver's no-fault policy carrier. Upon information and belief, such payment was made with the agreement or understanding that Gerling would be a witness and with the understanding that it would influence Gerling's testimony regarding the necessity for such medical treatment and/or whether it was caused by the accident in question in violation of N.Y. Penal Law § 215 (bribery). And upon information and belief, Gerling accepted such payment with the agreement or understanding that his testimony would be influenced thereby, in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness).

79.    On December 10, 2019, in furtherance of the fraud scheme and in violation of 18

U.S.C. § 1343 (wire fraud), the Lavelle Defendants electronically filed a verified bill of particulars

falsely stating that "as a result of [the] accident, Plaintiff sustained the following serious injuries:

Anterior cervical diskectomy and fusion level C5-6 and C6-7, cervical spine;

- C5 anterior cervical corpectomy, cervical spine;

- Cervical spondylosis, cervical spine;

- C2-3 and C3-4 cervical facet joint injections, cervical spine;

- Fluoroscopic needle guidance, cervical spine;

- Right C5 and C6 radiculopathy, cervical spine;

- Cervical radiculopathy, cervical spine;

- Cervical multilevel discopathy, cervical spine;

- C5-C6 and C6-C7 herniation, cervical spine;

- C3-C4 and C4-C5 annular bulges, cervical spine;

- Canal and cord impingement, cervical spine;

- Spinal stenosis produced, cervical spine;

- Discogenic endplate reaction, cervical spine;

- Hypolordosis, cervical spine;

- Lateral meniscectomy and debridement, left knee;

- Left knee synovectomy 3 compartments, left knee;

- Lysis of adhesions, left knee;

- Medial meniscal tear, left knee;

- Lateral mensical tear, left knee;

- Lateral meniscal myxoid reaction, left knee;

- ACL injury, left knee;

27

- Quadriceps and patellar tendinitism, left knee;

- Joint effusion, left knee[.]"

80.     The bill of particulars also falsely states that Personal Injury Plaintiff B "sustained a serious injury resulting in . . . significant limitation of use of a body function or system which prevented him [sic] from performing substantially all of the material acts which constituted his [sic] usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment." Upon information and belief, each such statement was knowingly false when made and made with the intent to defraud the defendants in the litigation and the court.

81.     On or about April 6, 2020, Personal Injury Plaintiff B executed a consent to substitute the Wingate firm as counsel of record, which was electronically filed on August 10, 2020. Upon information and belief, the Wingate firm and the Lavelle Defendants agreed to share the proceeds with respect to this lawsuit in furtherance of the scheme.

82.     On October 13, 2020, the Wingate firm filed an amended complaint naming Uber as a defendant. As with the initial complaint, the amended complaint alleged that Personal Injury Plaintiff B "was severely injured and damaged, rendered sick, sore, lame and disabled, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are permanent in nature and duration, and Plaintiff [Personal Injury Plaintiff B] will be permanently caused to suffer pain, inconvenience and other effects of such injuries." The verified amended complaint further alleged that "as a result of the foregoing, this Plaintiff [Personal Injury Plaintiff B] suffered a serious injury as defined by Section 5102(d) of the Insurance Law of the State of New York."

83.     The Wingate firm utilized Gerling's fraudulently procured treatment as a basis for its claim. On November 11, 2022, one of the named defendants moved for summary judgment on

the ground that there was no evidence that Personal Injury Plaintiff B had sustained a serious injury. The Wingate firm utilized Gerling's treatment in opposition to such motion.

84.    On February 21, 2023, Gerling produced a summary of Personal Injury Plaintiff B's treatment with his office. This summary stated that Personal Injury Plaintiff B had "sustained significant musculoskeletal injuries to her neck and low back in the above stated accident." The summary went on to state that Personal Injury Plaintiff B "sustained a permanent and significant limitation to her cervical and lumbar spine due to this injury." This statement was knowingly false when it was made and was made with the intent to defraud the defendants in the lawsuit. In violation of 18 U.S.C. § 1343 (wire fraud), Gerling electronically transmitted this summary through a patient records portal and to the Wingate firm for use in the affirmation discussed below.

85.    On February 22, 2023, the Wingate firm electronically filed an affirmation signed by Gerling appending his medical records for treatment of Personal Injury Plaintiff B. In that affirmation, Gerling stated that he had treated Personal Injury Plaintiff B through the Gerling Institute and that "the injuries above, recommended treatments and resultant disability, are directly caused by the accident of March 1, 2019." In his affirmation, Gerling also testified that Personal Injury Plaintiff B was a "candidate for cervical diskectomy and fusion" even though such invasive surgery was medically unnecessary. Upon information and belief, Gerling knew such statements—which he purported to make pursuant to his specialized knowledge—were false when made and that they had been procured by the attorney payments described above. Gerling either did not subjectively believe such statements or, to the extent he did, such statements omitted material facts, including the circumstances regarding the underlying incident. In violation of 18 U.S.C. § 1343 (wire fraud) and in furtherance of the scheme, Gerling electronically transmitted the affirmation to the Wingate firm for electronic filing.

29

86.     The Wingate firm continued to prosecute the case against Uber today, even though they knew or should have known that Personal Injury Plaintiff B was not seriously injured in the accident. Uber has suffered substantial defense costs as a result of this scheme..

**C.    Personal Injury Plaintiff C**

87.     On December 4, 2019, Personal Injury Plaintiff C was a passenger of a driver with whom he had connected using the Uber app. The vehicle in which Personal Injury Plaintiff C was a passenger was rear-ended in a light, low-speed collision. Personal Injury Plaintiff C told the driver he was "ok," and then left the scene.

88.     A police report produced at the scene noted that there were no injuries. Personal Injury Plaintiff C had been involved in a previous car accident and subsequent lawsuit in 2014. MRIs taken of Personal Injury Plaintiff C's back after the 2019 collision show the same damage already present in MRIs taken after the 2014 collision and do not show any new damage.

89.      Late in the evening on the day after the 2019 collision, Personal Injury Plaintiff C visited the emergency room at Montefiore Medical Center. Records from his visit at Montefiore show he was ambulating with a normal gait and showed no neurological deficit. He refused to wait for an official x-ray, stating that he "feels well." Physicians at Montefiore discharged him shortly thereafter.

90.     Approximately one month later, Personal Injury Plaintiff C began visiting a physical therapy practice for treatment of a supposed neck injury. Personal Injury Plaintiff C testified that he chose the specific practice "[a]fter I spoke to my attorney." Upon information and belief, Personal Injury Plaintiff C's attorneys both referred him to this clinic and coordinated subsequent medical treatment, directly or indirectly.

91.     Personal Injury Plaintiff C received physical therapy at this practice up to three times a week over a period of time lasting up to three years. At one point during the course of his

treatment, he moved to a different home, and his attorneys personally arranged for him to begin attending therapy sessions at a different location of the same practice.

92.    On or about March 30, 2020, Personal Injury Plaintiff C had an appointment at Reyfman's Pain Physicians NY practice. Reyfman was the attending provider. The resulting medical record falsely and fraudulently stated that "there is a direct causal relationship between the accident described and the patient's current injuries." Upon information and belief, such statement was knowingly false when made. Reyfman's associates administered two medically unnecessary epidural steroid injections to Personal Injury Plaintiff C.

93.    Upon information and belief, the attorneys for Personal Injury Plaintiff C directly or indirectly made payments to Pain Physicians NY with the understanding that Reyfman would be a witness and with the understanding that such payments would influence his testimony. And, upon information and belief, Reyfman accepted such payments with the agreement or understanding that his testimony would be influenced thereby, in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness).

94.    During and after the course of Personal Injury Plaintiff C's treatment at Pain Physicians NY, Reyfman caused certain fraudulent claim documents to be mailed to or electronically filed with no-fault insurance providers in connection with the vehicle collision in violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud). On April 13, 2020, Reyfman caused his staff to mail and electronically file a claim form that falsely checked "yes" in response to a question that asked "[i]s condition solely a result of this automobile accident?" This statement was knowingly false at the time it was made. Reyfman caused his staff to submit additional false claim forms in connection with appointments that occurred on March 30, 2020, July 30, 2020, and April 26, 2022.

95.     The physical therapy practice also referred Personal Injury Plaintiff C to a physician who, upon information and belief, is associated with Gerling through their positions at Hudson Regional Hospital. On August 18, 2022—close to three years after Personal Injury Plaintiff C's accident—this physician performed an invasive and medically unnecessary spinal surgery on Personal Injury Plaintiff C.

96.     On or about February 2, 2023, Wechsler and the Wingate firm entered an appearance in the case and took over its prosecution. In violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud), Wechsler and the Wingate firm electronically filed and served via U.S. mail a number of false and fraudulent statements made to advance the litigation.

97.     Specifically, on or about March 7, 2023, the Wingate Defendants electronically filed a verified bill of particulars that stated that as a result of the accident, Personal Injury Plaintiff C had sustained "serious and permanent injuries" and was "significantly partially disabled" by the collision and suffered "significant limitation of use of a body function or system … which prevents her [sic] from performing substantially all of the material acts which constitute such person's usual and customary daily activities." The bill of particulars also falsely stated that:

> As a direct and proximate result of the accident, the Plaintiff sustained the following serious and permanent injuries: C5-C6 CENTRAL SUBLIGAMENTOUS DISC HERNIATION IMPRESSING ON THE ANTERIOR THECAL SAC AND NARROWING THE NEUROFORAMINA; C3-C4 DISC BULGING IMPRESSING ON THE ANTERIOR THECAL SAC AND NARROWING THE NEUROFORAMINA; CERVICAL RADICULOPATHY; SPRAIN/STRAIN SECONDARY TO TRAUMA; POST TRAUMATIC CERVICALGIA; CERVICAL MYOFASCITIS; CERVICAL DISPLACEMENT; INSTABILITY; SUBLUXATION; CERVICAL STENOSIS; CHRONIC NECK PAIN MYALGIA; MUSCLE SPASMS.

98.      The bill of particulars went on to state that these injuries created a "necessity to undergo" the two epidural steroid injections and the spinal surgery. Upon information and belief,

these statements were knowingly false when made and were made with an intent to defraud. It would have been obvious from any interaction with Personal Injury Plaintiff C that he did not suffer from any serious and permanent injury, just as it had been obvious to the medical professionals at Montefiore. Personal Injury Plaintiff C's own social media account refutes any suggestion he was "significantly partially disabled" by the accident. That social media account records a large birthday party thrown in Personal Injury Plaintiff C's honor on April 8, 2022, during a time period in which he was supposedly "significantly partially disabled" and unable to work.



*Figure 4.*

99.     Similar social media posts from the summer of 2022 indicate no evidence of an ongoing serious injury as alleged.



*Figure 5.*

100.     The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on Uber via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

101.     On or about May 1, 2023, Wechsler and the Wingate firm filed another bill of particulars that contained the same false and fraudulent statements. Specifically, this bill of particulars stated that Personal Injury Plaintiff C had suffered a "permanent and lasting" injury and had become "permanently disabled" and "totally disabled" as a result of the accident. Upon information and belief, these statements were also knowingly false when made. The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on Uber via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

34

102.    On or about November 14, 2023, Wechsler and the Wingate firm electronically filed an affirmation, in support of a motion to strike Uber's answer, that falsely and fraudulently stated that Personal Injury Plaintiff C had sustained "serious and permanent personal injuries" in the collision. Upon information and belief, these statements were also knowingly false when made. The affirmation was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on Uber via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

103.    On or about January 30, 2024, Wechsler and the Wingate firm electronically filed an affirmation, in support of a separate motion to strike Uber's answer, that repeated the false and fraudulent statement that Personal Injury Plaintiff C had sustained "serious and permanent personal injuries" in the collision. Upon information and belief, these statements were also knowingly false when made. The affirmation was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on Uber via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

104.    The Wingate Defendants continue to prosecute this case against Uber today, even though they know or should know that Personal Injury Plaintiff C did not sustain serious injuries as a result of the accident. Uber has suffered substantial defense costs as a result of this scheme.

**D.    Personal Injury Plaintiff D**

105.    Uber is not the only victim of Defendants' fraudulent scheme. The Law Firm Defendants' and Doctor Defendants' related pattern of corrupt activities extends to other defendants as well.

106.    For example, on July 8, 2018, Personal Injury Plaintiff D was involved in a minor vehicle collision in Brooklyn. A police report filled out at the scene of the collision stated there were no injuries. Personal Injury Plaintiff D himself later testified that he never observed any damage to the vehicle he was riding in.

107.    Personal Injury Plaintiff D did not seek medical treatment immediately after the accident. In fact, he did not seek medical treatment at all until after he retained the Banilov Defendants to represent him in a personal injury lawsuit against the other driver.

108.    A paralegal working for and at the direction of the Banilov Defendants recommended that Personal Injury Plaintiff D receive medical treatment from a specified physical therapist and arranged for a car service to transport Personal Injury Plaintiff D to and from such appointments. Personal Injury Plaintiff D attended physical therapy at this practice up to three times a week for four months. Staff from Banilov & Associates also referred Personal Injury Plaintiff D to a pain management provider in New Jersey (far from where Personal Injury Plaintiff D resided), who administered at least four medically unnecessary steroid injections in Personal Injury Plaintiff D's back. Personal Injury Plaintiff D testified that the Banilov Defendants scheduled all appointments at the pain management provider's office for him and paid for a car service for him to attend the appointments. The Banilov Defendants also referred Personal Injury Plaintiff D for a series of MRIs at a specified radiology office.

109.    Upon information and belief, in violation of N.Y. Penal Law § 215 (bribery), the Banilov Defendants made these referrals to the physical therapy practice, the radiology practice, and the pain management physician upon an agreement or understanding that in exchange for the referrals and corresponding fees, these various providers would produce fraudulent causation statements and testimony that the Banilov Defendants could use to advance the litigation and defraud the defendants in the lawsuit.

110.    On or about November 1, 2018, the Banilov Defendants referred Personal Injury Plaintiff D to Gerling with the agreement and understanding that in exchange Gerling would both conduct a medically unnecessary spinal surgery and provide fraudulent documentation and

testimony supporting the need for said surgery. Personal Injury Plaintiff D later testified that he visited Gerling's practice for the first time because he "was told to."

111.    On or about November 19, 2018, Personal Injury Plaintiff D had his first appointment with Gerling. Gerling examined Personal Injury Plaintiff D and produced an initial examination report. The report diagnosed Personal Injury Plaintiff D with "low back" pain that "began after the patient sustained an accident" and stated that an invasive spinal surgery was recommended to alleviate Personal Injury Plaintiff D's symptoms.

112.    Before Gerling performed the surgery, the Banilov Defendants arranged for a third-party litigation funder to advance all of the costs. The advance came in the form of a loan for $102,000, to be repaid through a lien on any recovery Personal Injury Plaintiff D received from the lawsuit. Personal Injury Plaintiff D later testified that he did not know how the bill for his surgery was paid, did not know that a loan had been taken out in his name, and did not know that the third-party litigation funder had asserted a lien on any recovery he obtained through the lawsuit. Upon information and belief, in violation of N.Y. Penal Law § 215 (bribery), the Banilov Defendants arranged the loan funding with the understanding that it would influence Gerling's testimony regarding the necessity for such medical treatment and/or whether it was caused by the accident in question. And upon information and belief, Gerling accepted such payment with the agreement or understanding that his testimony would be influenced thereby in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness).

113.    On or about March 12, 2019, Gerling performed the medically unnecessary surgery. The Banilov Defendants scheduled the surgery, and a paralegal from Banilov & Associates accompanied Personal Injury Plaintiff D to the surgery.

114.    On or about January 7, 2019, Banilov electronically filed a complaint on behalf of Personal Injury Plaintiff D to initiate the lawsuit. The complaint falsely stated that the vehicle collision "caused [Personal Injury Plaintiff D] to sustain severe and serious injuries," including "economic loss greater than basic economic loss as defined by Section 5104 of the New York State Insurance Law." These statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

115.    On or about March 21, 2019, Banilov electronically filed a bill of particulars that contained numerous additional false statements in violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud). Specifically, among other similar statements, the bill of particulars stated that:

> By reason of the subject occurrence, the Plaintiff sustained, aggravated, activated, exacerbated and/or precipitated the following personal injuries, all of which are alleged to be of a permanent nature: LUMBOSACRAL SPINE, L5/S1, POSTEROLISTHESIS, L3/4, DISC BULGE FLATTENING THE THECAL SAC WITH MILD BILATERAL FORAMINAL ENCROACHMENT; L4/5, DISC BULGING WITH A SUPERIMPOSED RIGHT CENTRAL DISC HERNIATION ASSOCIATED WITH A FOCAL ANNULAR TEAR FLATTENING THE THECAL SAC; LUMBAR RADICULITIS/ RADICULOPATHY; LUMBAR SPRAIN/STRAIN; LUMBAGO; STATUS-POST TRANSFORAMINAL EPIDURAL STEROID INJECTION AT BILATERAL L5/S1 AND RIGHT L4/5 LEVELS UNDER FLUOROSCOPIC GUIDANCE ON OR ABOUT SEPTEMBER 11, 2018, SEPTEMBER 25, 2018 AND OCTOBER 9, 2018; STATUS-POST BILATERAL LUMBAR MEDIAL BRANCH NERVE BLOCK AT L3/4/5 LEVEL ON OR ABOUT OCTOBER 16, 2018. STATUS-POST TRANSFORAMINAL LUMBAR INTERBODY FUSION WITH INSTRUMENTATION AND ALLOGRAFT FROM CADAVER BONE ON OR ABOUT MARCH 12, 2019. THORACIC SPINE T8/9, DISC BULGING FLATTENING THE THECAL SAC; T10/11, DISC BULGING FLATTENING THE THECAL SAC; THORACIC

DISC HERNIATION [. . .]; CERVICAL SPRAIN/STRAIN; CER-VICALGIA.

116.    These statements were knowingly false and were made with the intent to advance the litigation and defraud the defendants and the courts. The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud). Through the use of these false statements and the predicate acts of wire fraud, mail fraud, and bribery, Defendants were able to fraudulently advance this lawsuit by exaggerating Personal Injury Plaintiff D's injuries and justifying expensive, invasive, and unnecessary medical procedures.

## II.    RACKETEERING ALLEGATIONS

117.    At all relevant times, Defendants' scheme was in violation of 18 U.S.C. §§ 1962(c) and/or (d) of the RICO statute as further set forth below.

### A.    Defendants' Respective Misconduct and Basis for Liability

#### 1.    The Wingate Defendants

118.    As described above, the Wingate Defendants were a leading organizer of this scheme and took primary responsibility in pursuing fabricated claims against defendants, including Uber. The Wingate Defendants have participated, continue to participate, and likely will in the future participate in the scheme by utilizing the Doctor Defendants' false statements regarding medical treatment to advance unfounded and/or inflated claims. The Wingate Defendants used the fraudulent documentation and testimony provided by Reyfman and Gerling to make numerous false statements to Uber and to the court in the course of personal injury litigation. Upon information and belief, the Wingate firm entered into fee agreements with the Banilov and Levelle Defendants to further the goals of the scheme and share in its proceeds.

119.    The Wingate firm has been named as a defendant in a RICO lawsuit filed by Roosevelt Reinsurance and Tradesman Program Managers alleging that it orchestrated a fraudulent scheme to manufacture false workers' compensation claims. The complaint in *Roosevelt Road RE, v. Wingate, Russotti, Shapiro, Halperin, and Moses LLP et al.*¸ No. 1:24-cv-06259-vms (E.D.N.Y), alleges that the Wingate firm engaged in a pattern of racketeering activity involving bribery, mail fraud, and wire fraud by recruiting construction workers to manufacture false claims and inducing medical providers to provide unnecessary treatments and false documentation and testimony. The complaint in that case was filed in September 2024, and the case is still pending.

120.    Additionally, the Wingate firm has been named as a defendant in a RICO lawsuit filed by Ionian Reinsurance and three construction companies alleging that they orchestrated a fraudulent scheme to stage construction accidents and manufacture fraudulent workers' compensation claims and personal injury lawsuits. The complaint in *Ionian RE, LLC et al. v. Patrick Cedillo a/k/a/ Patricio Froilan Cedillo et al.*, No. 1:24-cv-07969-jrc (E.D.N.Y.), similarly alleges that the Wingate firm engaged in a pattern of racketeering activity involving mail fraud and wire fraud by recruiting construction workers to stage accidents and inducing medical providers to provide unnecessary treatments and false documentation and testimony in order to secure inflated settlements. The complaint was filed in November 2024, and the case is still pending.

### 2.    The Banilov Defendants

121.    As described above, the Banilov Defendants have participated, continue to participate, and likely will in the future participate in the scheme by orchestrating initial medical treatment for personal injury plaintiffs, including corruptly inducing Reyfman and Gerling to provide unnecessary medical treatment, false documentation, and false testimony through direct or indirect payments, creating false evidence, and making false statements to initiate and advance personal injury claims.

40

122.    The Banilov Defendants referred or caused to be referred potential plaintiffs to the Doctor Defendants for the purpose of manufacturing unfounded and/or inflated claims. The Banilov Defendants directly or indirectly paid the Doctor Defendants for such treatment and for the attendant false statements regarding necessity and causation.

123.    The Banilov Defendants have filed or prosecuted dozens of lawsuits involving the Doctor Defendants and/or their respective medical practices.

### 3.    The Lavelle Defendants

124.    As described above, the Lavelle Defendants have participated, continue to participate, and likely will in the future participate in the scheme by orchestrating initial medical treatment for personal injury plaintiffs, including inducing Gerling to provide unnecessary medical treatment, false documentation, and false testimony through direct or indirect payments, creating false evidence, and making false statements to advance personal injury claims.

125.    The Lavelle Defendants referred or caused to be referred potential plaintiffs to the Doctor Defendants for the purpose of manufacturing unfounded and/or inflated claims. The Lavelle Defendants directly or indirectly paid the Doctor Defendants for such treatment and with the understanding that such payments would corruptly result in the attendant false statements regarding necessity and causation.

### 4.    The Gerling Defendants

126.    Gerling and the Gerling Institute have been, continue to be, and likely will in the future be involved in the treatment of numerous personal injury plaintiffs referred to them by the Law Firm Defendants.

127.    Gerling controlled and directed the operations of the Gerling Institute at all relevant times.

128.     As part of and in furtherance of the scheme, Gerling controlled and directed the provision of unnecessary medical treatment to personal injury plaintiffs. Gerling made false diagnoses, performed unnecessary treatment and procedures, and provided false documentation and testimony in exchange for direct or indirect payments from the Law Firm Defendants, including through third-party funders, and with the understanding that in exchange for doing so, the Law Firm Defendants would continue to funnel patients to him.

129.     Gerling has also been named as a defendant in a RICO lawsuit filed by GEICO insurance company alleging his participation in a fraudulent scheme of providing unnecessary medical treatment in exchange for kickbacks from referring attorneys. The complaint filed in *GEICO* v. *Michael Gerling, M.D., et al.*, No. 1:23-cv-7693-PKC-MMH (E.D.N.Y.), alleges that personal injury attorneys funneled kickback payments to Gerling by retaining a phony marketing firm. Instead of providing any marketing services, the marketing firm made payments in the tens of thousands of dollars to Gerling's businesses to corruptly induce them to perform medically unnecessary surgeries. The phony marketing company wrote checks directly to NY Orthopedics, another medical institution owned and controlled by Gerling:



*Figure 6.*

---

*Figure 7.*

130.    Based on such evidence, this Court entered a preliminary injunction staying all pending collections arbitrations and lawsuits between Gerling and GEICO and barring Gerling from commencing any new claims against GEICO. The case was settled shortly thereafter.

### 5.    The Reyfman Defendants

131.    Reyfman and Pain Physicians NY have been, continue to be, and likely will in the future be involved in the treatment of numerous personal injury plaintiffs referred to them directly by the Law Firm Defendants.

132.    Reyfman controlled and directed the operations of Pain Physicians NY at all relevant times.

133.    As part of the scheme, and at the direction of the Law Firm Defendants, Reyfman controlled and directed the provision of unnecessary medical treatment to personal injury plaintiffs. This involved medically unnecessary treatments and false statements regarding the necessity of treatment and injury causation made at the direction of the Law Firm Defendants.

134.    Reyfman profited from the scheme through fraudulent insurance submissions and payments made or caused to be made by the Law Firm Defendants. Certain such payments were made through intermediate litigation funders. As but one example, on or about June 1, 2020, Reyfman performed a cervical percutaneous discectomy at C5/6 level on a personal injury plaintiff represented by the Banilov Defendants. Neither the plaintiff nor his insurer paid for the procedure. Rather, the Banilov Defendants directed compensation to Reyfman in the amount of $8,358.70 through a payment made by a third-party litigation funder. Upon information and belief, such funding was provided to Reyfman with the understanding that it would influence his testimony regarding the necessity for such medical treatment and/or whether it was caused by the accident in question. That case settled before Reyfman had the opportunity to submit his planned false testimony.

135.    Reyfman made false diagnoses, performed unnecessary treatment and procedures, and provided false documentation and testimony with the understanding that in exchange for doing so, the Law Firm Defendants would continue to funnel patients to him.

136.    Reyfman is also a defendant in two separate ongoing RICO lawsuits filed by Tradesman Program Managers alleging his involvement in schemes to manufacture fraudulent workers' compensation claims. The first Tradesman complaint, *Roosevelt Road RE, et al. v. Wingate, Russotti, Shapiro, Halperin, and Moses LLP et al.*¸ No. 1:24-cv-06259-vms (E.D.N.Y), is discussed above and alleges that Reyfman participated in a racketeering enterprise to defraud money from workers' compensation plans by providing diagnoses and unnecessary steroid injections to construction workers with non-existent or exaggerated workplace injuries. That complaint further alleges that Reyfman knowingly profited from the workers' compensation scheme by accepting direct and indirect reimbursements from personal injury attorneys for unnecessary treatments and by receiving an ongoing stream of patient referrals. The second complaint, *Roosevelt Road RE, et al. v. Liakas Law, P.C., et al.*, No. 1:25-cv-00300-RML (E.D.N.Y.), alleges that Reyfman participated in a similar racketeering enterprise managed by a separate law firm.

### B.    Uber Is a Victim of the Scheme and Has Suffered Injury

137.    Uber is a victim of this scheme because it has incurred substantial expense in defending these false or inflated claims, including responding to claims that would otherwise be barred by operation of New York State Insurance Law § 5104. The unnecessary medical treatments provided through Defendants' scheme of bribery and fraud, and the false statements supporting the necessity of those treatments, allowed the Law Firm Defendants to attempt to fraudulently induce significantly larger settlement payments out of Uber in personal injury lawsuits. As such, Uber has been forced to incur legal costs in defending these lawsuits in excess of what would have

45

otherwise been required. These inflated costs damaged Uber in its business or property. This damage was the direct result of Defendants' pattern of racketeering activity.

138.    Uber is not the only victim of this scheme. The courts of the State of New York and Uber's co-defendants are also its victims. Even the personal injury plaintiffs themselves have suffered from unnecessary surgery and medical treatment resulting from Defendants' greed.

### C.    The RICO Enterprise

139.    The Law Firm and Doctor Defendants are a group of persons associated together in fact for the common purpose of carrying out the ongoing fraudulent course of conduct directed at Uber and others described above. Each of the defendants understood that their ability to extract financial rewards from pursuit of fraudulent claims against Uber and others—whether through the lawyer's recovery of litigation settlements or the doctor's receipt of inflated medical payments—depended on (i) manufacturing unnecessary and/or causally unconnected medical treatment for potential personal injury plaintiffs, (ii) creating associated medical records that could be used in resulting litigation for the purpose of establishing necessity and causation, and (iii) generating and propounding false and misleading testimony from the medical providers to advance such litigation claims. The Law Firm and Doctor Defendants worked together and functioned as a unit to achieve that purpose and shared a common intent to act unlawfully in furtherance of that goal.

140.    The Law Firm and Doctor Defendants shared long-standing relationships with each other, acted for each other's common benefit, and depended on other another and their respective activities for such benefit:

> a.    The Lavelle and the Banilov Defendants each shared relationships with each of the Doctor Defendants. These law firms referred patients to Reyfman, Gerling, and their associated medical practices in the cases described above and in numerous

other cases. The relationship was cemented by payment made directly or indirectly by the Lavelle and Banilov Defendants to each of the Doctor Defendants.

b. The Wingate Defendants shared a relationship with each of the Doctor Defendants. In the cases described above as well as in other cases, the Wingate Defendants worked with the Doctor Defendants to utilize their false or misleading medical records and/or testimony to litigate the fraudulent claims against Uber or others.

c. The Lavelle, Banilov, and Wingate Defendants shared a relationship with each other and have worked together on these and other cases. Where claims arose involving Uber or other ride matching defendants, the Banilov and the Lavelle firms referred cases to the Wingate firm which was larger and had more resources to litigate against a corporate defendant. In each case, the relationship was cemented through fee-sharing arrangements as discussed above.

d. The Doctor Defendants shared a relationship with each other. Gerling and Reyfman had a long-standing professional relationship extending back to 2007, referred numerous patients to one another, and had worked together on numerous personal injury cases, including the ones described above.

e. Each of the Law Firm and Doctor Defendants share geographical proximity in that their respective legal and medical practices are concentrated in Kings County and the surrounding area. They came to work together as a result of their long involvement in representing or treating personal injury plaintiffs in that jurisdiction.

141. The acts of wire and mail fraud described above could not have been accomplished without the participation and assistance of each of the members of the enterprise. Each party played a critical role and depended on the others to carry out their respective roles in furtherance of the

47

scheme, including the initial intake and referral work of the Banilov and Lavelle firms; the delivery of medical treatment, creation of medical records, and provision of testimony by the Doctor Defendants; and the added scale and resources to litigate claims against ride matching defendants provided by the Wingate firm.

142.    The Law Firm and Doctor Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the Law Firm and Doctor Defendants participated in the operation or management of the enterprise. The enterprise itself is distinct from the culpable persons of Banilov, Wechsler, Lavelle, Reyfman, and Gerling and their respective corrupt activities. Banilov, Wechsler, Lavelle, Reyfman, and Gerling are employees or partners of their own respective law firms and medical practices, and each worked to operate the larger association-in-fact enterprise and manage its affairs through their corrupt patterns of referrals, making and accepting bribery payments, and false statements.

143.    The enterprise was of sufficient duration to accomplish its purposes, originating at least as early as 2019 and threatening to continue into the future.

144.    In the alternative, each of the Doctor Defendants' respective medical practices, namely the Gerling Institute and Pain Physicians NY, constitutes an enterprise. Gerling and Reyfman each operated, managed and controlled their respective medical practices directly and/or indirectly through an ongoing referral relationship in furtherance of the scheme. The Law Firm Defendants participated in the management and control of each such enterprise through the corrupt referrals and payments described above.

145.    At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate

wires and because its activities were directed at and intended to influence an out-of-state corporation.

### D.    Pattern of Racketeering Activity

146.    Defendants' scheme constitutes a pattern of racketeering activity. The pattern of racketeering activity includes, among others, commission of the predicate acts and specific statutes violated described above.

147.    Defendants committed these acts willfully and knowingly.

148.    The predicate acts relate to each other as a part of a common plan. The Defendants' roles in the scheme all depended on each other—the Doctor Defendants accepted bribes in the form of client referrals and illegal payments to provide unnecessary treatments and false documentation and testimony. The Law Firm Defendants then used this false testimony to fraudulently attempt to induce larger settlement payments. Each Defendant was aware of its respective role within the larger scheme.

149.    The predicate acts further relate to the association-in-fact described above as well as to each of the Doctor Defendants' respective medical practices. The Law Firm Defendants referred clients and made, directly or indirectly, corrupt payments to the Doctor Defendants in exchange for the provision of unnecessary medical treatment and false testimony and documentation. The Law Firm Defendants then used these false statements and unnecessary treatment to initiate and advance litigation against Uber and fraudulently attempt to induce larger settlements. A specific threat of repetition exists with respect to such acts. Such predicate acts are a regular way of conducting the ongoing medical practices at issue herein. Such acts are also attributable to the Law Firm Defendants and Doctor Defendants operating as part of the long-term association-in-fact that exists for criminal purposes as described herein. Hence, the pattern of activity is part of an open-ended and ongoing scheme.

150.    The acts also occurred over a substantial period of time and hence constitute a pattern of activity even if the scheme were not ongoing.

**E.    Equitable Tolling**

151.    Defendants also wrongfully concealed material facts relating to their scheme. Such concealment included Defendants' failure to disclose the causes and extent of the personal injury plaintiffs' claimed injuries and the necessity of treatment resulting from the alleged accidents. Indeed, Defendants actively misled Uber about the cause and extent of injury and the necessity of treatment through the numerous false statements described above.

152.    Uber exercised due diligence by investigating the circumstances of the claim it asserts here. In particular, Uber diligently used the disclosure tools available to it in the underlying personal injury litigation. However, Defendants' ongoing concealment and affirmative false statements in response to such disclosure requests prevented Uber from discovering the nature of the scheme. Although Uber brings this claim within the applicable statute of limitations, any such statute is in any event tolled as a result of Defendants' fraudulent concealment.

## <u>CAUSES OF ACTION</u>

**COUNT I**
**Civil RICO (18 U.S.C. § 1962(c))**
**Association-in-Fact Enterprise**
**(Against All Defendants)**

153.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 152 above.

154.    At all relevant times herein, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). Defendants constituted a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce. Each of the Defendants participated in the operation or management of the enterprise.

155.    The enterprise's racketeering activities, as described throughout this Complaint, included:

    a.   Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

    b.   Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations; and

    c.   Violations of the New York State witness bribery statute, N.Y. Penal Law §§ 215.00 and 215.05, based upon agreeing to confer benefits on medical providers with the understanding that such benefits would influence the testimony of the medical providers and the acceptance of such bribes.

156.    Each of the Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

157.    Uber has been injured in its business and property by reason of the above-described conduct.

158.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**RICO Enterprise Violation (18 U.S.C. § 1962(c))**
**Gerling Institute Enterprise**
**(Against Gerling, Reyfman, the Wingate Defendants, the Lavelle Defendants, and the**
**Banilov Defendants)**

159.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 152 above.

160.    The Gerling Institute is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

161.    Gerling, Reyfman, the Wingate Defendants, the Lavelle Defendants, and the Banilov Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of the Gerling Institute's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

162.    Defendants' racketeering activities, as described in detail in this Complaint, included:

    a.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

    b.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations; and

52

c. Violations of the New York State witness bribery statute, N.Y. Penal Law §§ 215.00 and 215.05, based upon agreeing to confer benefits on medical providers with the understanding that such benefits would influence the testimony of the medical providers and the acceptance of such bribes.

163. Each of the Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

164. Uber has been injured in its business and property by reason of the above-described conduct.

165. By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III
### RICO Enterprise Violation (18 U.S.C. § 1962(c))
### Pain Physicians NY Enterprise
### (Against Gerling, Reyfman, the Banilov Defendants, and the Wingate Defendants)

166. Uber incorporates herein by reference each and every allegation in paragraphs 1 through 152 above.

167. Pain Physicians NY is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

168. Reyfman, Gerling, the Banilov Defendants, and the Wingate Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of Pain Physicians NY's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

169.    Defendants' racketeering activities, as described in detail in this Complaint, included:

    a.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing the scheme;

    b.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing the scheme; and

    c.    Violations of the New York State witness bribery statute, N.Y. Penal Law §§ 215.00 and 215.05, based upon agreeing to confer benefits on medical providers with the understanding that such benefits would influence the testimony of the medical providers and the acceptance of such bribes.

170.    Each of the Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

171.    Uber has been injured in its business and property by reason of the above-described conduct.

172.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT IV
## RICO Conspiracy Violation (18 U.S.C. § 1962(d))
## (Against All Defendants)

173.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 152 above.

174.    For at least the time period referenced herein, Defendants did unlawfully, knowingly, and intentionally combine, conspire, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and/or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

175.    This pattern of racketeering activity in which the Defendants intentionally conspired to engage involved the specific acts as described in detail in this Complaint constituting wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, and witness bribery in violation of N.Y. Penal Law §§ 215.00 and 215.05.

176.    All of these predicate acts constituted "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

177.    Uber has been injured in its business and property by reason of the above-described conduct.

178.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT V
### N.Y. Judiciary Law § 487
### (Against the Law Firm Defendants)

179.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 152 above.

180.    In the course of the pattern of conduct described herein, the Law Firm Defendants colluded with each other, with the other Defendants, and with other known and unknown individuals to intentionally deceive the courts of the State of New York, Uber, and the other defendants in the above cases concerning the cause and severity of their personal injury clients' injuries and such clients' entitlement to litigate vehicle negligence claims pursuant to the requirements of New York no-fault insurance law.

181.    As discussed herein, the Law Firm Defendants' intentional deceit includes filing of false and/or frivolous complaints, affirmations, and other pleadings and motions made in the course of the above-referenced litigations.

182.    As a result of this deceit and collusion, Uber has been injured as alleged above because it has been required to incur substantial legal expenses in an amount in excess of $75,000.

183.    By reason of its injury, Uber is entitled to treble damages and reasonable attorneys' fees.

### COUNT VI
### Unjust Enrichment
### (Against the Doctor Defendants)

184.    Uber hereby incorporates herein the allegations contained in paragraphs 1 through 152 above as though set forth in their entirety.

185.    The Doctor Defendants have been and will continue to be unjustly enriched by benefits received pursuant to the fraudulent scheme, including through payments derived directly or

56

indirectly from the Law Firm Defendants. Such benefit was received at Uber's expense given that Uber has been required to incur substantial legal expense as a result of the scheme.

186.     Principles of equity and good conscience require restitution of any such benefits received by the Doctor Defendants.

187.     Uber demands judgment against the Doctor Defendants, jointly and severally, for restitution of all such benefits received.

## PRAYER FOR RELIEF

1.     For general damages according to proof at trial, trebled according to statute;

2.     For restitution;

3.     For prejudgment interest;

4.     For reasonable attorneys' fees and costs;

5.     For punitive damages;

6.     For equitable relief as appropriate pursuant to applicable law, including but not limited to issuance of a temporary restraining order, a preliminary and permanent injunction, disgorgement, imposition of a constructive trust, and appointment of a monitor and/or receiver;

7.     For such other relief as the Court may deem appropriate.

Dated: New York, New York.
      January 30, 2025

Respectfully submitted,

PERKINS COIE LLP

By: */s/ David W. T. Daniels*
    David W. T. Daniels
    Michael R. Huston (*pro hac vice* applica-
    tion forthcoming)
    700 Thirteenth Street NW
    Washington, DC 20005-3960
    Tel: +1.202.654.6200
    Fax: +1.202.654.6211
    DDaniels@perkinscoie.com
    MHuston@perkinscoie.com

    David Massey
    Jacob J. Taber
    William P. Wilder
    1155 Avenue of the Americas, 22nd Floor
    New York, NY 10036-2711
    Tel: +1.212.262.6900
    Fax: +1.212.977.1649
    DMassey@perkinscoie.com
    JTaber@perkinscoie.com
    WWilder@perkinscoie.com

## <u>JURY DEMAND</u>

Uber demands a trial by jury on all issues so triable.

Dated: New York, New York.
       January 30, 2025

Respectfully submitted,

PERKINS COIE LLP


By*: /s/ David W. T. Daniels*
    David W. T. Daniels
    Michael R. Huston (*pro hac vice* application forthcoming)
    700 Thirteenth Street NW
    Washington, DC 20005-3960
    Tel: +1.202.654.6200
    Fax: +1.202.654.6211
    DDaniels@perkinscoie.com
    MHuston@perkinscoie.com

    David Massey
    Jacob J. Taber
    William P. Wilder
    1155 Avenue of the Americas, 22nd Floor
    New York, NY 10036-2711
    Tel: +1.212.262.6900
    Fax: +1.212.977.1649
    DMassey@perkinscoie.com
    JTaber@perkinscoie.com
    WWilder@perkinscoie.com