UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UBER TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> WINGATE, RUSSOTTI, SHAPIRO, MOSES & HALPERIN, LLP, JAY WECHSLER, BANILOV & ASSOCIATES, P.C., NICK BANILOV, IGOR TARASOV, THE LAW OFFICE OF DOMINICK W. LAVELLE d/b/a LAVELLE LAW FIRM, EMILY K. LAVELLE, MICHAEL GERLING, GERLING INSTITUTE, LEONID REYFMAN, AND PAIN PHYSICIANS NY, PLLC, <br><br> Defendants. | Case No. 25-cv-00522-OEM-VMS <br><br><br> **AMENDED COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page**

SUMMARY OF THE ACTION ........................................................................................ 1

THE PARTIES ............................................................................................................... 2

JURISDICTION AND VENUE ...................................................................................... 3

FACTUAL BACKGROUND ........................................................................................... 4

I.   DEFENDANTS' SCHEME TARGETS UBER ........................................................ 4

    A.   *Ludmila Gorbacevska v. Osama F. Zalouk, et al.* – Supreme Court, Kings County – Index No. 522028/2020 .................................................. 9

    B.   *Fatima Callum v. Namie Glendel Price, et al.* – Supreme Court, Bronx County – Index No. 23748/2019E ................................................... 25

    C.   *Cadeem Clarke v. Alex E. Perez, et al.* – Supreme Court, Bronx County – Index No. 811429/2022E ......................................................... 30

    D.   *Zarrina Khalilova v. Leonard Hakeem, et al.* – Supreme Court, Kings County – Index No. 506743/2017 ........................................................ 35

    E.   *Joshua Lopez v. Li Zhen Tang, et al.* – Supreme Court, Kings County – Index No. 510792/2023 ................................................................... 39

II.  THE SCHEME TARGETS OTHERS AS WELL ...................................................... 43

    A.   *Ibrahim Abuzahrieh v. Robert Diliddo, et al.* – Supreme Court, Kings County – Index No. 500409/2019 ........................................................ 43

    B.   *Fazliddin Asamov et al v. Djakhongir Khodjaev, et al.* – Supreme Court, Kings County – Index No. 516506/2019 ........................................... 47

    C.   *Irina Vayman v. Freddy M. Santana et al.* – Supreme Court, Kings County – Index No. 505564/2021 ........................................................ 50

    D.   *Yury Tsatskin v. Antonio Zavaleta et al.* – Supreme Court, Kings County – Index No. 512407/2018 ........................................................ 53

    F.   *Uktam A. Ashurov v. Eunice L. Jemmott* – Supreme Court, Kings County – Index No. 508120/2021 ........................................................ 59

    G.   *Alexandre Voltchenkov v. Gregory Ware, et al.* – Supreme Court, Kings County – Index No. 514489/2020 ........................................................ 60

H.    *Alberto Barco v. Joseph A. Micciola, et al.* – Supreme Court, Kings County – Index No. 523098/2018.................................................................62

I.    *Georges Nicolas v. Jean B. Robillard, et al.* – Supreme Court, Kings County – Index No. 513771/2017.................................................................66

J.    *Aubrosio Lora v. Angelica Compagnone* – Supreme Court, Kings County – Index No. 509468/2020 ...............................................................67

K.    *Rene G. Perez Rosario v. Victor O. Parra Siguencia, et al.* – Supreme Court, Kings County – Index No. 503324/2022 ................................................70

L.    *Sukhrob Tagiyev v. NYC Transit Auth., et al.* – Supreme Court, Kings County – Index No. 506678/2018.................................................................72

N.    *Alisher Ikramov v. Benyahu Adinyayev, et al.* – Supreme Court, Kings County – Index No. 503653/2017.................................................................81

III.    RACKETEERING ALLEGATIONS .............................................................82

A.    Defendants' Respective Misconduct and Basis for Liability.............................83

1.    The Wingate Defendants......................................................................83

2.    The Banilov Defendants ......................................................................83

3.    The Lavelle Defendants .......................................................................84

4.    The Gerling Defendants.......................................................................84

5.    The Reyfman Defendants .....................................................................87

B.    Uber Is a Victim of the Scheme and Has Suffered Injury ...............................88

C.    The RICO Enterprise ..........................................................................89

D.    Pattern of Racketeering Activity.........................................................92

E.    Equitable Tolling ................................................................................93

CAUSES OF ACTION ...................................................................................94

PRAYER FOR RELIEF ................................................................................101

JURY DEMAND ..........................................................................................103

Plaintiff Uber Technologies, Inc. ("Uber"), by its undersigned attorneys, hereby alleges as follows against Defendants Wingate, Russotti, Shapiro, Moses & Halperin, LLP, and Jay Wechsler (the "Wingate Defendants"); Banilov & Associates, P.C., Nick Banilov, and Igor Tarasov (the "Banilov Defendants"); the Law Office of Dominick W. Lavelle d/b/a Lavelle Law Firm, and Emily K. Lavelle (the "Lavelle Defendants," and together with the Wingate and Banilov Defendants, the "Law Firm Defendants"); Michael Gerling and Gerling Institute (the "Gerling Defendants"); Leonid Reyfman and Pain Physicians NY, PLLC ("Pain Physicians NY"; together with Reyfman, the "Reyfman Defendants"; together with the Gerling Defendants, the "Doctor Defendants"; and collectively with the Law Firm Defendants, "Defendants"):

## SUMMARY OF THE ACTION

1. Hundreds of thousands of New Yorkers rely on Uber's ride-matching services every day to get door-to-door. The unscrupulous and fraudulent conduct of Defendants threatens to make those services more expensive and less available, harming the broader public as well as Uber, earners using the Uber application, and the other specific victims of this scheme. Defendants—personal injury attorneys and doctors who specialize in treating personal injury plaintiffs— are conspiring to exploit passengers in purported or actual minor vehicle collisions and provide them with medically unnecessary and/or causally unconnected "treatments," up to and including invasive and painful surgeries such as spinal fusions, for conditions that are fictitious, exaggerated, or that preexisted the purported accident. Lawyers, directly or indirectly, regularly pay for the treatments with the understanding that such payments will corruptly influence those providers into creating false medical documentation and supplying false testimony.

2. Defendants have used, and threaten to continue using into the future, such fabricated medical evidence that bears no relationship with the actual injuries that the passengers experienced (if any), in an attempt to fraudulently induce settlements from Uber and others. To

accomplish their scheme, Defendants knowingly and willfully misrepresent material facts at every turn—to the passengers, to the courts, and to parties to such meritless litigation, including Uber. This scheme harms Uber and the many users of Uber's apps who are affected by increased costs caused by Defendants' widespread fraud.

3.      This case is not about litigation activity in a single or even a series of frivolous, fraudulent, or baseless lawsuits. Rather, these Defendants engaged in wide-ranging out-of-court actions to further their fraudulent scheme. These actions encompassed a pattern of corrupt activity, including wire fraud, mail fraud, and bribery. Uber principally seeks equitable relief to remediate the fraudulent activity and to prevent such misconduct from occurring in the future, including injunctive relief and a monitorship of the corrupt medical practices and law firms. Uber also seeks monetary damages to hold Defendants accountable.

## THE PARTIES

4.      Plaintiff Uber is a Delaware corporation with its principal place of business in California.

5.      Defendant Wingate, Russotti, Shapiro, Moses & Halperin, LLP is a limited liability partnership duly organized and existing under the laws of the State of New York. At all relevant times, the Wingate firm maintained its principal place of business in New York.

6.      Defendant Jay Wechsler resides in and is a citizen of New York. At all relevant times, Wechsler was an employee of the Wingate firm in New York.

7.      Defendant Banilov & Associates, P.C. is a professional service corporation duly organized and existing under the laws of the State of New York. At all relevant times, Banilov & Associates maintained its principal place of business in New York.

8.      Defendant Nick Banilov resides in and is a citizen of New York. At all relevant times, Banilov was a named partner of Banilov & Associates.

2

9.    Upon information and belief, Defendant Igor Tarasov resides in and is a citizen of New York. At all relevant times, Tarasov was a personal injury attorney working with Banilov. Tarasov and Banilov shared office space and staff; regularly appeared for one another's clients regardless of which one was attorney of record in a particular case; and registered the same email address, litigation86street@nypilaw.net, for NYSCEF notifications.

10.    Defendant Law Office of Dominick W. Lavelle, d/b/a Lavelle Law Firm is a professional services corporation duly organized and existing under the laws of the State of New York. At all relevant times, Lavelle Law Firm maintained its principal place of business in New York.

11.    Defendant Emily K. Lavelle resides in and is a citizen of New York. At all relevant times, Lavelle was a named partner of Lavelle Law Firm.

12.    Defendant Michael Gerling resides in and is a citizen of New York. Gerling is a physician who specializes in spinal surgery.

13.    Defendant Gerling Institute is a New York medical professional corporation with its principal place of business in New York. Gerling Institute at all relevant times was owned and controlled by Gerling.

14.    Defendant Leonid Reyfman resides in and is a citizen of New York. Reyfman is a physician who specializes in pain management.

15.    Defendant Pain Physicians NY is a New York medical professional corporation with its principal place of business in New York. Pain Physicians NY at all relevant times was owned and controlled by Reyfman.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. § 1961, et seq. (the Racketeer Influenced and Corrupt Organizations Act, or "RICO").

3

17.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interests and costs, exceeds $75,000, and the controversy is between citizens of different states.

18.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in the Eastern District of New York and a substantial amount of the activities forming the basis of this Amended Complaint occurred within the Eastern District of New York.

## FACTUAL BACKGROUND

### I.     DEFENDANTS' SCHEME TARGETS UBER

20.     Defendants conceived and implemented a fraudulent scheme to exploit passengers in purported or actual minor motor vehicle collisions, generating phony or exaggerated claims through delivery of unnecessary or unrelated medical treatment. Defendants' ongoing scheme involves a pattern of corrupt activity intended to manufacture claims that passengers in vehicle collisions suffered materially more severe injuries than they actually experienced (if any). Pursuant to the scheme: (i) the Law Firm Defendants recruit personal injury claimants; (ii) the Law Firm Defendants refer the personal injury claimants to the Doctor Defendants for a course of medically unnecessary treatments; (iii) the Law Firm Defendants also refer claimants with a potential cause of action against Uber to the Wingate Defendants in exchange for a cut of any future settlement or other recovery; and (iv) the Law Firm Defendants, directly or indirectly, make above-market payments to the Doctor Defendants for the corrupt purpose of inducing false diagnoses, false statements, and false testimony by the Doctor Defendants that the personal injury claimants' treatment was medically necessary and/or that their injuries were caused by the accidents in question. This pattern of falsehoods results in the manufacture of false liability and damages evidence designed

4

to induce Uber and other deep-pocketed defendants into settling cases for far more than they would be worth absent the fraud.

21.     The pattern of corrupt activity spanned a wide range of misconduct, including falsified accident reports; medical examination reports used to justify unnecessary treatments and services; medically unnecessary imaging used to attribute any preexisting condition or injury to the alleged collision and to thereby inflate medical bills; invasive, expensive, and medically unnecessary and/or causally unconnected treatments and surgeries; and knowingly false statements and testimony made before, in the course of, and/or after the medical treatment by the Doctor Defendants that were then utilized by the Law Firm Defendants to effectuate the scheme.

22.     Chief among the medically unnecessary treatments provided by the Doctor Defendants is spinal fusion surgery. A spinal fusion is a surgical procedure to treat severe spinal injuries that cannot be relieved through less invasive options. In a spinal fusion, the surgeon reinforces a patient's back structure by linking two or more vertebrae in the spine together using bone or bone-like material. The surgeon typically inserts metal screws or rods to hold the bones together. The two bones then "fuse" and heal as one bone. Once the healing process is complete, the fused bones cannot move independently of each other.

23.     A spinal fusion is a major surgery, and even spinal fusions performed through "minimally invasive" methods can take several hours. Spinal fusion is performed under general anesthesia. In average cases, a hospital stay of two to three days is required after successful fusion surgery. As with any major surgery, patients undergoing a spinal fusion face the risk of complications including infections, bleeding, pain, anesthesia problems, or wound issues.

24.     Spinal fusion also has serious, long-term consequences for patients. Even after recovering—which can require significant support at home for weeks—the procedure permanently

5

limits mobility between the two fused bones. Patients often must undergo months of physical therapy to learn how to move, sit, stand, and walk again in a way that keeps their fused spine in line. Having a spine that is fused in certain areas can also put additional strain on other areas of the back that have not been fused, causing these areas to break down faster. As a result, even patients who undergo successful fusion procedures often require additional spinal surgeries in the future.

25.    As part of the scheme, the Doctor Defendants performed medically unnecessary spinal fusion surgeries on personal injury claimants to artificially inflate damages and, therefore, potential settlement amounts. The Doctor Defendants did so notwithstanding the risk that the personal injury claimants would experience life-long pain and injury from a procedure that was not medically necessary and that offered the personal injury claimants little to no benefit.

26.    The Law Firm Defendants, directly or indirectly, caused the Doctor Defendants to be paid excessive and/or above-market compensation in exchange for providing false diagnoses, medically unnecessary treatments—including spinal fusions—and false statements and testimony regarding causation and medical necessity. The payments received far exceeded what the Doctor Defendants would otherwise have recovered from ordinary sources of reimbursement for delivery of legitimate medical care.

27.    Additionally, the Doctor Defendants understood and agreed that in exchange for these false diagnoses, unnecessary treatments, and false statements, the Law Firm Defendants would continue to funnel patients to the Doctor Defendants' offices, thus continuing the corrupt pattern.

28.    The Law Firm Defendants paid such excessive and/or above-market compensation to induce the Doctor Defendants to manufacture evidence, and the Doctor Defendants accepted such payments. The manufactured evidence was necessary to support a false and fraudulent claim

6

of "serious injury" among personal injury plaintiffs from minor vehicle collisions who were, in truth, uninjured or only lightly injured, so that the Law Firm Defendants could pursue multi-million-dollar claims against Uber and others in New York state court. Under New York State Insurance Law § 5104(a), the Law Firm Defendants could not seek non-economic damages on behalf of their clients, including damages for pain and suffering, without showing that the plaintiff suffered a "serious injury." The false evidence that Defendants manufactured and intended to procure through the scheme was essential to surviving pre-trial motion practice on the "serious injury" issue and maintaining lucrative claims for non-economic damages.

29.    A "serious injury" is defined under New York State Insurance Law § 5102(d) as follows:

> "Serious injury" means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

30.    Section 5104(a) further states that, with respect to motor vehicle negligence claims, there is no right to recover for "basic economic loss." A basic economic loss is defined under New York Insurance Law § 5102(a) in relevant part as follows:

> "Basic economic loss" means, up to fifty thousand dollars per person of the following combined items . . . :
>
> (1) All necessary expenses incurred for: (i) medical, hospital (including services rendered in compliance with article forty-one of the public health law, whether or not such services are rendered directly by a hospital), surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services; (ii) psychiatric, physical therapy (provided that treatment is rendered pursuant to a referral) and

7

occupational therapy and rehabilitation (provided that treatment is rendered pursuant to a referral); (iii) any non-medical remedial care and treatment rendered in accordance with a religious method of healing recognized by the laws of this state; and (iv) any other professional health services; all without limitation as to time, provided that within one year after the date of the accident causing the injury it is ascertainable that further expenses may be incurred as a result of the injury. . . .

(2) Loss of earnings from work . . . .

(3) All other reasonable and necessary expenses incurred . . . .

31.     The availability of non-economic damages—which should not have been available at all because the plaintiffs did not in fact suffer any serious injury—substantially increased the potential claim that could be presented to a jury and hence the expected settlement value of such cases. Incurring medical expenses above the $50,000 threshold for basic economic loss also permits a plaintiff to litigate a motor vehicle negligence claim.

32.     Uber also relied upon Defendants' fraudulent statements and conduct with respect to entering into settlements, as discussed below.

33.     In sum, the purpose of Defendants' scheme was to attempt to fraudulently induce larger settlements in personal injury lawsuits that Defendants prosecuted using manufactured "evidence" of nonexistent injuries. Defendants at all times acted with the intent of depriving Uber and others of their property and/or money.

34.     The scheme was employed in numerous cases against Uber and others. It involved a wide-ranging pattern of corrupt activity, including conduct in violation of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and N.Y. Penal Law §§ 215.00 and 215.05 (bribery) described in the following non-exhaustive sampling of cases.

8

A. ***Ludmila Gorbacevska v. Osama F. Zalouk, et al.* – Supreme Court, Kings County – Index No. 522028/2020**

35.    On July 4, 2020, Ludmila Gorbacevska was a passenger in a vehicle after connecting with the driver via the Uber app. While driving on the highway her driver had to slow down because his vehicle hit a cardboard box containing a sofa cushion that fell out of the back of a pickup truck. Figure 1 below was taken from the forward-facing dashboard camera of the vehicle in which Gorbacevska was riding. It shows the moment before that event.



*Figure 1.*

36.    Neither the vehicle nor the sofa cushion was damaged when the vehicle hit the box. Gorbacevska did not report any pain or injury at the time. The vehicle had both forward-facing and passenger view cameras, which recorded both the vehicle hitting the sofa cushion and Gorbacevska's reaction. The video footage shows Gorbacevska talking on her phone before, during, and after the incident, and shows no injury to Gorbacevska; no contact between Gorbacevska and any part of the interior of the vehicle; and no damage to the vehicle. Figure 2 below shows Gorbacevska immediately before the incident, and Figure 3 shows her shortly afterward.

9



*Figure 2.*

10



*Figure 3.*

37.    The vehicle in which Gorbacevska was riding did not collide with another vehicle. The police were not called, no ambulance came, and no airbags deployed.

38.    The driver of the pickup truck that lost the sofa cushion stopped to exchange information with the driver of the vehicle in which Gorbacevska was riding. Both the pickup truck driver who lost the cushion and Gorbacevska were Russian speakers. Because they were traveling in the same direction, the pickup truck driver gave Gorbacevska a ride home from the scene of the incident. As the pickup truck driver memorialized in a subsequent email: "Through out the ride she essentially discusses how she's going to ride the insurance claim and sue [] the driver . . . . She showed no signs of any physical distress, pain or injury . . . . Additionally her chatty nature also noted that she's happy to use her prior medical procedure to blame [a]nyone because everyone[]

11

in New York is dishonest and it's her right to do so . . . ." Upon information and belief, Gorbacevska's lawyers were also aware of her plans.

39.    Gorbacevska retained the Banilov Defendants to file a personal injury lawsuit. The Banilov Defendants executed on the scheme by fabricating evidence falsely describing Gorbacevska as having been in an accident between two vehicles and having been injured therein. Specifically, Gorbacevska signed a blank Report of Motor Vehicle Accident, MV-104. This is a standard form utilized in New York to report the circumstances of an accident. Though she signed the blank form, as she later admitted in sworn testimony, she never saw or reviewed the completed form, and the handwriting on the form was not her handwriting.

40.    Upon information and belief, the Banilov Defendants or persons acting at their direction completed the blank Report of Motor Vehicle Accident that Gorbacevska had signed. In furtherance of the scheme, the form reflected fabricated facts about a supposed collision that simply did not occur. The completed form falsely stated that "V1 rear ended V2," that Vehicle 1 suffered damage to its front bumper, and that Vehicle 2 suffered damage to its rear bumper. It further falsely represented that Gorbacevska suffered "multiple" injuries. The statements that "V1 rear ended V2," that the vehicles suffered damage, and that Gorbacevska suffered "multiple" injuries were knowingly false when made given that there was no such vehicle collision or injuries. On or about July 6, 2020, in furtherance of the fraud scheme and in violation of 18 U.S.C. § 1343 (wire fraud), the Banilov Defendants caused the completed Form MV-104 to be transmitted to the New York Commissioner of Motor Vehicles by electronic means on Gorbacevska's behalf.

41.    Gorbacevska did not initially seek medical treatment after the incident. She was neither visibly injured at the time of the incident nor did she complain to either driver about any injury. She did not seek medical care to treat any legitimate injury resulting from the incident.

12

Instead, she sought medical care from the Doctor Defendants as part of the scheme to manufacture a false and fraudulent claim. As Gorbacevska testified at her deposition, "I only spoke with the attorney. I was recommended to do that and the attorney explained to me . . . where I could go."

42.   Upon information and belief, the Banilov Defendants directed Gorbacevska to an extensive program of unnecessary and expensive medical treatment in furtherance of the scheme.

43.   Over the ensuing months, Gorbacevska received an extensive range of medical treatments that were unnecessary and/or causally unconnected with the sofa cushion incident. Such medical treatment included treatment on or about the following dates:

- Acupuncture from July 8, 2020, through September 24, 2020;

- Chiropractor treatment from July 22, 2020, through December 4, 2020;

- Orthopedic surgery and follow-up from July 29, 2020, through May 2, 2023;

- Pain management from August 6, 2020, through January 4, 2021;

- Physical therapy from July 8, 2020, through December 4, 2020.

44.   Pursuant to the fraudulent and corrupt scheme, the providers of these medical treatments purported to deliver services to address the non-existent injuries from the incident. In reality, the services were provided for the purpose of enabling Gorbacevska to pursue a claim in New York state court against the driver and against Uber, and to increase the supposed value of such claim. To maximize the value of such claim, Gorbacevska received a range of unnecessary and expensive pain management and surgery treatments from medical providers. Such treatments were at the heart of the scheme.

45.   Upon information and belief, such treatments were coordinated and funded by the Banilov and Wingate Defendants, directly or indirectly. The Banilov and Wingate Defendants provided such funding, including excessive payments for unnecessary medical services, to persons

13

whom they knew or reasonably should have believed would be witnesses in the action and for the purpose of inducing false statements and testimony from the Reyfman and Gerling Defendants regarding medical necessity and/or causation in violation of N.Y. Penal Law § 215 (bribery).

46.     On August 6, 2020, Gorbacevska visited Reyfman's pain management practice. Reyfman is a medical professional who specializes in pain management and surgery. He routinely performs various medical procedures on patients, including lumbar discectomies, annuloplasties, and contrast injections, in addition to routine pain evaluation and management. Reyfman has been named as a defendant in several lawsuits alleging that he engaged in fraudulent activity to fabricate and inflate no-fault insurance claims.

47.     With respect to Gorbacevska and pursuant to this scheme, Reyfman documented non-existent "soft tissue" injuries resulting from the incident and recommended an extensive program of medical treatment, including physical therapy and injections.

48.     Throughout the course of Gorbacevska's treatment at Pain Physicians NY, Reyfman and his staff produced fraudulent statements that falsely attributed Gorbacevska's injuries to the claimed accident with the intent to defraud Uber. The Gerling Defendants engaged in the same conduct, both in this and other cases. There was no medical reason for the Doctor Defendants to make these causation statements because the treatment would be the same regardless of the origin of the supposed injuries. Rather, the purpose of the causation statements was to manufacture evidence to support future false testimony by the Doctor Defendants in support of the personal injury plaintiffs—false testimony that was induced by, and offered in exchange for, payments from the Law Firm Defendants.

14

49.    For example, on August 6, 2020, in violation of 18 U.S.C. § 1343 (wire fraud), Reyfman used an electronic patient records portal to electronically sign the following knowingly false causation statement in connection with an epidural steroid injection he performed that day:

> CAUSALITY:
>
> No pre-existing conditions exist that affects the causality. I feel that there is a direct causal r[e]lationship between the accident described and the patient's current injuries. The patient's symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas.

50.    The statement—which was purportedly based upon specialized knowledge—was knowingly false when made given that there was no such "accident" and no such resulting "current injuries." Reyfman made this statement knowing that it was false. It was obvious that Gorbacevska was not, in fact, injured.

51.    Beginning in August 2020 and continuing through at least November 2020, Reyfman or his staff acting at his direction administered a series of medically unnecessary spinal injections to Gorbacevska. In furtherance of the scheme, Reyfman's assistant incorporated identical false assertions regarding causation in medical records describing a "telemedicine" visit on November 10, 2020, and a follow-up visit on November 13, 2020. These false statements and the associated medical records were created for the purpose of litigation and were provided to defendants in that litigation in support of Gorbacevska's claim in furtherance of the scheme.

52.    Upon information and belief, Gorbacevska's counsel also referred her to Gerling.

53.    Gerling is a physician licensed to practice medicine in New York and New Jersey who owned and controlled several medical entities including Gerling Institute. Separate and apart from this action, Gerling has repeatedly been alleged to have engaged in fraudulent and unlawful no-fault insurance billing through these entities in addition to an illegal patient brokering, referral, and self-referral scheme.

54.     During Gorbacevska's visits with Gerling, Gerling ordered a variety of unnecessary medical imaging, including MRIs and spinal x-rays. Gerling ordered an MRI and then recommended that Gorbacevska undergo neck surgery.

55.     As with Reyfman, Gerling made false and fraudulent statements regarding causation and medical necessity with respect to this neck surgery treatment in the medical records for Gorbacevska. In connection with a November 24, 2020 initial appointment, Gerling falsely described patient pain and injury and added:

> CAUSATION:
>
> As the patient was asymptomatic in the cervical spine prior to their injury, it is my professional opinion, within a reasonable degree of medical certainty, that the injuries above, recommended treatments above, and resultant disability are directly causally related to the above stated accident.

56.     Gerling made this statement knowing that it was false. It was obvious that Gorbacevska was not injured. On November 24, 2020, in violation of 18 U.S.C. § 1343 (wire fraud), Gerling used an electronic patient records portal to electronically sign and transmit this knowingly false and fraudulent statement with the intent to defraud the victims of the scheme.

57.     Gerling operated on Gorbacevska on February 1, 2021. Gerling performed a cervical discectomy and fusion, as well as a spinal graft. Gerling also inserted a titanium plate and screw system into Gorbacevska's spine.

58.     In connection with these surgeries, Gerling signed a statement regarding Gorbacevska's cervical spine—which at most reflected the ordinary wear and tear of a person of plaintiff's age rather than any acute injury—stating that it was his "professional opinion, within a reasonable degree of medical certainty, that the injuries above, recommended treatments above, and resultant disability are directly causally related to the above stated accident." Gerling signed an identical note concerning Gorbacevska's alleged lumbar spine injury. Both such statements were

knowingly false when made given that there was no such accident or resulting injury. On August 17, 2021, in violation of 18 U.S.C. § 1343 (wire fraud), Gerling used an electronic patient records portal to electronically sign and transmit this knowingly false and fraudulent statement with the intent to defraud the victims of the scheme.

59.    A medical expert retained by Uber reviewed Gorbacevska's pre-surgical imaging and did not identify any acute disc herniations or other injury that would indicate so aggressive a surgical treatment as a spinal fusion. The expert noted that "[b]ased on the images, I am not quite sure of the indications for the claimant's cervical spine surgery, which clearly was degenerative in nature." Gerling's statements regarding causation, the associated medical records, and indeed the spinal fusion surgery itself were created and/or performed for the purpose of litigation. The medical records containing the false statements were provided to defendants in that litigation in support of Gorbacevska's fraudulent claim and in furtherance of the scheme.

60.    On November 9, 2020, the Banilov Defendants filed a lawsuit on Gorbacevska's behalf against her driver and the driver of the pickup truck who lost the sofa cushion. The complaint did not yet name Uber as a defendant, even though Gorbacevska and the Banilov Defendants knew that Gorbacevska had used the Uber app to connect with the driver. Upon information and belief, at the time of filing the Banilov Defendants intended to subsequently add Uber as a defendant on a vicarious liability theory. They waited to do so for the perceived strategic advantage of setting a discovery schedule and obtaining some discovery from the driver defendant before Uber's involvement in the case. The Banilov Defendants at all times knew that their false statements in support of Gorbacevska's fabricated claims were directed at Uber, and at all times intended to coerce an inflated settlement amount from Uber.

17

61.     The complaint repeated the false statement from the accident report that one driver had rear-ended the other, stating that the box containing the sofa cushion caused the motor vehicle "in which plaintiff . . . was a lawful passenger to loss [sic] control and rear-end the motor vehicle, owned and operated by" the second driver defendant. The complaint also falsely stated that a collision had rendered Gorbacevska "sick, sore, lame and disabled," and that she was now "incapacitated from attending to her usual duties." Again, these statements were knowingly false when made given that there was no such vehicle collision or injury. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud). In violation of 18 U.S.C. § 1341 (mail fraud), copies of the complaint were served on defendants by U.S. mail on or about November 19, 2020, and December 19, 2021.

62.     On August 3, 2021, Wechsler and the Wingate firm entered an appearance in the case for Gorbacevska. Neither the Banilov Defendants nor the Wingate Defendants ever filed a Consent to Change Attorney, and Banilov never withdrew his representation of Gorbacevska in the action.

63.     Upon information and belief, Banilov retained an attorney's lien on Gorbacevska's eventual recovery even after the Wingate Defendants appeared for Gorbacevska, and/or entered into a fee-splitting agreement with the Wingate Defendants in order to maintain a financial interest in the settlement payment that Defendants intended to coerce from Uber. The basis for this belief is twofold. First, there is a consistent pattern, reflected below, in which the Banilov Defendants recruit personal injury plaintiffs, commence the action, and then refer the case to the Wingate Defendants when it is time to add Uber as a defendant. The Wingate firm is larger and more resourced, and therefore more suited to litigation against Uber. Second, Banilov was representing Gorbacevska on a contingency basis and would not have agreed to refer his client to another

18

attorney without assurance that he would be compensated for the work that he had done at the start of the case.

64.     On August 24, 2021, the Wingate Defendants filed an amended complaint that added Uber as a defendant and repeated the false and fraudulent allegations about the incident. When Uber was added as a defendant, it reviewed the prior public filings in the action and relied upon those documents, and the representations contained therein, for the purpose of evaluating its potential exposure and assessing the settlement value of the case. The documents on which Uber relied include the November 9, 2020 Complaint. As Uber received other documents in discovery, including the Gerling and Reyfman medical records discussed above, it likewise relied on those documents, and the representations contained therein, for the same purpose of evaluating its potential exposure and assessing the settlement value of the case.

65.     The Wingate Defendants' amended complaint repeated the false statements that the two vehicles "came into contact with each other" and that Gorbacevska "was severely injured." Upon information and belief, such statements were knowingly false when made given that there was no such "accident" involving a collision between two vehicles, or any resulting injury. It was apparent to the Wingate Defendants from the face of the record and/or disclosure that the MV-104 misrepresented the accident. The amended complaint, which the Wingate Defendants prepared in furtherance of the fraud scheme, was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud). That same day, the Wingate Defendants also caused the amended complaint to be served on Uber and the other defendants by U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

66.     On or about November 16, 2021, in furtherance of the fraud scheme, and in violation of 18 U.S.C. § 1343 (wire fraud), the Wingate Defendants electronically filed a verified bill of particulars response providing information regarding the incident and made a false statement

19

that the "motor vehicles [came] into contact with one another." The bill of particulars provided a

false laundry list of claimed injuries resulting from the purported collision between two vehicles

and a list of surgeries that the Wingate Defendants falsely claimed were necessitated thereby:

> As a result of the accident the plaintiff sustained the following serious and permanent injuries:
>
> **Left Shoulder**: Full thickness tear of the anterior supraspinatus tendon; Partial rotator cuff tear; Partial labral tear; Glenohumeral joint effusion that extends into the subcortacoid; Fluid within the subdeltoid bursa and within the biceps tendon sheath; Loose bodies; Chondromalacia of the posterior glenoid grade IV; Adhesions; Synovitis; Impingement syndrome; Traumatic internal derangement; Traumatic induced pain; Instability; Weakness; Sprain/strain secondary to trauma; Restricted flexibility and range of motion; Post traumatic arthritis;
>
> **Surgical Procedure**: Necessity to undergo the following surgical procedure on September 8, 2020 performed by Aleksandr Khaimov, D.O.:
>
> • Arthroscopy; Arthroscopic rotator cuff and labral debridement; Removal of loose bodies; Microfracture of the glenoid; Lysis of adhesions; Synovectomy; Permanent disfiguring scarring overlying the left shoulder secondary to the above surgical procedure.
>
> **Right Shoulder**: Partial thickness tear, communicating with the articular surface; along the anterolateral margin of the supraspinatus tendon; Focal of the infraspinatus tendon consistent with a focal erosion at the lateral glenoid process; Post traumatic edema; Fluid in the subdeltoid bursa and in the glenohumeral joint space; Impingement syndrome; Traumatic internal derangement; Traumatic induced pain; Instability; Weakness; Sprain/strain secondary to trauma; Restricted flexibility and range of motion; Post traumatic arthritis.
>
> **Cervical Spine**: C3-C4 central right paracentral herniation, the midline component of which flattens the thecal sac; C5-C6 broad-based posterior herniation involving the central and bilateral posterolateral disc margins, flattening the thecal sac; C6-C7 central left paracentral herniation causes moderate flattening the thecal sac; C6-C7 grade I anterolisthesis with endplate change; Reversal of the cervical lordosis; Cervical radiculopathy; Sprain/strain secondary to trauma; Post traumatic cervicalgia; Cervical myofascitis; Cervical displacement;

20

Subluxation; Cervical stenosis; Chronic neck pain; Myalgia; Muscle spasms.

**Surgical Procedure:** Necessity to undergo the following surgical procedures on February 1, 2021 performed by Michael Gerling, M.D.:

• Anterior cervical diskectomy and fusion, including discectomy, arthrodesis and anterior instrumentation at C5-C6-C7; Partial Corpectomy: C6; Anterior Instrumentation: Accel spine VanGough Titanium plate and screw system; Biomechanical Device(s): peek cage x 2; Spinal Graft: Allograft, morselized, Autograft, local [through same incision]; Imaging: Fluoroscopic Guidance; Neurologic Monitoring Type: SSEP, MEP, EKG; Permanent disfiguring scarring overlying the left side of the neck secondary to the above surgical procedure.

**Lumbar Spine**: Lumbar radiculopathy; Muscle spasm; Lumbar post traumatic sprain/strain syndrome; Lumbar displacement; Lumbar spondylosis; Disc protrusions; Chronic back pain; Restricted range of motion; Lumbalgia; Lumbar Myalgia/Myositis.

**Procedure:** Necessity to undergo the following procedure on January 4, 2021 performed by Leonid Reyfman, M.D.:

• Interlaminar Epidural Steroid Injection at L5-S1

**Thoracic Spine:** T2-T3 posterior central herniation, flattening the thecal sac; T4-T5 posterior central herniation, flattening the thecal sac; Muscle spasms; Sprain/strain secondary to trauma; Thoracalgia; Thoracolumbar derangement[.]

67.    The bill of particulars that the Wingate Defendants intentionally filed with knowledge of its falsity further falsely and fraudulently stated that permanent, serious injuries were caused by the purported accident between two vehicles:

[A]ll of the aforementioned injuries, manifestations and disabilities are associated with further soft tissue injury and traumatic arthritis to the areas traumatically affected including injury, tearing, derangement and damage to the associated muscle groups, ligaments, tendons, blood vessels, blood supply, nerves and nerve tissue, soft tissue, with resultant pain, deformity and disability, stiffness, tenderness, weakness and restriction and limitation of motion and pain on motion; all injuries were caused, aggravated, exacerbated and/or

21

precipitated by the accident; possibility of future surgical repair to those parts of the body claimed to have been injured in this accident; and possible loss of use of above mentioned parts, atrophy, anxiety and mental anguish, all of which substantially prevents this Plaintiff from enjoying the normal fruits of activities [social, educational and economical] and Plaintiff's enjoyment of life has been permanently impaired, impeded and/or destroyed.

All of the injuries referenced above are permanent and lasting in their nature and character, with permanent effects of pain, loss of motion, disability, atrophy, anxiety and mental anguish.

By reason of the subject occurrence and the serious injuries sustained therein, Plaintiff has been intermittently confined to bed at various periods of time since the accident relative to the afore-mentioned disability caused by the subject accident.

By reason of the subject occurrence and the serious injuries sustained therein, the Plaintiff remains significantly partially disabled with intermittent home confinement to date relative to the afore-mentioned disability caused by the subject accident.

68.     Gorbacevska sought $5,000,000 from Uber for her claimed injuries.

69.     On or about January 5, 2022, in violation of 18 U.S.C. § 1343 (wire fraud), the Wingate Defendants electronically filed a copy of the MV-104 that Gorbacevska had signed in blank. As discussed above, the MV-104 falsely stated that a vehicle collision had occurred resulting in injury to Gorbacevska. Upon information and belief, the Wingate Defendants knew that such statements were false but nevertheless placed the report on the docket in order to advance the litigation and defraud Uber.

70.     On or about June 9, 2023, in furtherance of the fraudulent scheme, and in violation of 18 U.S.C. § 1343 (wire fraud), the Wingate Defendants signed and electronically filed an affirmation in support of a motion to extend a note of issue deadline that repeated the false statement that Gorbacevska "was involved in a motor vehicle accident which resulted in multiple serious injuries." Upon information and belief, the Wingate Defendants knew this statement was false and made it with the intent to advance the litigation and defraud Uber.

22

71.     Throughout the Gorbacevska litigation, the Banilov and Wingate Defendants utilized the Doctor Defendants' treatment and false statements to advance the scheme through the litigation. The Banilov and Wingate Defendants knew that under New York State Insurance Law § 5104(a) and (b), their ability to attempt to fraudulently induce a large settlement out of Uber was dependent on their ability to establish a basic economic loss of greater than $50,000 or a "serious injury." Absent evidence of such loss or injury, they would have no state court claim. By directing the Doctor Defendants to make false diagnoses, provide unnecessary and expensive treatments, and provide false statements regarding causation and necessity, the Banilov and Wingate Defendants were able to manufacture injuries and damages that supposedly resulted from Gorbacevska's vehicle hitting the sofa cushion. The Banilov and Wingate Defendants induced such conduct and false statements by paying above-market and excessive compensation to Reyfman and Gerling, directly or indirectly.

72.     For example, Gorbacevska's medical records from the day of the Gerling surgery memorialized that Gorbacevska had told the nurse that "[p]atient has no health insurance and no [primary care physician]. She states any meds/needs related to this surgery will be covered by ***her payment through lawyer*** by way of her accident." Such payment was made with the knowledge that Gerling would be a witness and with the agreement or understanding that it would corruptly influence Gerling's testimony regarding the necessity for such medical treatment and/or whether it was caused by the accident in question, in violation of N.Y. Penal Law § 215 (bribery). Gerling accepted such payment with the agreement or understanding that his testimony would be influenced thereby, in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness).

73.     On October 16, 2023, and as described further below, a federal RICO lawsuit was filed in this District naming Gerling as a defendant and containing detailed factual allegations that

Gerling had participated in a conspiracy to submit thousands of fraudulent and unlawful no-fault insurance charges through Gerling Institute. Among other things, the lawsuit alleged that Gerling "was among the surgeons who, in exchange for payments from [an unlawful patient brokering entity] agreed to perform invasive, expensive, and medically unnecessary surgeries on automobile accident patients." The lawsuit was captioned *Government Employees Insurance Co., et al. v. Michael Gerling, M.D., et al.*, Case No. 1:23-cv-07693 (E.D.N.Y.).

74. On February 2, 2024, Uber issued a subpoena to Gerling and Gerling Institute requiring his testimony regarding "the statements plaintiff LUDMILA GORBACEVSKA made about how the subject accident occurred." The subpoena also sought Gerling's testimony "regarding the matter of GOVERNMENT EMPLOYEES INSURANCE CO., et al. v. MICHAEL GERLING, M.D., et al. pending in the United States District Court Eastern District of New York Docket No. 1:23-cv-07693" and "whether Plaintiff LUDMILA GORBACEVSKA's treatment with you is a subject of the pending lawsuit under EDNY Docket No. 1:23-cv-07693."

75. Gerling was scheduled to appear for his deposition on March 7, 2024; however, Wechsler requested an adjournment.

76. On March 8, 2024—the day after the Gerling deposition was scheduled to occur—the Wingate Defendants filed an order to show cause seeking leave to withdraw as counsel for Gorbacevksa in the New York state court case.

77. In arguing that order to show cause, a Wingate attorney represented to the New York state court judge: "[W]e are requesting to be relieved as counsel based on a video that was exchanged which makes us believe the accident didn't occur in the manner that the plaintiff claims it occurred, and it would be unethical for us to go forward with the case at this time." The stated excuse for withdrawal, however, was false and misleading given that the video had been available

24

to the Wingate Defendants well before May 4, 2023, when it was an exhibit at Gorbacevska's deposition, which Wechsler defended; and given that the underlying false accident report had been manufactured by the attorneys and not by Gorbacevska.

78.    The motion to withdraw was granted. Following the Wingate firm's withdrawal, the New York state court dismissed Uber from the case because the Wingate Defendants failed to proffer evidence showing that the driver was Uber's employee.

79.    By the time of Uber's dismissal, Uber had already incurred hundreds of thousands of dollars in unreimbursed defense costs as a result of this scheme.

B.    *Fatima Callum v. Namie Glendel Price, et al.* **– Supreme Court, Bronx County – Index No. 23748/2019E**

80.    On March 1, 2019, Fatima Callum was a restrained passenger in the rear middle seat of a vehicle in which she was riding after connecting with the driver through the Uber app. As that vehicle made a right turn, it was hit lightly on its side by a second vehicle that was also turning right alongside it. At the time of the accident, Callum did not report any pain or injury at the scene and refused medical treatment from the ambulance that arrived. The airbags of the car in which she was riding did not deploy. Callum rode home afterward with the same driver in the same vehicle, which remained drivable.

81.    Callum later went to a hospital emergency room complaining only of neck pain. She was diagnosed with a neck sprain, prescribed an over-the-counter non-narcotic pain reliever, and discharged.

82.    Even though Callum did not complain of, or seek treatment for, any pain in her knees, back, or shoulders when she visited the emergency room, she brought a lawsuit against the other driver and, subsequently, Uber, alleging serious injuries to each of those body parts. Upon

25

information and belief, those supposed injuries were fraudulently manufactured by her attorneys in collusion with the Doctor Defendants.

83.    On March 29, 2019, in furtherance of the fraud scheme, the Lavelle Defendants caused to be electronically filed a complaint against the driver, which Emily Lavelle verified. The verified complaint falsely states that as a result of the accident, Callum "was severely injured and damaged, rendered sick, sore, lame and disabled, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are permanent in nature and duration, and plaintiff [Callum] will be permanently caused to suffer pain, inconvenience and other effects of such injuries." The verified complaint further falsely states: "That as a result of the foregoing, this plaintiff [Callum] suffered a serious injury as defined by Section 5102(d) of the Insurance Law of the State of New York." Upon information and belief, each such statement was knowingly false when made. In violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud), the Lavelle Defendants caused the complaint to be electronically filed and used the U.S. Postal Service to serve it on the driver defendant.

84.    Over the ensuing months, Callum received an extensive range of medical treatments that were unnecessary and/or causally unconnected with the collision. Such medical treatment included: physical therapy; acupuncture; massage; cervical facet joint injections; diskectomy and spinal fusion; shoulder arthroscopy; and knee meniscectomy and synovectomy. Upon information and belief, Callum was directed to the providers for such medical treatment by her lawyers. Gerling was one such provider.

85.    On or about May 21, 2019, Callum visited Gerling for treatment. According to an independent medical examination, Callum's cervical MRI revealed no injury that required a

26

cervical fusion to be repaired. But Gerling nevertheless recommended expensive and invasive neck surgery.

86.    On August 28, 2019, Gerling performed a cervical diskectomy and fusion at two levels, C5-6 and C6-7, on Callum.

87.    The Lavelle Defendants paid for Gerling's surgery either in whole or in part. Callum's admission paperwork for such surgery listed "The Lavelle Firm," with the date of her accident as the policy number, as the payment source alongside the driver's no-fault policy carrier. Upon information and belief, such payment was made with the agreement or understanding that Gerling would be a witness and with the understanding that it would influence Gerling's testimony regarding the necessity for such medical treatment and/or whether it was caused by the accident in question in violation of N.Y. Penal Law § 215 (bribery). And upon information and belief, Gerling accepted such payment with the agreement or understanding that his testimony would be influenced thereby, in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness).

88.    On December 10, 2019, in furtherance of the fraud scheme and in violation of 18 U.S.C. § 1343 (wire fraud), the Lavelle Defendants electronically filed a verified bill of particulars falsely stating that "as a result of [the] accident, Plaintiff sustained the following serious injuries:

> Anterior cervical diskectomy and fusion level C5-6 and C6-7, cervical spine; C5 anterior cervical corpectomy, cervical spine; Cervical spondylosis, cervical spine; C2-3 and C3-4 cervical facet joint injections, cervical spine; Fluoroscopic needle guidance, cervical spine; Right C5 and C6 radiculopathy, cervical spine; Cervical radiculopathy, cervical spine; Cervical multilevel discopathy, cervical spine; C5-C6 and C6-C7 herniation, cervical spine; C3-C4 and C4-C5 annular bulges, cervical spine; Canal and cord impingement, cervical spine; Spinal stenosis produced, cervical spine; Discogenic endplate reaction, cervical spine; Hypolordosis, cervical spine; Lateral meniscectomy and debridement, left knee; Left knee synovectomy 3 compartments, left knee; Lysis of adhesions, left knee; Medial meniscal tear, left knee; Lateral mensical [sic] tear, left knee; Lateral meniscal myxoid reaction, left knee; ACL injury, left knee;

27

Quadriceps and patellar tendinitism, left knee; Joint effusion, left knee[.]

89.    The bill of particulars also falsely states that Callum "sustained a serious injury resulting in . . . significant limitation of use of a body function or system which prevented him [sic] from performing substantially all of the material acts which constituted his [sic] usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment." Upon information and belief, each such statement was knowingly false when made and made with the intent to defraud the defendants in the litigation and the court.

90.    On or about April 6, 2020, Callum executed a consent to substitute the Wingate firm as counsel of record, which was electronically filed on August 10, 2020. Upon information and belief, the Wingate firm and the Lavelle Defendants agreed to share the proceeds with respect to this lawsuit in furtherance of the scheme. Lavelle was representing Callum on a contingency basis and would not have agreed to refer her client to another attorney without assurance that she would be compensated for the work that she had done at the start of the case.

91.    On October 13, 2020, the Wingate firm filed an amended complaint naming Uber as a defendant. As with Banilov in the Gorbacevska matter, it was Lavelle's plan from the outset to eventually transfer the case to the Wingate firm so that they could add Uber as a defendant. Lavelle knew that her client, Callum, was allegedly injured while a passenger in a ride which she obtained using the Uber app. Lavelle's conduct was therefore directed toward Uber and intended to increase the settlement value of Callum's intended claim against Uber, the recovery of which Lavelle would share through her agreement with Wingate.

92.    As with the initial complaint, the amended complaint alleged that Callum "was severely injured and damaged, rendered sick, sore, lame and disabled, sustained severe nervous

28

shock and mental anguish, great physical pain and emotional upset, some of which injuries are permanent in nature and duration, and Plaintiff [Callum] will be permanently caused to suffer pain, inconvenience and other effects of such injuries." The verified amended complaint further alleged that "as a result of the foregoing, this Plaintiff [Callum] suffered a serious injury as defined by Section 5102(d) of the Insurance Law of the State of New York."

93.    The Wingate firm utilized Gerling's fraudulently procured treatment as a basis for its claim. On November 11, 2022, one of the named defendants moved for summary judgment on the ground that there was no evidence that Callum had sustained a serious injury. The Wingate firm utilized Gerling's treatment in opposition to such motion.

94.    On February 21, 2023, Gerling produced a summary of Callum's treatment with his office. This summary stated that Callum had "sustained significant musculoskeletal injuries to her neck and low back in the above stated accident," and that the "treatments above, and resultant permanent disability are directly causally related to the above stated accident." This statement was knowingly false when it was made and was made with the intent to defraud the defendants in the lawsuit. In violation of 18 U.S.C. § 1343 (wire fraud), Gerling electronically transmitted this summary to the Wingate firm for use in the affirmation discussed below.

95.    On February 22, 2023, the Wingate firm electronically filed an affirmation signed by Gerling appending his medical records for treatment of Callum. In that affirmation, Gerling stated that he had treated Callum through Gerling Institute and that "the injuries above, recommended treatments and resultant disability, are directly caused by the accident of March 1, 2019." In his affirmation, Gerling also testified that Callum was a "candidate for cervical diskectomy and fusion" even though such invasive surgery was medically unnecessary. Gerling knew such statements—which he purported to make pursuant to his specialized knowledge—were false when

29

made and that they had been procured by the attorney payments described above. Gerling either did not subjectively believe such statements or, to the extent he did, such statements omitted material facts, including the circumstances regarding the underlying incident. In violation of 18 U.S.C. § 1343 (wire fraud) and in furtherance of the scheme, Gerling electronically transmitted the affirmation to the Wingate firm for electronic filing.

96.     The Wingate firm continues to prosecute the case against Uber today, even though they knew or should have known that Callum was not seriously injured in the accident. Uber has suffered substantial defense costs as a result of this scheme.

**C.    *Cadeem Clarke v. Alex E. Perez, et al.* – Supreme Court, Bronx County – Index No. 811429/2022E**

97.     On the afternoon of December 4, 2019, Cadeem Clarke was a passenger of a driver with whom he had connected using the Uber app. The vehicle in which Clarke was a passenger was rear-ended in a light, low-speed collision. When the driver asked Clarke if he was "ok," Clarke said yes and then left the scene.

98.     A police report produced at the scene noted that there were no injuries. Clarke had been involved in a previous car accident and subsequent lawsuit in 2014. MRIs taken of Clarke's back after the 2019 collision show the same damage already present in MRIs taken after the 2014 collision and do not show any new damage. He was not injured.

99.      Late in the evening on the day after the 2019 collision, Clarke visited the emergency room at Montefiore Medical Center. Records from his visit to Montefiore show he was ambulating with a normal gait and showed no neurological deficit. He refused to wait for an official x-ray, stating that he "feels well." Physicians at Montefiore discharged him shortly thereafter.

100.    Approximately one month later, Clarke began visiting a physical therapy practice for treatment of a supposed neck injury. Clarke testified that he chose the specific practice "[a]fter

30

I spoke to my attorney." Clarke's attorneys referred him to this clinic and coordinated his medical treatment.

101. Clarke received physical therapy at this practice up to three times a week over a period of time lasting up to three years. At one point during the course of his treatment, he moved to a different home, and his attorneys personally arranged for him to begin attending therapy sessions at a different location of the same practice.

102. On or about March 30, 2020, Clarke had an appointment at Reyfman's Pain Physicians NY practice, which, upon information and belief, was also arranged by his attorneys. Reyfman was the attending provider. The resulting medical record falsely and fraudulently stated that "there is a direct causal relationship between the accident described and the patient's current injuries." Upon information and belief, such statement was knowingly false when made. Reyfman's associates administered two medically unnecessary epidural steroid injections to Clarke.

103. Upon information and belief, the attorneys for Clarke directly or indirectly made payments to Pain Physicians NY with the understanding that Reyfman would be a witness and with the understanding that such payments would influence his testimony. And, upon information and belief, Reyfman accepted such payments with the agreement or understanding that his testimony would be influenced thereby, in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness).

104. During and after the course of Clarke's treatment at Pain Physicians NY, Reyfman caused certain fraudulent claim documents to be mailed to or electronically filed with no-fault insurance providers in connection with the vehicle collision in violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud). On April 13, 2020, Reyfman caused his staff to mail and

31

electronically file a claim form that falsely checked "yes" in response to a question that asked "[i]s condition solely a result of this automobile accident?" This statement was knowingly false at the time it was made. Reyfman caused his staff to submit additional false claim forms in connection with appointments that occurred on March 30, 2020, July 30, 2020, and April 26, 2022.

105.    On or about February 2, 2023, Wechsler and the Wingate firm entered an appearance in the case and took over its prosecution. On information and belief, at the time that they took over the case, they were aware of the underlying facts, including Clarke's lack of injury. In violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud), Wechsler and the Wingate firm electronically filed and served via U.S. mail a number of false and fraudulent statements made to advance the litigation.

106.    Specifically, on or about March 7, 2023, the Wingate Defendants electronically filed a verified bill of particulars that stated that as a result of the accident, Clarke had sustained "serious and permanent injuries" and was "significantly partially disabled" by the collision and suffered "significant limitation of use of a body function or system … which prevents her [sic] from performing substantially all of the material acts which constitute such person's usual and customary daily activities." The bill of particulars also falsely stated that:

> As a direct and proximate result of the accident, the Plaintiff sustained the following serious and permanent injuries: C5-C6 CENTRAL SUBLIGAMENTOUS DISC HERNIATION IMPRESSING ON THE ANTERIOR THECAL SAC AND NARROWING THE NEUROFORAMINA; C3-C4 DISC BULGING IMPRESSING ON THE ANTERIOR THECAL SAC AND NARROWING THE NEUROFORAMINA; CERVICAL RADICULOPATHY; SPRAIN/STRAIN SECONDARY TO TRAUMA; POST TRAUMATIC CERVICALGIA; CERVICAL MYOFASCITIS; CERVICAL DISPLACEMENT; INSTABILITY; SUBLUXATION; CERVICAL STENOSIS; CHRONIC NECK PAIN MYALGIA; MUSCLE SPASMS.

32

107.    The bill of particulars went on to state that these injuries created a "necessity to undergo" the two epidural steroid injections and the spinal surgery. Upon information and belief, these statements were knowingly false when made and were made with an intent to defraud. It would have been obvious from any interaction with Clarke that he did not suffer from any serious and permanent injury, just as it had been obvious to the medical professionals at Montefiore. Clarke's own social media account refutes any suggestion he was "significantly partially disabled" by the accident. That social media account records a large birthday party thrown in Clarke's honor on April 8, 2022, during a time period in which he was supposedly "significantly partially disabled" and unable to work.



*Figure 4.*

33

108.   Similar social media posts from the summer of 2022 indicate no evidence of an ongoing serious injury as alleged. The Wingate Defendants were aware from interacting with their client that he was not significantly disabled.



*Figure 5.*

109.   The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on Uber via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

110.   On or about May 1, 2023, Wechsler and the Wingate firm filed another bill of particulars that contained the same false and fraudulent statements. Specifically, this bill of particulars stated that Clarke had suffered a "permanent and lasting" injury and had become "totally disabled" as a result of the accident. Upon information and belief, these statements were also knowingly

34

false when made. The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on Uber via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

111.    On or about November 14, 2023, Wechsler and the Wingate firm electronically filed an affirmation, in support of a motion to strike Uber's answer, that falsely and fraudulently stated that Clarke had sustained "serious and permanent personal injuries" in the collision. Upon information and belief, these statements were also knowingly false when made. The affirmation was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on Uber via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

112.    On or about January 30, 2024, Wechsler and the Wingate firm electronically filed an affirmation, in support of a separate motion to strike Uber's answer, that repeated the false and fraudulent statement that Clarke had sustained "serious and permanent personal injuries" in the collision. Upon information and belief, these statements were also knowingly false when made. The affirmation was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on Uber via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

113.    The Wingate Defendants continue to prosecute this case against Uber today, even though they know or should know that Clarke did not sustain serious injuries as a result of the accident. Uber has incurred substantial defense costs as a result of this scheme.

**D.    *Zarrina Khalilova v. Leonard Hakeem, et al.* – Supreme Court, Kings County – Index No. 506743/2017**

114.    On August 28, 2016, Zarrina Khalilova was a passenger in a ride that she arranged using the Uber app. Khalilova's vehicle was driving eastbound on the Belt Parkway when it was rear-ended by another car. She was not significantly injured in the accident. Khalilova went to the emergency room after the accident, where medical imaging did not show any injury. She was

discharged with painkillers several hours later and was told to follow up with her primary care provider.

115. Khalilova then took the subway home from the emergency room. Khalilova testified during her deposition that there was no seat available on the train, so she stood for the entirety of the hour-long subway ride—something a seriously injured person would not have been able to do.

116. The next day, Khalilova visited her primary care doctor, who also reviewed her x-rays and prescribed physical therapy.

117. Khalilova retained the Banilov Defendants to represent her in a personal injury action. Thereafter, her treatment plan changed. At Banilov's direction, Khalilova went to see Reyfman. Reyfman in turn referred Khalilova to Gerling.

118. Despite Khalilova's lack of serious injury, Gerling performed an invasive cervical spinal fusion surgery on March 28, 2017. Gerling did so knowing that the surgery was not medically necessary. An independent medical review of Khalilova's imaging and treatment records confirmed that her asserted injuries did not support claims of debilitating pain and did not necessitate the surgery that was performed.

119. Khalilova testified that her no-fault insurance did not cover the Gerling cervical spinal fusion surgery. Upon information and belief, the Banilov Defendants, directly or indirectly, paid Gerling for Khalilova's surgery to induce him to perform medically unnecessary surgery and to supply false causation evidence on their behalf.

120. Reyfman subsequently performed a lumbar discectomy and annuloplasty in September 2017. Like Gerling's surgery, Reyfman's surgery was medically unnecessary. Upon information and belief, the Banilov Defendants, directly or indirectly, paid Reyfman for Khalilova's

36

surgery to induce him to perform medically unnecessary surgery and to provide false causation testimony on their behalf.

121.    On or about April 5, 2017, Tarasov electronically filed a complaint on behalf of Khalilova to initiate the lawsuit. The complaint falsely stated that the vehicle collision "caused [Khalilova] to sustain severe and serious injuries," including "economic loss greater than basic economic loss as defined by Section 5104 of the New York State Insurance Law." These statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

122.    The Banilov Defendants filed the lawsuit knowing that Khalilova had connected with her driver through the Uber app, and intended at the time of filing to ultimately add Uber as a defendant. The Banilov Defendants filed the lawsuit initially without Uber as a defendant so that they could attempt to obtain early non-party discovery from Uber before Uber could move to dismiss or move to compel Khalilova's claim to arbitration. The Banilov Defendants therefore at all times intended that their false statements would coerce an inflated settlement from Uber, consistent with the overall purpose of the scheme.

123.    Consistent with the general scheme, the Banilov Defendants referred the claim to the Wingate Defendants who appeared as counsel for Khalilova on September 13, 2017. The same day that they appeared, the Wingate Defendants filed an Order to Show Cause seeking enforcement of a third-party subpoena that the Banilov Defendants had served on Uber seeking early non-party discovery.

37

124.    On or about February 26, 2018, the Wingate Defendants electronically filed an amended complaint on behalf of Khalilova. The amended complaint falsely stated that the vehicle collision caused Khalilova to become "sick, sore, lame and disabled," and "sustained a serious injury as defined by Section 5102(d) of the Insurance Law of the State of New York, and has sustained economic loss greater than basic economic loss as defined Section 5102(d) of the Insurance Law of the State of New York." These statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The amended complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

125.    On or about August 2, 2018, the Wingate Defendants served a verified bill of particulars that stated that as a result of the accident, Khalilova had sustained "serious and permanent injuries" to her spine, was "significantly partially disabled" by the collision, and suffered "significant limitation of use of a body function or system . . . which prevents [her] from performing substantially all of the material acts which constitute such person's usual and customary daily activities." The bill of particulars also falsely stated that:

> As a direct and proximate result of the accident the plaintiff sustained the following serious and permanent injuries:
>
> Cervical Spine:
>
> - C5-C6 herniated nucleus pulposus with cord and severe root impingement;
> - C6-C7 herniated nucleus pulposus with cord and severe root impingement;
> - C5-C6 lee paracentral protrusion which partially effaces the ventral thecal sac with abutment of the ventral cord;
> - C6-C7 right paracentral protrusion with annular tear which indents the ventral thecal sac;
> - C5-C6 spinal canal narrowing;
> - Cervical disc disorder with myelopathy;
> - Cervical radiculopathy;
> - Muscle Spasm;
> - Derangement of the cervical spine;

38

- Cervical spine tenderness;
- Cervical sprain/strain secondary to trauma;
- Cervicogenic headaches;

126.    The bill of particulars went on to state that Khalilova was "required to undergo" anterior cervical diskectomy and fusion. Upon information and belief, these statements were knowingly false when made and were made with an intent to defraud. It would have been obvious from any interaction with Khalilova that she did not suffer from any serious and permanent injury, just as it had been obvious to the medical professionals at the emergency room, as well as her primary care provider. Upon information and belief, the bill of particulars was served on defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

127.    On or about August 13, 2018, the Wingate firm served another bill of particulars that contained the same false and fraudulent statements. Specifically, this bill of particulars stated that Khalilova had suffered a "permanent" injury and had become "permanently impaired" as a result of the accident. Upon information and belief, these statements were also knowingly false when made. Upon information and belief, the bill of particulars was served on defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

128.    Uber ultimately settled Khalilova's claims against it. Uber relied on the false statements described above in deciding whether and for what amount to settle the claims. The settlement amount was significantly inflated, relative to what Uber would have paid to settle the case without Gerling and Reyfman's medically unnecessary surgeries and false testimony.

**E.    *Joshua Lopez v. Li Zhen Tang, et al.* – Supreme Court, Kings County – Index No. 510792/2023**

129.    On September 7, 2022, Joshua Lopez was a passenger in a ride that he arranged using the Uber app. Lopez's vehicle was involved in a minor accident while at the intersection of 6th Avenue and 54th Street in Brooklyn. The airbags did not deploy and damage to the vehicle

was minimal. Lopez did not request medical treatment at the scene and did not go to the emergency room—instead, he walked home. Lopez was not injured.

130.    Lopez testified that he was seated behind the front passenger seat of the vehicle, a Toyota SUV. He stated that, as a result of the impact of the collision, both sides of his head, neck and shoulders made contact with the left and right side of the vehicle. Such an occurrence would be physically impossible for someone who was wearing his seatbelt (which Lopez does not deny). Even if he was unbelted, at such low speeds he would not have been tossed all the way to the other side of a large SUV given the nature of the impact.

131.    Lopez did not seek medical treatment at an emergency room, an urgent care facility, or from his primary care physician. Instead of going to a medical doctor for diagnosis of his purported injuries, Lopez went to a physical therapist in the days following the accident. Upon information and belief, he did so at the direction of his attorney, Tarasov—who is affiliated with and works alongside Banilov. During his physical therapy treatment and in furtherance of the scheme, Lopez underwent a number of expensive and medically unnecessary treatments, including shock therapy.

132.    On or about December 14, 2022—three months after the accident—Lopez had his first appointment with Reyfman. Upon information and belief, Tarasov referred Lopez to Reyfman in furtherance of the scheme. Beginning in December 2022, Reyfman or his staff acting at his direction administered a series of medically unnecessary injections to Lopez. In violation of 18 U.S.C. § 1343 (wire fraud), after each of Lopez's visits—including on December 14, 2022, January 3, 2023, January 16, 2023, January 31, 2023, February 28, 2023, March 13, 2023, and April 28, 2023—Reyfman used an electronic patient records portal to electronically sign the following knowingly false causation statement: "I feel that there is a direct causal relationship between the

40

accident described and the patient's current injuries. The patient's symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas."

133.    On or about March 13, 2023, Reyfman's associate performed an invasive and medically unnecessary surgery on Lopez's spine. The operative report describes the surgery as an anterior cervical percutaneous discectomy and annuloplasty. An independent review of Lopez's MRI found only "degenerative disc disease" which "predates and is unrelated to the accident," and did not find any evidence of trauma caused by the accident.

134.    On or about November 27, 2023, another Reyfman associate performed an additional surgery on Lopez's spine, at Reyfman's recommendation. The operative report described the surgery as a discectomy, nucleoplasty and annuloplasty, and also included medically unnecessary injections. The operative report reiterated verbatim the fraudulent statement found in the operative report from the March 2023 surgery: "After reviewing the patient's clinical history, physical examination and imaging studies, the following procedure was deemed medically necessary for is therapeutic value."

135.    On or about April 11, 2023, Tarasov electronically filed a complaint on behalf of Lopez to initiate the lawsuit. The complaint falsely stated that, as a result of the vehicle collision, Lopez "was caused to sustain severe and serious injuries," including "economic loss greater than basic economic loss as defined by Section 5104 of the New York State Insurance Law." These statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

41

136.    On or about June 8, 2023, Tarasov prepared and served a bill of particulars that contained numerous additional false statements. Specifically, among other similar statements, the bill of particulars stated, "[b]y reason of the subject occurrence, [Lopez] sustained the following personal injuries, all of which are alleged to be of a permanent nature," followed by a laundry list of purported injuries of Lopez's cervical spine, lumbosacral spine, thoracic spine, and right and left shoulder, along with the surgeries that Tarasov falsely claimed were necessitated thereby. Upon information and belief, the bill of particulars was served on defendants via electronic mail in violation of 18 U.S.C. § 1343 (wire fraud) and/or U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

137.    On or about February 20, 2025, Tarasov prepared and electronically filed a supplemental bill of particulars. In addition to the injuries listed in the prior bill of particulars, the supplemental bill of particulars stated that Lopez had sustained additional, "future … permanent" injuries, including, "Status-Post Discectomy, Mechanical Decompression at L5/S1; Nucleoplasty, Radiofrequency Ablation at L5/S1 And L4/5; Annuloplasty at L5/S1 and L4/5; Contrast Injection and Evaluation of Nucleograms at L4/5 and L5/S1; Intradiscal Injection of Platelet Rich Plasma Injection at L4/5 and L5/S1 on or about January 30, 2023." The supplemental bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

138.    On May 6, 2025, Tarasov electronically filed an affirmation signed by Reyfman appending his medical records for treatment of Lopez. In that affirmation, Reyfman stated that he was "a treating physician of Joshua Lopez" and "affirm[ed] under penalties of perjury" that the "opinions" in the medical records were "authentic, true and complete." This statement was false when made. Reyfman knew that the opinion statements regarding injury causation in the medical records were untrue, and that Lopez was not injured. In violation of 18 U.S.C. § 1343 (wire fraud)

42

and in furtherance of the scheme, Reyfman electronically transmitted the affirmation to Tarasov and Tarasov electronically filed it.

139.   Tarasov continues to prosecute this case against Uber today. Uber has incurred substantial defense costs as a result of this scheme.

## II.   THE SCHEME TARGETS OTHERS AS WELL

140.   Uber is not the only victim of Defendants' widespread fraudulent scheme. Rather, Defendants have used the same illicit playbook—recruiting personal injury plaintiffs with nonexistent or minor injuries, referring them for unnecessary medical treatment, bribing doctors to provide the unnecessary medical treatment and provide false testimony, and using the resulting medically unnecessary surgeries to coerce inflated settlements—over and over again to target victims throughout New York. The equitable relief that Uber seeks will benefit not just Uber but all victims of Defendants' ongoing racketeering scheme.

### A.   *Ibrahim Abuzahrieh v. Robert Diliddo, et al.* – Supreme Court, Kings County – Index No. 500409/2019

141.   On July 8, 2018, Ibrahim Abuzahrieh was involved in a minor vehicle collision in Brooklyn. A police report filled out at the scene of the collision stated there were no injuries. Abuzahrieh himself later testified that he never observed any damage to the vehicle he was riding in.

142.   Abuzahrieh did not seek medical treatment immediately after the accident. In fact, he did not seek medical treatment at all until after he retained the Banilov Defendants to represent him in a personal injury lawsuit against the other driver.

143.   A paralegal working for and at the direction of the Banilov Defendants directed Abuzahrieh to a specific physical therapist and arranged for a car service to transport Abuzahrieh

43

to and from his physical therapy appointments. Abuzahrieh attended physical therapy at this practice up to three times a week for four months.

144.    Staff from Banilov & Associates also referred Abuzahrieh to a pain management provider in New Jersey (far from where he resided), who administered at least four medically unnecessary steroid injections in Abuzahrieh's back. Abuzahrieh testified that the Banilov Defendants scheduled all appointments at the pain management provider's office for him and paid for a car service for him to attend the appointments. The Banilov Defendants also referred Abuzahrieh for a series of MRIs at a specific radiology office of their choosing.

145.    Upon information and belief, in violation of N.Y. Penal Law § 215 (bribery), the Banilov Defendants made these referrals to the physical therapy practice, the radiology practice, and the pain management physician upon an agreement or understanding that in exchange for the referrals and corresponding fees, these various providers would produce fraudulent causation statements and testimony that the Banilov Defendants could use to advance the litigation and defraud the defendants in the lawsuit.

146.    The Banilov Defendants referred Abuzahrieh to Gerling with the agreement and understanding that in exchange Gerling would both conduct a medically unnecessary spinal surgery and provide fraudulent documentation and testimony supporting the need for said surgery. Abuzahrieh later testified that he visited Gerling's practice for the first time not because he found the practice on his own, but because he "was told to" become a Gerling patient.

147.    On or about November 19, 2018, Abuzahrieh had his first appointment with Gerling. Gerling examined Abuzahrieh and produced an initial examination report. The report diagnosed Abuzahrieh with "low back" pain that "began after the patient sustained an accident" and stated that an invasive spinal surgery was recommended to alleviate Abuzahrieh's symptoms.

44

148. Before Gerling performed the surgery, the Banilov Defendants arranged for a third-party litigation funder to advance all of the costs. The advance came in the form of a loan for $102,000, to be repaid through a lien on any recovery Abuzahrieh received from the lawsuit. Abuzahrieh later testified that he did not know how the bill for his surgery was paid, did not know that a loan had been taken out in his name, and did not know that the third-party litigation funder had asserted a lien on any recovery he obtained through the lawsuit. Upon information and belief, in violation of N.Y. Penal Law § 215 (bribery), the Banilov Defendants arranged the loan for the purpose of financing an unwarranted above-market payment to Gerling, with the understanding that it would influence Gerling's testimony regarding the necessity for such medical treatment and/or whether it was caused by the accident in question. And upon information and belief, Gerling accepted such payment with the agreement or understanding that his testimony would be influenced thereby in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness).

149. On or about March 12, 2019, Gerling performed the medically unnecessary surgery. The Banilov Defendants scheduled the surgery, and a paralegal from Banilov & Associates accompanied Abuzahrieh to the surgery.

150. On or about January 7, 2019, Banilov electronically filed a complaint on behalf of Abuzahrieh to initiate the lawsuit. The complaint falsely stated that, as a result of the vehicle collision, Abuzahrieh "was caused to sustain severe and serious injuries," including "economic loss greater than basic economic loss as defined by Section 5104 of the New York State Insurance Law." These statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

151.    On or about March 21, 2019, Banilov electronically filed a bill of particulars that contained numerous additional false statements. Specifically, among other similar statements, the bill of particulars stated that:

> By reason of the subject occurrence, the Plaintiff sustained, aggravated, activated, exacerbated and/or precipitated the following personal injuries, all of which are alleged to be of a permanent nature: LUMBOSACRAL SPINE, L5/S1, POSTEROLISTHESIS, L3/4, DISC BULGE FLATTENING THE THECAL SAC WITH MILD BILATERAL FORAMINAL ENCROACHMENT; L4/5, DISC BULGING WITH A SUPERIMPOSED RIGHT CENTRAL DISC HERNIATION ASSOCIATED WITH A FOCAL ANNULAR TEAR FLATTENING THE THECAL SAC; LUMBAR RADICULITIS/ RADICULOPATHY; LUMBAR SPRAIN/STRAIN; LUMBAGO; STATUS-POST TRANSFORAMINAL EPIDURAL STEROID INJECTION AT BILATERAL L5/S1 AND RIGHT L4/5 LEVELS UNDER FLUOROSCOPIC GUIDANCE ON OR ABOUT SEPTEMBER 11, 2018, SEPTEMBER 25, 2018 AND OCTOBER 9, 2018; STATUS-POST BILATERAL LUMBAR MEDIAL BRANCH NERVE BLOCK AT L3/4/5 LEVEL ON OR ABOUT OCTOBER 16, 2018. STATUS-POST TRANSFORAMINAL LUMBAR INTERBODY FUSION WITH INSTRUMENTATION AND ALLOGRAFT FROM CADAVER BONE ON OR ABOUT MARCH 12, 2019. THORACIC SPINE T8/9, DISC BULGING FLATTENING THE THECAL SAC; T10/11, DISC BULGING FLATTENING THE THECAL SAC; THORACIC DISC HERNIATION [. . .]; CERVICAL SPRAIN/STRAIN; CERVICALGIA.

152.    These statements were knowingly false and were made with the intent to advance the litigation and defraud the defendants and the courts. Through the use of these false statements and the predicate acts of wire fraud, mail fraud, and bribery, Defendants were able to fraudulently advance this lawsuit by exaggerating Abuzahrieh's injuries and justifying expensive, invasive, and unnecessary medical procedures. The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

46

**B.**    *Fazliddin Asamov et al v. Djakhongir Khodjaev, et al.* – **Supreme Court, Kings County – Index No. 516506/2019**

153.    On December 8, 2018, Fazliddin Asamov was involved in an accident that took place on the Belt Parkway at the 3rd Avenue/65th Street entrance in Brooklyn, when the driver of another vehicle attempted to slow down for traffic and rear-ended Asamov's vehicle. According to the police report, Asamov suffered "minor injuries" and was transported to the hospital. On information and belief, Asamov retained the Banilov Defendants following the accident.

154.    On July 9, 2019, Gerling performed a lumbar diskectomy on Asamov.

155.    The Banilov Defendants paid for Gerling's surgery either in whole or in part. Gerling's medical office, NY Orthopedics, PC, issued an invoice in connection with surgical services for a lumbar diskectomy, a surgical assistant, and hospital fees. These expenses were invoiced under Asamov's name, but addressed to the "Tarasov, Vakarev, and Banilov Law Firm" —in other words, to the Banilov Defendants, all under a single address.

156.    Upon information and belief, such payment was made with the agreement or understanding that Gerling would be a witness and with the understanding that it would influence Gerling's testimony regarding the necessity for such medical treatment and/or whether it was caused by the accident in question in violation of N.Y. Penal Law § 215 (bribery). And upon information and belief, Gerling accepted such payment with the agreement or understanding that his testimony would be influenced thereby, in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness). The amount that Gerling billed to the Banilov Defendants, $36,500, was substantially in excess of the median fee for a lumbar diskectomy in New York City, which at the time was less than $20,000. The above-market bill is a bribe and not merely payment for services rendered.



*Figure 6.*

157.    The Banilov Defendants financed part of the bribe payment to Gerling by arranging for a third-party litigation funder, Pegasus Fund LLC, to lend the money to Asamov so that the illicit payment could pass through to Gerling. Under the terms of the loan, the litigation funder would have the right to nearly $30,000 of any future recovery by Asamov—ensuring that the financial benefits of the scheme flowed not to a personal injury plaintiff like Asamov, but to the Defendants and to the litigation funders who facilitated the scheme.

158.    On or about July 26, 2019, the Banilov Defendants, through Aleksandr Vakarev, electronically filed a complaint on behalf of Asamov to initiate the lawsuit. The complaint falsely stated that the vehicle collision "caused [Asamov] to sustain severe and serious injuries," including

48

"economic loss greater than basic economic loss as to satisfy the exceptions of Sections 5102 and 5104 of the Insurance Law." These statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

159.    On or about June 1, 2021, the Banilov Defendants, through Vakarev, electronically filed a bill of particulars, dated November 8, 2019, that contained numerous additional false statements. Specifically, among other similar statements, the bill of particulars stated that, "[a]s a result of the [accident], . . . Asamov sustained the following personal injuries, all of which are alleged to be of a permanent nature . . ." including herniations of four discs in his cervical spine, disc herniations of his lumbar spine, tendinitis and contusions of the left shoulder, contusion of the right hip, and post-traumatic cervicogenic headaches. The bill of particulars further stated that Asamov had suffered injury and economic loss as defined by Section 5102 of the Insurance Law of the State of New York. The bill of particulars was electronically filed, in violation of 18 U.S.C. § 1343 (wire fraud), along with other bills of particulars containing numerous false statements, which were also served on defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

160.    The bill of particulars went on to state that as a result of the accident, "Asamov sustained special damages … [in the form of] a loan asserted against his recovery by Pegasus Fund, LLC … in the amount of twenty-three thousand two hundred fifty dollars ($23,250.00) to date plus interest for surgery performed by Dr. Michael Gerling on or about July 9, 2019."

161.    On or about June 7, 2022, Wechsler and the Wingate firm entered an appearance in the case to represent Asamov. Upon information and belief, the Banilov Defendants retained an attorney's lien on Asamov's eventual recovery even after the Wingate Defendants appeared for

49

Asamov, and/or entered into a fee-splitting agreement with the Wingate Defendants in order to maintain a financial interest in the settlement payment that Defendants intended to extract from the defendants in the case. Consistent with Defendants' practice, the Banilov Defendants were representing Asamov on a contingency basis, and would not have agreed to refer their client to another attorney without assurance that they would be compensated for the work that they had done at the start of the case.

162.    In violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud), Wechsler and the Wingate firm electronically filed and served via U.S. mail a number of false and fraudulent statements made to advance the litigation, including an affirmation by Wechsler dated April 17, 2023 falsely attesting that this is an action "to recover damages for serious injuries" and that as "a result of the accident, Plaintiff[ ] sustained serious and permanent personal injuries."

C.    *Irina Vayman v. Freddy M. Santana et al.* – **Supreme Court, Kings County – Index No. 505564/2021**

163.    In 2011, Irina Vayman was reportedly involved in a slip and fall accident and had spinal fusion surgery performed by Gerling on October 11, 2012. Vayman filed a lawsuit in connection with that incident that ended in a settlement of $850,000.

164.    Then, on February 24, 2020, Vayman was involved in a motor vehicle accident. Vayman was at fault: the accident occurred when she entered the roadway from a parking lane, striking another driver, who was traveling straight, with the right of way.

165.    On or about March 9, 2021, Banilov filed a complaint on behalf of Vayman to initiate the lawsuit. The complaint falsely stated that the vehicle collision "rendered [Vayman] sick, sore, lame and disabled and [that she had] remained so since the said occurrence." The complaint also falsely stated that Vayman had been "compelled to undergo medical aid, treatment and attention and expand [sic] money and incur obligations for physician's services, medical and

50

hospital expenses for the care and treatment of her injuries." The complaint further stated that Vayman sustained "serious injuries and economic loss greater than basic economic loss as to satisfy the exceptions of Sections 5102 and 5104 of the Insurance Law." The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

166.    On or about June 23, 2021, Banilov served a verified bill of particulars about injuries sustained by Vayman. The verified bill of particulars falsely stated that "[b]y reason of the [accident]," the Plaintiff sustained "… personal injuries, all of which are alleged to be of a permanent nature" including a tear of the medial meniscus of the left knee, anterior labral tear of the left shoulder, disc herniation of two discs in the cervical spine, herniation of several discs in the lumbar spine, and "pain syndrome" of the left wrist. Upon information and belief, these statements were knowingly false when made. Upon information and belief, the verified bill of particulars was served on the defendants via electronic mail in violation of 18 U.S.C. § 1343 (wire fraud) and/or U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

167.    Banilov knew or should have known that the statements in the complaint and the verified bill of particulars were false when made. An MRI of Vayman taken on March 14, 2020, almost a year before the complaint was filed, showed "no fractures or osseous contusions" and otherwise showed "non-specific finding[s] which may be positional in nature or related to spasm." A review of that MRI concluded, "No post traumatic-type etiologies related to the accident date of February 24, 2020 can be determined." A review of a follow-up MRI from June 11, 2020, taken almost a year before the verified bill of particulars was served, revealed the same result—preexisting damage from Vayman's 2011 slip-and-fall and resulting fusion, but nothing new that could have been caused by the car accident.

51

168.   Despite Vayman's lack of any serious injuries, Gerling performed another medically unnecessary and invasive surgery on Vayman. On November 1, 2021, Gerling performed a second lumbar fusion surgery on Vayman. Gerling's Operative Report, which falsely stated that Vayman had "a traumatic injury to the lumbar spine" requiring surgery was cut and pasted from another document without regard to the particulars of Vayman's circumstances. Among other things, the record repeatedly referred to Vayman using the wrong gender: "He [sic] was positioned into the prone position on a Jackson table . . . He [sic] was extubated and taken to the recovery in stable condition." On information and belief, the Banilov Defendants caused payment to be made to Gerling for such surgery and to influence his testimony.

169.   On November 16, 2021, the Wingate firm entered an appearance in the case for Vayman, and, on information and belief, were aware of Vayman's lack of injury. In violation of 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1341 (mail fraud), the Wingate firm nevertheless electronically filed or served via U.S. mail a number of false and fraudulent statements made to advance the litigation.

170.   On or about December 8, 2021, the Wingate firm served a verified supplemental bill of particulars disclosing Gerling's medically unnecessary spinal fusion surgery. In its verified supplemental bill of particulars, the Wingate firm falsely stated that "all injuries and/or conditions were caused, aggravated, exacerbated and/or precipitated by the accident; and possible loss of use of above mentioned parts, atrophy, anxiety and mental anguish, all of which substantially prevents this Plaintiff from enjoying the normal fruits of activities (social, educational and economical) and Plaintiff's enjoyment of life has been permanently impaired, impeded and/or destroyed." Upon information and belief, the Wingate firm sent the supplemental bill of particulars to defendants via

52

electronic mail in violation of 18 U.S.C. § 1343 (wire fraud) and/or U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

171. In 2022, consistent with Defendants' pattern, Vayman was treated by Reyfman, who administered a medically unnecessary epidural injection.

172. On May 17, 2024, both parties filed a joint stipulation of discontinuance indicating that the case had settled.

**D.** *Yury Tsatskin v. Antonio Zavaleta et al.* **– Supreme Court, Kings County – Index No. 512407/2018**

173. On or about August 31, 2016, Yury Tsatskin was involved in a minor motor vehicle collision in Brooklyn. A police report filled out at the scene of the collision stated there was minor damage to Tsatskin's vehicle's side bumper but that there were "no visible injur[ies]" to either driver. Tsatskin declined the EMT's offer to go to the emergency room.

174. Tsatskin instead went to CityMD, an urgent care facility. The medical records for his visit state that Tsatskin's vehicle was rear-ended, but that the airbags did not deploy. The records state further that Tsatskin had a "H/o [history of] prior lower back pain that was reaggrivated [sic] today," reflecting the fact that Tsatskin had a back injury prior to the collision on August 31, 2016. Imaging of Tsatskin's back and neck revealed "no acute fx [fracture] or dislocation."

175. On information and belief, Tsatskin retained the Banilov Defendants and thereafter the Banilov Defendants directed his medical care.

176. On or about September 8, 2016, Tsatskin had his first appointment with Reyfman—a provider located more than an hour by public transit from his home.

177. Reyfman's medical records falsely and fraudulently state that, notwithstanding Tsatskin's history of lower back pain, "all of his symptoms began" when "he was involved in a motor vehicle accident on 08/31/2016." The medical records include a false and fraudulent

53

causation opinion: "there is a direct causal relationship between the accident described and the patient's current injuries," and no "pre-existing conditions exist that affects the causality." Upon information and belief, such statement was knowingly false when made.

178.    Reyfman recommended an extensive program of medical treatment. Upon information and belief, throughout his treatment of Tsatskin, Reyfman and/or his associates administered numerous medically unnecessary epidural steroid injections.

179.    On information and belief, Banilov also referred Tsatskin to gerling. On or about February 3, 2017, Tsatskin had his first appointment with Gerling. Gerling examined Tsatskin and produced an initial examination report. The report diagnosed Tsatskin with "injuries to the neck, back and extremities including both shoulders" due to "an accident that occurred on 8/31/16 [.]" The report stated that Gerling reviewed a "conservative treatment" with Tsatskin, including physical therapy, medication, and diagnostic testing. The report included "Surgical Indications," which stated "ACDF C5-6 and diskectomy vs. fusion. L3-4, L4-5 discussed. Patient took CD which was copied into MAC. He mentioned second opinion and that he's really scared."

180.    On or about June 15, 2018, in furtherance of the fraud scheme, Banilov filed a complaint on behalf of Tsatskin to initiate the lawsuit. The complaint falsely stated that as a result of the accident, Tsatskin "was rendered sick, sore, lame and disabled," "continues to suffer mental anguish and great physical pain," and "has been incapacitated from attending to his usual duties, functions, occupations, vocations and avocations[.]" The complaint further falsely states: "That by reason of the foregoing, plaintiff [Tsatskin], sustained serious injuries and economic loss greater than basic economic loss as defined by Section 5104 of the New York State Insurance Law." Upon information and belief, these statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically

filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

181.   On or about September 26, 2018, in furtherance of the fraud scheme and in violation of 18 U.S.C. § 1343 (wire fraud), Banilov electronically filed a verified bill of particulars that falsely stated: "By reason of the subject occurrence, [Tsatskin] sustained the following personal injuries, all of which are alleged to be of a permanent nature:

### Cervical Spine

- C2/3, right central disc herniation abutting the ventral portion of the cervical cord;
- C3/4, disc bulging flattening the cervcal [sic] cord;
- C4/5, focal central disc herniation flattening the cervical cord;
- C5/6, broad-based central disc herniation;
- C6/7, disc bulging flattening the thecal sac;
- C7/T1, disc bulging;
- Posterior subluxation of C3 upon C4 and C5 upon C6;
- C5/6, radiculopathy;
- Intervertebral disc displacement;
- Cervical disc disorder with myelopathy;
- Cervical plexopathy;
- Cervical sprain/strain;
- Status-post cervical interlaminar epidural steroid injection at C6/7 level, under fluoroscopic guidance on or about June 12, 2017 and June 26, 2017;
- Aggravation of asymptomatic degenerative changes of the cervical spine that created susceptibility to injury and/or made his injuries more serious than otherwise would have been.

### Lumbosacral Spine

- Posterolisthesis of L5 upon S1;
- L3/4, annular bulging disc, flattening the thecal sac with an area of superimposed right lateral disc herniation, abutting the exiting L3 nerve root;
- L4/5, central disc herniation associated with an annular tear and flattening the thecal sac;
- L5/S1, annular disc bulging with an area of superimposed right lateral disc herniation;
- Lumbar radiculopathy;
- Lumbosacral sprain/strain;
- Lumbosacral plexopathy;
- Sprain of ligaments of lumbar spine;
- Lumbosacral intervertebral disc displacement;
- Sacroillitis;

55

- Status-post interlaminar epidural steroid injection at L5/S1 level under fluoro-scopic guidance on or about July 17, 2017 and September 5, 2017;
- Aggravation of preexisting asymptomatic degenerative changes of the lumbar spine that created susceptibility to injury and/or made his injuries more serious than otherwise would have been.

**Other**
- Post-traumatic headaches;
- Bilateral shoulder contusion;
- Sprain/strain of the thoracic spine;
- Right carpal tunnel syndrome."

182.   These statements were knowingly false and were made with the intent to advance the litigation and defraud the defendants and the courts. Through the use of these false statements and the predicate acts of wire fraud, mail fraud, and bribery, Defendants were able to fraudulently maintain and advance the lawsuit by exaggerating Tsatskin's injuries and justifying expensive, invasive, and unnecessary medical procedures and treatment. The bill of particulars was electron-ically filed in violation of 18 U.S.C. § 1343 (wire fraud).

**E.    *Edin Huseinovic v. Michael P. Silvia, et al.* – Supreme Court, Kings County – Index No. 525843/2018**

183.   Huseinovic was involved in a motor vehicle accident in 2009, which caused him to have neck and back pain. He treated this neck and back pain with physical therapy, which, upon information and belief, relieved some but not all of his symptoms.

184.   On December 5, 2017, Edin Huseinovic was involved in a second vehicle collision in Brooklyn. The police report produced at the scene described the accident as a "side swipe" that resulted in "No Injuries." Upon information and belief, Huseinovic did not go to the emergency room after the accident. He was not injured.

185.   On information and belief Huseinovic retained the Banilov Defendants following his second accident and the Banilov Defendants directed his subsequent medical treatment.

56

186.    Huseinovic's lawsuit over the 2017 accident followed the same path as Tsatskin's, above. Banilov, Reyfman, and Gerling each ignored Huseinovic's demonstrated and admitted history of prior accident and prior back and neck pain, and falsely attributed Huseinovic's supposed new injuries only to the new injury. Defendants made these fraudulent misrepresentations for the purpose of inflating the settlement value of Huseinovic's claim.

187.    On or about March 26, 2018, Huseinovic had an appointment with Reyfman. The resulting medical record falsely stated that "all of [Huseinovic's] symptoms began" when "he was involved in a motor vehicle accident on 12/05/2017." The medical records further falsely stated that "there is a direct causal relationship between the accident described and the patient's current injuries." Upon information and belief, these statements were knowingly false when made—especially in light of Huseinovic's documented history of neck and back pain. The Reyfman Defendants administered a medically unnecessary epidural steroid injection to Huseinovic during this visit.

188.    On or about March 12, 2018, Huseinovic had his first appointment with Gerling at SpineCare NYC. The resulting medical records falsely state that Huseinovic's "symptoms began after the patient sustained an accident[.]" Upon information and belief, in light of Huseinovic's prior 2009 motor vehicle collision and ensuing neck and back pain—which are mentioned in Gerling's medical records—these statements were knowingly false when made.

189.    On or about December 25, 2018, in furtherance of the fraud scheme, Banilov electronically filed a complaint on behalf of Huseinovic to initiate the lawsuit. The complaint falsely stated that as a result of the accident, Huseinovic "was rendered sick, sore, lame and disabled," "sustained nervous shock and continues to suffer mental anguish and great physical pain," and "has been incapacitated from attending to his usual duties, functions, occupations, vocations and

57

avocations[.]" The complaint further falsely states: "That by reason of the foregoing, plaintiff [Huseinovic], sustained serious injuries and economic loss greater than basic economic loss as defined by Section 5104 of the New York State Insurance Law." Upon information and belief, these statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

190.    On or about April 11, 2019, in furtherance of the fraud scheme and in violation of 18 U.S.C. § 1343 (wire fraud), Banilov electronically filed a verified bill of particulars falsely stating that "[b]y reason of the subject occurrence, [Huseinovic] sustained the following personal injuries, all of which are alleged to be of a permanent nature[,]" including, among numerous other purported injuries: L4/5 annular disc bulging with a superimposed left lateral disc herniation flattening the thecal sac; intervertebral disc displacement of the lumbar spine; lumbar sprain/strain; right lateral disc herniation; cervical disc displacement; and cervical sprain/strain. The bill of particulars further falsely states: "Plaintiff has and will continue to experience impairment, disruption and difficulty with daily activities, and significant impairment of numerous daily activities." The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

191.    These statements were knowingly false and were made with the intent to advance the litigation and defraud the defendants and the courts.

192.    A stipulation of discontinuance, indicating a settlement, was filed on September 14, 2020.

F.    *Uktam A. Ashurov v. Eunice L. Jemmott* – Supreme Court, Kings County – Index No. 508120/2021

193.    On November 19, 2019, Uktam Ashurov was involved in a minor vehicle collision when his vehicle was rear-ended by Eunice Jemmott's vehicle while the vehicles were driving in heavy traffic. Photographs taken at the scene show minor damage to Ashurov's rear bumper. Ashurov told Jemmott that he was "all right" after they got out of their cars. When the police arrived on the scene, Ashurov said that he did not need an ambulance. The airbags did not deploy, and Ashurov drove his car home. The police report confirms that nobody was injured.

194.    Upon information and belief, Ashurov retained the Banilov Defendants following the accident, and the Banilov Defendants directed his subsequent medical treatment.

195.    Approximately three months after the accident, Ashurov sought pain management treatment from Reyfman. During the first appointment, Reyfman examined Ashurov and recommended epidural steroid injections for his neck. Reyfman and/or his associates administered medically unnecessary epidural steroid injections to Ashurov on at least three separate occasions.

196.    On or about June 1, 2020, Reyfman performed surgery on Ashurov that involved adjusting a disc in his spine. Upon information and belief, the surgery was paid for in advance by a third-party litigation funder at the direction of the Banilov Defendants. The advance came in the form of a loan for approximately $8,000, to be paid through a lien on any recovery, and was made for the purpose of inducing the unnecessary treatment and influencing Reyfman's testimony.

197.    In furtherance of Defendants' scheme, Reyfman referred Ashurov to the Gerling Defendants for additional medically unnecessary surgery. Gerling performed a medically unnecessary and invasive spinal fusion surgery on Ashurov on April 19, 2021. Upon information and belief, Banilov caused Gerling to be paid, directly or indirectly, an above-market payment for the surgery intended to induce Gerling to provide false testimony regarding injury and/or causation.

59

198.    On or about April 7, 2021, Banilov electronically filed a complaint on behalf of Ashurov to initiate the lawsuit. The complaint falsely stated that as a result of the vehicle collision, Ashurov "was caused to sustain severe and serious injuries," including "economic loss greater than basic economic loss as to satisfy the exceptions of Section 5102 and 5104 of the Insurance Law." These statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendant via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

199.    On or about March 14, 2022, Banilov electronically filed a bill of particulars, dated June 16, 2021, that contained numerous additional false statements in violation of 18 U.S.C. § 1343 (wire fraud). In particular, among other similar statements, the bill of particulars stated: "By reason of the subject occurrence, the Plaintiff sustained, aggravated, activated, exacerbated and/or precipitated the following personal injuries, all of which are alleged to be of a permanent nature[.]" The so-called "personal injuries" spanned two pages and included claimed injuries related to Ashurov's right shoulder, cervical spine and lumbosacral spine resulting from the purported accident. Upon information and belief, these statements were knowingly false when made and were made with an intent to defraud. The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

200.    The case settled on or around November 2, 2022.

**G.    *Alexandre Voltchenkov v. Gregory Ware, et al.* – Supreme Court, Kings County – Index No. 514489/2020**

201.    On September 4, 2019, Alexandre Voltchenkov was rear-ended while driving on Hempstead Turnpike in Nassau County.

202.    The accident resulted in minimal damage to both vehicles, with "minor scuffing" on the front bumper of the other vehicle, and "minor damage" to the front of Voltchenkov's automobile. Voltchenkov spoke with the driver of the other vehicle, who asked whether he wanted an ambulance, to which Mr. Voltchenkov responded that he did not. According to the police report, both vehicles were driven from the scene by their operators. No injuries were reported. On information and belief, Voltchenkov retained the Wingate Defendants after his accident and the Wingate Defendants directed his subsequent medical treatment.

203.    This was not Voltchenkov's first motor vehicle accident. In 2015, he was in a head-on collision resulting in a concussion and torn muscles. Following the 2015 accident, Voltchenkov received a cervical spinal fusion surgery from Gerling.

204.    Even though Voltchenkov was not injured in the September 2019 rear-end collision, he still sought treatment from Gerling. On March 11, 2020, Gerling performed a second fusion and diskectomy surgery. On information and belief, this invasive surgery was medically unnecessary.

205.    Voltchenkov testified that he had not paid out of pocket for any medical treatment relating to the accident. On information and belief, Wingate paid Gerling, directly or indirectly, for Voltchenkov's spinal fusion surgery. This payment was made as a bribe to induce helpful false testimony and for the purpose of fraudulently inflating the settlement value of Voltchenkov's case.

206.    On August 10, 2020, Voltchenkov, represented by Wingate, filed a complaint in Kings County Supreme Court, seeking damages for injuries allegedly incurred as a result of the accident. The complaint stated, "[b]y reason of the [accident], Voltchenkov sustained serious injury as defined in Section 5102(d) of the Insurance Law of the State of New York and/or economic loss greater than basic economic loss as defined in Section 5102(a) of the Insurance Law of the

State of New York." The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

207.    On or about November 19, 2020, Wingate electronically filed a verified bill of particulars that stated that as a result of the accident, Voltchenkov had sustained injuries to the cervical spine, lumbar spine, left shoulder, and experienced chronic post traumatic headaches. Upon information and belief, these statements were knowingly false when made and were made with an intent to defraud. The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

208.    On December 2, 2024, a stipulation of discontinuance was filed.

**H.    *Alberto Barco v. Joseph A. Micciola, et al*. – Supreme Court, Kings County – Index No. 523098/2018**

209.    On July 9, 2018, Alberto Barco was bent over in the middle of a crosswalk in Brooklyn when a vehicle that was moving approximately five miles per hour made contact with him. A police report produced at the scene stated that the vehicle went over Barco's left foot. Barco did not fall, and was able to walk to the side of the road following the incident. The driver of the vehicle described the contact his vehicle made with Barco as a "bump."

210.    Barco visited the emergency room at NYU Langone in Brooklyn the day of the accident, where his "[c]hief [c]omplaint" was "[l]eft foot pain." Records from his visit at NYU Langone stated that Barco's x-rays were "neg[ative]" and that there was no evidence of "soft tissue swelling," "displaced fracture" or "joint malalignment" in his foot. Physicians at NYU Langone discharged him only a few hours later.

211.    Upon information and belief, Barco retained the Banilov Defendants shortly after the accident. On or about September 24, 2018, Barco visited Reyfman's pain management practice, Pain Physicians NY, at the direction of the Banilov Defendants.

62

212.    Reyfman's medical records falsely and fraudulently stated that "there is a direct causal ralationship [sic] between the accident described and the patient's current injuries." Upon information and belief, such statement was knowingly false when made. Based on his assessment, Reyfman diagnosed Barco with "cervical disc displacement" and administered medically unnecessary epidural steroid injections to Barco. Barco visited Reyfman's practice for follow-up appointments on or about October 8, 2018, November 5, 2018, December 5, 2018, January 2, 2019. Upon information and belief, Banilov caused Reyfman to be paid, directly or indirectly, above-market payments in exchange for his false testimony.

213.    On or about November 15, 2018, Banilov electronically filed a complaint on behalf of Barco to initiate the lawsuit. The complaint falsely stated that as a result of the accident, Barco "was caused to sustain severe and serious injuries," including "economic loss greater than basic economic loss as defined by Section 5104 of the New York State Insurance Law." The complaint stated further Barco "was rendered sick, sore, lame and disabled" as a result of the accident, and "has been incapacitated from attending to his usual duties, functions, occupations, vocations and avocations[.]" These statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

214.    On or about February 13, 2019, Banilov electronically filed a bill of particulars that contained numerous additional false statements in violation of 18 U.S.C. § 1343 (wire fraud). Specifically, among other similar statements, the bill of particulars stated that, "[a]s a result of the subject occurrence, the Plaintiff sustained, aggravated, activated, exacerbated and/or precipitated the following personal injuries, all of which are alleged to be of a permanent nature:

**Left Knee**

• Intrasubstance tear of the posterior horn of the medial meniscus of the left knee;
• Partial tear of the anterior cruciate ligament of the left knee;
• Sprain/strain of the posterior cruciate ligament of the left knee;
• Chondromalacia of the left knee;
• Effusion of the left knee;
• Internal derangement of the left knee;
• Aggravation of asymptomatic hypertrophic changes of the left knee that created susceptibility to injury and/or made his injuries more serious than otherwise would have been.

**Cervical spine**

• C2/3, posterior disc bulge impinging upon anterior thecal sac;
• C3/4, posterior disc bulge impinging upon anterior thecal sac;
• C4/5, posterior disc bulge impinging upon anterior thecal sac;
• C5/6, broad-based posterior disc bulge impinging upon anterior thecal sac;
• C6/7, broad-based posterior disc bulge impinging upon anterior thecal sac;
• T1/2, broad-based posterior disc bulge;
• T2/3, broad-based posterior disc bulge;
• Cervical intervertebral disc displacement;
• Cervicalgia;
• Cervical radiculopathy;
• Cervical strain/sprain;
• Cervical nerve root impingement;
• Status-post interlaminar epidural steroid injection at C7/T1 level on or about September 24, 2018.

**Lumbar Spine**

• L4/5, broad disc bulge;
• L3/4, disc bulge;
• L5/S1, disc bulge;
• T11/12, broad disc bulge flattening the thecal sac;
• T10/11, broad disc bulge flattening the thecal sac;
• Lumbar intervertebral disc displacement;
• Lumbar sprain/strain;
• Lumbar nerve root impingement;
• Lumbar radiculopathy;
• Aggravation of asymptomatic hypertrophic changes of lumbar spine that created susceptibility to injury and/or made his injuries more serious than otherwise would have been.

**Other**

• Pain syndrome of the left foot;

64

• Bilateral ankle pain syndrome."

215.    The bill of particulars also falsely stated that Barco "has further suffered and continues to suffer severe pain and difficulty with prolonged sitting, standing, walking, bending, climbing stairs, lifting or carrying heavy objects, performing strenuous activities," and that he "will continue to experience impairment, disruption and difficulty with daily activities, and significant impairment of numerous daily activities."  The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

216.    These statements were knowingly false and were made with the intent to advance the litigation and defraud the defendants and the courts. Through the use of these false statements and the predicate acts of wire fraud, mail fraud, and bribery, Defendants were able to fraudulently advance this lawsuit by exaggerating Barco's injuries and justifying expensive, invasive, and unnecessary medical procedures.

217.    Barco was deposed on June 3, 2020. His testimony confirms that he did not suffer any serious injuries. For instance, he testified that at various times since the incident, he has been able to work strenuous jobs as a laborer. In particular, he stated that during one job, he was responsible for lifting heavy pieces of debris from the floor of a construction site to a large dumpster. On another occasion, he had to lift large pieces of wood in and out of different houses.

218.    In January 2020, Gerling performed medically unnecessary back surgery on Barco. Upon information and belief, the Banilov Defendants caused payments to be made to Gerling for such surgery. Following that surgery, the case was settled and a stipulation of discontinuance was filed on September 2, 2022.

65

I. *Georges Nicolas v. Jean B. Robillard, et al.* – **Supreme Court, Kings County – Index No. 513771/2017**

219.    On April 23, 2016, a Ford E450 van owned by GCF Transportation made contact with an ambulance at the intersection of Flatbush Avenue and Prospect Place. According to the police report, there were no injuries. George Nicolas was not a passenger in the van and was not involved in the accident. Indeed, Mr. Nicolas's wife said in a written statement that Mr. Nicolas did not know about the accident until she called to inform him that it had occurred, at which point he drove his own vehicle to the location of the accident before police arrived on the scene.

220.    On or about July 17, 2017, in furtherance of the fraud scheme, Lavelle electronically filed a complaint on behalf of Nicolas to initiate the lawsuit. That complaint was entirely false and frivolous because Nicolas was not involved in the accident. It falsely stated that as a result of the accident, Nicolas was "severely injured and damaged, rendered sick, sore, lame and disabled, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are permanent in nature." The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

221.    Nicolas testified that after the accident, his attorneys (the Lavelle Defendants) scheduled medical appointments with Gerling. Gerling, in turn, directed him to Reyfman (who was working out of the same office). Upon information and belief, the Lavelle Defendants caused payments to be made to Gerling to influence his testimony.

222.    On May 7, 2018, the Lavelle Defendants electronically filed a Response to Demand for Verified Bill of Particulars, stating that "[a]s a result of this accident, Plaintiff sustained" injuries to his lumbar spine, cervical spine, left knee, future pain and suffering, future lost wages, and future surgery. Upon information and belief, these statements were knowingly false when made

66

and were made with an intent to defraud. The bill of particulars further stated that these injuries "are of a permanent nature and were proximately caused by the … motor vehicle accident," or "were exacerbated or aggravated" by the accident. It would have been obvious from any interaction with Nicolas that he did not suffer from any serious and permanent injury. The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

223.    On November 11, 2018, Gerling performed a medically unnecessary cervical diskectomy surgery on Nicolas. Upon information and belief, the Lavelle Defendants caused Gerling to be paid, directly or indirectly, for such surgery and to influence his testimony.

224.    According to defendant's expert report in this matter, even if Nicolas had actually been a passenger in the van that day, the impact felt would have been so minimal that Mr. Nicolas's body would not have experienced any substantial movement, and that there was therefore "no injury mechanism present in the subject incident" to account for his injuries.

225.    On July 8, 2025, the parties entered a joint Stipulation of Discontinuance with prejudice.

**J.    *Aubrosio Lora v. Angelica Compagnone* – Supreme Court, Kings County – Index No. 509468/2020**

226.    On October 13, 2019, Ambrosio Lora's vehicle was sitting in traffic on the Verrazano Bridge when he was rear-ended by another vehicle. According to the police report, the airbag did not deploy, and there were no reported injuries. The only damage to his vehicle was a small scratch on the bumper.

227.    For a full six months following the accident, Lora did not seek any medical attention.

228.    Lora then retained Lavelle as his attorney. Continuing the pattern, Lavelle sent his client to Gerling for treatment, even though Lora was uninjured. The referral was itself a bribe, with Gerling receiving fees from treating a new patient and Lavelle receiving in exchange a witness willing to provide false testimony regarding injury and causation in support of a plaintiff who was not injured in the subject car accident. Lavelle's referral of Lora to Gerling is evidenced by Lora's testimony and corroborated by Gerling's medical records, which contain the same typo as in Lavelle's file (misspelling Lora's first name, Ambrosio, as A**u**brosio) and show that Gerling obtained intake information for Lora from Lavelle, and not from his patient. Upon information and belief, the Lavelle Defendants made a further upfront payment for treatment and to influence Gerling's testimony.

229.    Gerling performed a medically unnecessary lumbar fusion on Lora on December 9, 2020. On information and belief, a doctor of Gerling's experience knew or should have known that Lora was not injured in the accident and did not require a lumbar fusion.

230.    On or about June 8, 2020, in furtherance of the fraud scheme, Lavelle electronically filed a complaint on behalf of Lora to initiate the lawsuit. The complaint falsely stated that as a result of the accident, Lora was "severely injured and damaged, rendered sick, sore, lame and disable, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are permanent in nature." The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendant via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

231.    On August 27, 2020, Lavelle Defendants filed a Response to Demand for Verified Bill of Particulars, stating that "As a result of this accident, Plaintiff sustained the following injuries:

- L5-S1 herniated nucleus pulposus with foraminhal stenosis; lumosacral spine;
- L4-L5 disc herniation, lumbar spine;
- right L5 spinal nerve lesion;
- Radiculopathy, lumbar spine;
- Restricted range of motion, thoracolumbar spine;
- Future pain and suffering;
- Future lost wages and medical expenses;
- Future surgery."

232.    The bill of particulars further stated, "All of the aforementioned injuries are of a permanent nature and were proximately caused by the aforementioned motor vehicle accident or in the alternative, the injuries are of a pre-existing nature and were exacerbated or aggravated by this occurred." Upon information and belief, these statements were knowingly false when made and were made with an intent to defraud. It would have been obvious from any interaction with Lora that he did not suffer from any serious and permanent injury.  The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendant via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

233.    On or about January 29, 2021, Lavelle served, via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud), a supplemental verified bill of particulars that stated that as a result of the accident, Lora sustained the following additional injuries:

- Transforaminal lumbar interbody fusion right side, lumbar levels L5-S1, posterior instrumentation: Medtronic Sextant titanium screw system, biomechanical device(s): PEEK FlareHawk Expandable Spacer back filled with graft material, Spinal Graft(s): Allograft, morselized Autograft, local (through same incision), Nanoss CaPO4, Imaging: Fluoroscopic Guidance, using loops and headlight;
- Laminectomy, facetectomy and foraminotomy, lumbar vertebral segments: L5-S1 Right Side (One level);
- Arthrodesis, posterior or posterolateral technique: Lumbar Level(s): L5-S1;
- Smith Peterson Osteotomy LS-Sl.

69

234.    On May 17, 2021, plaintiff attended an Independent Medical Exam, which noted that only "mild progression of degenerative changes … that this is the anticipated expected course of the disease process as degeneration will continue to progress over the patient's lifetime," and that "there are no findings to indicate a traumatic injury."

235.    On September 1, 2021, Lavelle electronically filed an affirmation, signed by Gerling under penalties of perjury on June 24, 2021, stating that "the injuries sustained by Ambrosio Lora were as a result of the automobile accident of October 13, 2018 [sic], are permanent in nature and have caused a permanent partial disability." This causation statement was intentionally false and fraudulent, because Gerling knew that Lora was not injured in the accident, let alone permanently disabled. Gerling transmitted the signed affirmation to filing counsel electronically, in violation of 18 U.S.C. § 1343 (wire fraud), or by mail, in violation of 18 U.S.C. § 1341 (mail fraud). Gerling gave this false testimony in exchange for a bribe from Lavelle, in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness). The affirmation was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

236.    The case was discontinued on February 23, 2023.

**K.**    ***Rene G. Perez Rosario v. Victor O. Parra Siguencia, et al.* – Supreme Court, Kings County – Index No. 503324/2022**

237.    On November 10, 2021, Rene Perez Rosario was involved in a staged automobile accident on the Van Wyck Expressway, at or near its intersection with Jewel Avenue, in Queens County.

238.    According to the police report, Perez Rosario stated that he was driving straight when he was side swiped by another vehicle. The driver of the other vehicle reported that he did not know that he had hit Perez Rosario's vehicle. There was no damage to the other driver's vehicle.

70

239.    Perez Rosario was not injured. On January 26, 2023, Perez Rosario was named as a defendant in an action filed by Progressive Max Insurance Company, Nassau County Index Number 601526/2023 alleging that he staged the November 10, 2021 car accident and obtained unnecessary and fraudulent medical treatment. Perez Rosario did not contest the allegations. On January 3, 2024, default judgment was entered against him.

240.    On or about February 2, 2022, in furtherance of the fraud scheme, Tarasov electronically filed a complaint on behalf of Perez Rosario to initiate the lawsuit arising from the staged accident. The complaint falsely stated that as a result of the staged accident, Perez Rosario was "caused to sustain severe and serious injuries" and "[t]hat as a result of the aforesaid occurrence, the plaintiff, was rendered sick, sore, lame and disabled and has remained so since." The complaint further stated that Perez Rosario "continues to suffer mental anguish and great physical pain. He has been compelled to undergo medical aid, treatment and attention and expand money and incur obligations for physicians' services, medical and hospital expenses for the care and treatment of his injuries." The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendant via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

241.    Perez Rosario disclosed in discovery that he received medical treatment from Gerling in connection with the staged accident. On information and belief, the Banilov Defendants directly or indirectly paid Gerling for medically unnecessary treatments and to influence his testimony.

242.    On September 19, 2023, consistent with the general scheme, the Banilov Defendants referred the claim to the Wingate firm who appeared as counsel for Perez Rosario. The Wingate firm appeared *after* the Progressive Complaint was filed against Perez Rosario and knew that

71

Perez Rosario had staged the accident and was not injured. The Wingate firm nevertheless agreed to take on the representation.

243. On November 9, 2023, Wingate firm filed an order to show cause seeking to withdraw from the representation.

**L.    *Sukhrob Tagiyev v. NYC Transit Auth., et al.* – Supreme Court, Kings County – Index No. 506678/2018**

244. On March 17, 2017, Sukhrob Tagiyev, who was driving using the Uber app, was double-parked in his vehicle on Manhattan Avenue in Brooklyn. The driver of a second vehicle—a New York City Transit bus—honked multiple times in an attempt to get Tagiyev to move and then proceeded to move around the left side of Tagiyev's vehicle. When the driver of the bus was navigating around Tagiyev's vehicle, Tagiyev moved his vehicle to the left, causing the bus to sideswipe it. The police report states that there were "no injuries." The post-incident photographs of Mr. Tagiyev's car reflect only that there were scrapes and scuff marks on the driver-side rear door.

245. Over the ensuing months, Tagiyev received an extensive range of medical treatments that were unnecessary and/or causally unconnected with the collision, including physical therapy, acupuncture, and massage. Upon information and belief, such medical treatment was directed by the Banilov Defendants.

246. On or about July 3, 2017—months after the accident—Tagiyev visited Coney Island Hospital's emergency department, with a chief complaint of left arm/shoulder pain. The medical records from the hospital visit state that Tagiyev was "wrestling with his friends Sunday night and the pain is getting progressively worse since last night."

247. On or about September 5, 2017, Tagiyev had an appointment at Gerling's SpineCare NYC complaining of left arm pain—which was caused by his roughhousing, not the

72

slow-speed sideswipe six months prior. Gerling nevertheless ended up performing two medically unnecessary spinal surgeries on Tagiyev, a diskectomy and a spinal fusion.

248.   On or about April 3, 2018, Tarasov electronically filed a complaint on behalf of Tagiyev to initiate the lawsuit against the bus driver, Cory Guy, and the New York City Transit Authority. The complaint falsely stated that, as a result of the vehicle collision, Tagiyev "was caused to sustain severe and serious injuries," including "economic loss greater than basic economic loss as to satisfy the exceptions of Sections 5102 and 5104 of the Insurance Law." The complaint further falsely stated that the accident rendered Tagiyev "sick, sore, lame and disabled and has remained so since the said occurrence." These statements were knowingly false and were made for the purpose of advancing the lawsuit and defrauding defendants and the court. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on the defendants via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

249.   On or about July 23, 2018, Tarasov electronically filed a bill of particulars that contained numerous additional false statements in violation of 18 U.S.C. § 1343 (wire fraud). Specifically, among other similar statements, the bill of particulars stated that: "By reason of the subject occurrence, [Tagiyev] sustained the following personal injuries, all of which are alleged to be of a permanent nature:

### Lumbar Spine

- L4/5, broad-based central disc herniation extending into the ventral epidural fat;
- L5/S1, annular disc bulging extending into the ventral epidural fat;
- Posterorlisthesis of L4 upon L5;
- Posterorlisthesis of L5 upon S1;
- Lumbar radiculopathy;
- Lumbosacral sprain/strain;
- Lumbar sprain/strain;
- Lumbosacral spine derangement/myofascial lower back pain syndrome.

### Cervical Spine

73

- C5/6, annular disc bulging with an area of superimposed broad-based left central disc herniation with flattening of the ventral portion of the cervical cord;
- C5/6, posterior subluxation;
- Reversal of the cervical lordosis centered at C5 reflecting the presence of underlying muscle spasm;
- Cervical radiculopathy;
- Cervicalgia;
- Cervical disc disorder with myelopathy;
- Cervical spine derangement/myofascial neck pain syndrome;
- Cervical sprain/strain.

**Other**

- Sacroillitis;
- Chest contusion;
- Contusion of the left hip;
- Contusion of the upper arm."

250.    The bill of particular further falsely stated that Tagiyev's injuries "will continue in the future to affect every facet of the Plaintiff's pre-accident way of life with resultant damages and with advancing years there will be naturally and medically related complications and exacerbations becoming progressively disabling."

251.    These statements were knowingly false and were made with the intent to advance the litigation and defraud the defendants and the courts. The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

252.    On or about February 25, 2020, in furtherance of the scheme, Wechsler and the Wingate firm entered an appearance in the case and took over its prosecution. In violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud), Wechsler and the Wingate firm electronically filed and served via U.S. mail a number of false and fraudulent statements made to advance the litigation.

253.    Specifically, on or about October 7, 2022, the Wingate Defendants electronically filed a supplemental verified bill of particulars, signed and verified by Wechsler, that stated that

74

on October 8, 2019, Tagiyev "underwent a surgical procedure performed by Michael Gerling." The surgery was described as follows: "Transpedicular approach with decompression of the spinal cord, equina and/or nerve root, single segment; lumbar, left side; Discography, lumbar, radiological supervision and interpretation, L4-5; Endoscopic lumbar discectomy, L4-5; Annuloplasty, L4-5; Therapeutic intradiscal injection of Depomedrol medicated injection including Marcaine with epinephrine and antibiotic injected into the disk at L4-5." The supplemental bill of particulars falsely stated that "all injuries and/or conditions were caused, aggravated, exacerbated and/or precipitated by the accident," and further, that "[a]ll injuries and their effects . . . are permanent." The supplemental bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and served via U.S. mail on defendants in violation of 18 U.S.C. § 1341 (mail fraud).

254.    On or about October 7, 2022, the Wingate Defendants electronically filed a second supplemental verified bill of particulars, also signed and verified by Wechsler, in which it supplemented the injuries that Tagiyev allegedly sustained from the purported accident and included the following injuries concerning his left shoulder: Tear of supraspinatus tendon, tendinosis/tendinopathy, left shoulder hiking, positive supraspinatus test, positive Neer's test, and positive Bear Hug Test. The Wingate Defendants again stated falsely that "all injuries and/or conditions were caused, aggravated, exacerbated and/or precipitated by the accident." The second supplemental bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and served via U.S. mail on defendants in violation of 18 U.S.C. § 1341 (mail fraud).

255.    On or about October 7, 2022, the Wingate Defendants electronically filed a third supplemental verified bill of particulars, again signed and verified by Wechsler, in which they provided information about an additional surgery performed by Gerling on Tagiyev. Specifically, Tagiyev underwent an "[a]nterior cervical diskectomy and fusion (including discectomy,

arthrodesis, and anterior instrumentation)" at the C5-C6 cervical level. The Wingate Defendants reiterated their statement from all of the prior bills of particular, asserting that "all injuries and/or conditions were caused, aggravated, exacerbated and/or precipitated by the accident." The third supplemental bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and served via U.S. mail on defendants in violation of 18 U.S.C. § 1341 (mail fraud).

256.    On January 5, 2024, the defense in this case introduced two expert reports confirming that Tagiyev was not seriously injured. Specifically, the defense experts concluded:

    a.  The subject collision can be described as a same-direction sideswipe between the right side of the transit bus and the driver side of the Infiniti. The Infiniti had was stopped and the driver had the brake applied, and the transit bus had an impact speed between 6 and 7 miles per hour.

    b.  Based on the laws of physics, Mr. Tagiyev tended to move rearward and leftward relative to his original seating position in the interior of the vehicle as a result of this collision. Any motion was limited by the relatively small overall motion of the vehicle.

    c.  Mr. Tagiyev's cervical and lumbar spine pathologies, as identified in the available medical records, cannot be attributed biomechanically to the sideswipe accident of March 17, 2017.

    d.  The loads experienced in Mr. Tagiyev's cervical spine during the subject sideswipe collision were comparable to and less than cervical spine loads associated with vigorous activities and less than cervical spine loads associated with chiropractic manipulations.

    e.  The loads experienced in Mr. Tagiyev's lumbar spine during the subject sideswipe collision were substantially less than those he experienced during routine daily activities.

    f.  The subject accident did not provide a mechanism for traumatic injury to Mr. Tagiyev's left shoulder.

257.    The Wingate Defendants nevertheless tried the case before a jury. On March 11, 2024, the jury returned a unanimous verdict finding that Tagiyev had not been seriously injured. In particular, the jury unanimously found that Tagiyev did not sustain a significant limitation of

use of his cervical spine or lumbar spine as a result of the accident on March 17, 2017. The Wingate Defendants knew that Tagiyev did not sustain serious injuries as a result of the accident, but nevertheless prosecuted the frivolous case all the way to trial, causing defendants to incur unnecessary legal expenses.

**M.** ***Dewayne Currence v. Sheldon Wright, et al.*** **– Supreme Court, Kings County – Index No. 507701/2016**

258.    On October 5, 2015, Dewayne Currence was in a minor motor vehicle collision when another vehicle merged into the lane in which he was driving. As a result of the impact, Currence's bumper, fender, headlight and hood suffered minimal damages. The airbags in Currence's vehicle did not deploy. Currence testified that the other vehicle sustained only "[m]inor scratches." He told the police at the scene that he was "fine" and that he did not need an ambulance. He drove away from the scene in the vehicle that was involved in the collision.

259.    On or about May 10, 2016, the Lavelle Defendants filed a lawsuit on Currence's behalf. The complaint falsely stated that as a result of the accident, Currence "was severely injured and damaged, rendered sick, sore, lame and disabled, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are permanent in nature and duration, and [Currence] will be permanently caused to suffer pain, inconvenience and other effects of such injuries[.]" These statements were knowingly false when made. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on defendants by U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

260.    On August 16, 2016, in furtherance of the fraud scheme and in violation of 18 U.S.C. § 1343 (wire fraud), the Lavelle Defendants electronically filed a verified bill of particulars falsely stating that "[a]s a result of this accident, Plaintiff DEWAYNE CURRENCE sustained the following serious injuries:

77

- Posterior annular tears at the L4/L5 and L5/S1 levels;
- Disc herniation at L5/S1;
- Disc bulge at L4/5;
- Disc herniations at C4/5 and C5/6;
- Restricted range of motion, lumbar spine;
- Restricted range of motion, cervical spine;
- Future pain and suffering;
- Future lost wages and medical expenses;
- Future surgery;
- Future arthritis."

261.   The bill of particulars further falsely stated that "[a]ll of the aforementioned injuries are of a permanent nature and were proximately caused by the aforementioned motor vehicle accident or in the alternative, the injuries are of a pre-existing nature and were exacerbated or aggravated by this occurrence." Upon information and belief, these statements were also knowingly false when made. The bill of particulars was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on defendants by U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

262.   On or about November 4, 2016, Currence had his first appointment with Gerling. The medical records from the appointment stated that Currence "had injuries to the neck and lower back in an accident that occurred on October 5, 2015" and that he "was driving when another car struck his car on the right side in an attempt to pass him, injuring his neck and back." Gerling's assessment was "Lumbar Disk Herniation" and "Cervical Disk Herniation."

263.   On June 5, 2017, the Wingate Defendants entered an appearance in the case for Currence.

264.   On or about September 7, 2017, Gerling performed surgery on Currence at Richmond University Medical Center. The operative report described the procedure as a left L5-S1 hemilaminotomy, partial medial facetectomy, foraminotomy and microdiskectomy. Upon information and belief, such surgery was performed as a result of advance payments, directly or

78

indirectly, by the Lavelle Defendants and/or the Wingate Defendants. Such payments were for the purposes of influencing Gerling's testimony.

265.    The Wingate firm made a number of false and fraudulent statements to advance the litigation. Specifically, on or about February 26, 2018, the Wingate Defendants served a supplemental verified bill of particulars about the surgical procedure performed by Gerling. The supplemental verified bill of particulars falsely stated that "[a]ll of the above mentioned injuries and their natural sequelae, are claimed to be permanent" and "all injuries and/or conditions were caused, aggravated, exacerbated and/or precipitated by the accident[.]" Upon information and belief, these statements were also knowingly false when made. Upon information and belief, the supplemental verified bill of particulars was served on defendants via electronic mail in violation of 18 U.S.C. § 1343 (wire fraud) and/or via U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

266.    This sworn statement was false because Currence was injured in two other accidents which the Wingate Defendants did not disclose—a second car accident on January 24, 2017, in which Currence rear-ended another vehicle, and a trip-and-fall on October 30, 2017 in which he broke his finger and hurt his back. These other incidents, and not Currence's 2015 car accident, caused the injuries described in the supplemental verified bill of particulars.

267.    On or about April 19, 2019, in furtherance of the fraudulent scheme, and in violation of 18 U.S.C. § 1343 (wire fraud), the Wingate Defendants signed and electronically filed an affirmation in opposition to defendants' motion for summary judgment, in which they falsely stated: "As a result of the collision, Mr. Currence – who, at the time of the collision, was an otherwise healthy 38-year-old man with no significant past medical history – was caused to sustain numerous serious injuries to his cervical spine and lumbar spine. This included multiple intervertebral disc herniations with associated radiculopathy, which required extensive physical therapy

and then ultimately <u>lumbar spine surgery, including an L5-S1 hemi-laminotomy, partial medial facetectomy, foraminotomy, and micro-discectomy</u>." (emphasis in original). The affirmation was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud).

268.    In support of their opposition, the Wingate firm electronically filed an affirmation signed by Gerling appending his medical records for treatment of Currence. Gerling stated that the surgery he performed "was medically necessary and required due to the lumbar spine trauma that Mr. Currence suffered in the motor vehicle collision which he was involved in on October 5, 2015." He also stated that "Mr. Currence's injuries . . . and their resultant physical impairments and limitations, are all causally related to the motor vehicle collision which she [sic] was involved in on October 5, 2015." Gerling stated further that, "[w]ithin a reasonable degree of medical certainty, Mr. Currence's injuries . . . have caused him to suffer a permanent, significant, and consequential limitation/impairment in terms of the use and function of his spinal column and musculo-skeletal system[.]" But Currence suffered no such impairment. He testified that since the October 5, 2015 accident, he has worked numerous jobs as a laborer. In fact, at the time of the deposition, he worked five days a week, eight hours a day, as a construction laborer and flag man for Quality Floor Shine, where he removes heavy debris and stands for up to two hours at a time holding a flag or stop sign to direct pedestrians.

269.    Upon information and belief, Gerling knew that statements in his affirmation—which he purported to make pursuant to his specialized knowledge—were false when made. Gerling either did not subjectively believe such statements or, to the extent he did, such statements omitted material facts, including—among other things—the circumstances regarding the underlying incident and the October 2017 slip-and-fall incident about which Currence informed Gerling's office. In violation of 18 U.S.C. § 1343 (wire fraud) and in furtherance of the scheme, Gerling

80

electronically transmitted the affirmation to the Wingate firm for electronic filing and the Wingate firm electronically filed it.

N.    *Alisher Ikramov v. Benyahu Adinyayev, et al.* **– Supreme Court, Kings County – Index No. 503653/2017**

270.    On March 4, 2016, Alisher Ikramov was involved in an accident at the intersection of 50th Street and 16th Avenue in Brooklyn. Ikramov had picked up a passenger through Uber's ride matching service. When the ride was completed, Ikramov pulled over to let the passenger out. However, when the passenger opened the door to exit, an oncoming vehicle made contact with the door, side-swiping Ikramov's vehicle.

271.    The form MV-104 signed and filed by Ikramov in connection with the incident stated that no injuries had occurred, and that there had been "property damage only."

272.    Ikramov complained of chest pain at the scene and was transported by ambulance to the emergency room at Maimonides Medical Center. Medical records indicate that Ikramov did not complain of back pain or joint pain in the emergency room—he was only there about his heart. Nor did he undergo any x-rays.

273.    Ikramov retained the Wingate Defendants to represent him in a personal injury suit. On February 23, 2017, the Wingate Defendants filed a complaint in King's County Supreme Court, claiming that as a result of the accident, Ikramov sustained injuries to his back and right shoulder, prompting a "need for future surgery." As of the date of this filing, there is no indication that Ikramov has undergone, or intends to undergo, surgery for his right shoulder. Despite his claim of injury to his right shoulder, during his deposition on March 11, 2019, Ikramov testified that it was his "left shoulder" that came into contact with the interior of his vehicle as a result of the accident. The complaint was electronically filed in violation of 18 U.S.C. § 1343 (wire fraud) and also served on defendants by U.S. mail in violation of 18 U.S.C. § 1341 (mail fraud).

81

274. The Wingate Defendants referred Ikramov to Gerling for treatment. On March 28, 2017, Gerling performed a lumbar discectomy and annuloplasty at L3-4 and L4-5 on Ikramov. This surgery was not medically necessary and did not treat any injury caused by the accident. Gerling performed the surgery because he was paid to do so by the Wingate Defendants and because surgery and resulting testimony would increase the settlement value of Ikramov's personal injury suit.

275. On October 21, 2020, the Wingate firm electronically filed an affidavit from Gerling, prepared on October 16, 2020, in which he attested that the accident was the root cause of Ikramov's injuries, and that "it is indisputable that as a result of the accident, Mr. Ikramov sustained serious injuries to his lumbar spine, cervical spine, right shoulder, and head." This statement was knowingly false when made. As an experienced physician, Gerling knew, or should have known, that Ikramov was not injured in the crash. Gerling accepted payment for the false affidavit in violation of N.Y. Penal Law § 215.05 (bribe receiving as a witness). In violation of 18 U.S.C. § 1343 (wire fraud) and in furtherance of the scheme, Gerling electronically transmitted the affidavit to the Wingate firm for electronic filing and the Wingate firm electronically filed it.

276. On November 19, 2021, the parties entered a stipulation of discontinuance. Upon information and belief, Ikramov's case settled for an amount greater than it would have had the Wingate Defendants not bribed the Gerling Defendants to perform medically unnecessary surgery and to render false testimony regarding Ikramov's supposed injuries and their causation.

## III.    RACKETEERING ALLEGATIONS

277. At all relevant times, Defendants' scheme was in violation of 18 U.S.C. §§ 1962(c) and/or (d) of the RICO statute as further set forth below.

### A.    Defendants' Respective Misconduct and Basis for Liability

### 1.    The Wingate Defendants

278.    As described above, the Wingate Defendants were a leading organizer of this scheme and took primary responsibility in pursuing fabricated claims against defendants, including Uber and many others. The Wingate Defendants have participated, continue to participate, and likely will in the future participate in the scheme by utilizing the Doctor Defendants' false statements regarding medical treatment to advance unfounded and/or inflated claims. The Wingate Defendants used the fraudulent documentation and testimony provided by Reyfman and Gerling to make numerous false statements to Uber and to the court in the course of personal injury litigation. Upon information and belief, the Wingate firm entered into fee-splitting agreements with the Banilov and Lavelle Defendants to further the goals of the scheme and share in its proceeds.

### 2.    The Banilov Defendants

279.    As described above, the Banilov Defendants have participated, continue to participate, and likely will in the future participate in the scheme by recruiting personal injury plaintiffs; orchestrating medical treatment for personal injury plaintiffs, including corruptly inducing Reyfman and Gerling to provide unnecessary medical treatment, false documentation, and false testimony through direct or indirect payments in excess of market rates; creating false evidence; and making false statements to initiate and advance personal injury claims.

280.    The Banilov Defendants referred or caused to be referred potential plaintiffs to the Doctor Defendants for the purpose of manufacturing unfounded and/or inflated claims. The Banilov Defendants directly or indirectly paid the Doctor Defendants for such treatment and for the attendant false statements regarding necessity and causation.

281.    The Banilov Defendants have filed or prosecuted dozens of lawsuits involving the Doctor Defendants and/or their respective medical practices.

### 3.       The Lavelle Defendants

282.    As described above, the Lavelle Defendants have conspired with the other Defendants and have carried out predicate acts in furtherance of the scheme. The Lavelle Defendants have orchestrated initial medical treatment for personal injury plaintiffs, and induced Gerling to provide unnecessary medical treatment, false documentation, and false testimony through direct or indirect payments. They have created false evidence and made false statements to advance personal injury claims.

283.    The Lavelle Defendants referred or caused to be referred potential plaintiffs to the Doctor Defendants for the purpose of manufacturing unfounded and/or inflated claims. The Lavelle Defendants directly or indirectly paid the Doctor Defendants for such treatment and with the understanding that such payments would corruptly result in the attendant false statements regarding necessity and causation.

### 4.       The Gerling Defendants

284.    Gerling controlled and directed the operations of Gerling Institute at all relevant times.

285.    As part of and in furtherance of the scheme, Gerling controlled and directed the provision of unnecessary medical treatment to personal injury plaintiffs. Gerling made false diagnoses, performed unnecessary treatment and procedures, and provided false documentation and testimony upon specialized knowledge in exchange for direct or indirect payments from the Law Firm Defendants, including through third-party funders, and with the understanding that in exchange for doing so, the Law Firm Defendants would continue to funnel patients to him.

286.    In order to conceal the scheme, Gerling Institute maintains two sets of books. The Gerling Defendants use one system for their ordinary patients who pay using insurance. That billing system, for the legitimate portion of Gerling Institute's business, utilizes standard billing codes.

84

The Gerling Defendants track the lawyer-directed above-market payments received in connection with the scheme using an entirely separate set of books, which does not use any billing codes. The Gerling Defendants use this separate set of books for its illicit business to generate fraudulent invoices, at significantly above-market rates, to submit to no-fault carriers or for large up-front payments from attorneys or litigation funders.

287.    In connection with the illicit portion of their business, the Gerling Defendants consistently bill at above the prevailing market rate. For example, although the median cost of a diskectomy in New York City was less than $20,000 in 2017, the Gerling Defendants billed the Banilov Defendants $36,500 for Asamov's 2019 diskectomy. In another case from 2018, the Gerling Defendants billed the personal injury plaintiff $48,750 for that same procedure (more than double the market rate) and received an "upfront payment" of $20,750. The Gerling Defendants billed the lawyers for a third personal injury plaintiff an astonishing $366,069.47 for a 2022 cervical fusion—far in excess of the $41,871 median cost of a "major" cervical fusion operation in New York City in 2017. Both the excessive nature of the fees and the up-front payments from attorneys function as bribes to Gerling in exchange for his false testimony as part of the scheme.

288.    Gerling's pattern of unethical and fraudulent conduct is well known. Gerling has also been named as a defendant in a RICO lawsuit filed by GEICO insurance company alleging his participation in a fraudulent scheme of providing unnecessary medical treatment in exchange for kickbacks from referring attorneys. The complaint filed in *GEICO* v. *Michael Gerling, M.D., et al.*, No. 1:23-cv-7693-PKC-MMH (E.D.N.Y.), alleges that personal injury attorneys funneled kickback payments to Gerling by retaining a phony marketing firm called Campiro, Inc. Instead of providing any marketing services, Campiro made payments in the tens of thousands of dollars to Gerling's businesses to corruptly induce them to perform medically unnecessary surgeries. The

85

phony marketing company wrote checks directly to NY Orthopedics, another medical institution

owned and controlled by Gerling:



*Figure 7.*



*Figure 8.*

289.   Based on such evidence, this Court entered a preliminary injunction staying all pending collections arbitrations and lawsuits between Gerling and GEICO and barring Gerling from commencing any new claims against GEICO. The case was settled shortly thereafter.

290.   More recently, during oral argument on a motion in limine in *Holton v. N.Y.C. Transit Authority*, Queens Cty. Index No. 710736/2019, Justice Joseph Esposito observed:

> Quite frankly, just among us, I am very much anticipating [Gerling's] testimony because what I know about his background is disgraceful. Disgraceful. And I am going to give them a lot of leeway so that the jury understands the truth …. We are going to stop hiding behind legalities and fictions. I am going to unravel him at this trial. I just want you to be aware. I am going to be very hard on him because ***I am sick and tired of certain medical people who come in here and who with unclean hands, mind you, and try to pull off what he is trying to do here. I'm insulted by it. … I am insulted by Dr. Gerling.*** … I am not going to let him off the hook because he doesn't deserve to be let off the hook and to be presented to this jury like he's some kind of an expert medical person, ***because to me he is bordering on criminality***.

291.   Gerling continues to perform invasive and unnecessary surgeries on personal injury plaintiffs and provide false testimony at trial for the purpose of enriching himself and the other members of the RICO enterprise.

### 5.   The Reyfman Defendants

292.   Reyfman controlled and directed the operations of Pain Physicians NY at all relevant times.

293.   As part of the scheme, and at the direction of the Law Firm Defendants, Reyfman controlled and directed the provision of unnecessary medical treatment to personal injury plaintiffs. This involved medically unnecessary treatments and false statements regarding the necessity of treatment and injury causation all upon specialized knowledge and made at the direction of the Law Firm Defendants.

87

294.    Reyfman profited from the scheme through fraudulent insurance submissions and payments made or caused to be made by the Law Firm Defendants. Certain such payments were made through intermediate litigation funders. As but one example, on or about June 1, 2020, Reyfman performed a cervical percutaneous discectomy at C5/6 level on a personal injury plaintiff represented by the Banilov Defendants. Neither the plaintiff nor his insurer paid for the procedure. Rather, the Banilov Defendants directed compensation to Reyfman in the amount of $8,358.70 through a payment made by a third-party litigation funder. Upon information and belief, such funding was provided to Reyfman with the understanding that it would influence his testimony regarding the necessity for such medical treatment and/or whether it was caused by the accident in question. That case settled before Reyfman had the opportunity to submit his planned false testimony.

295.    Reyfman made false diagnoses, performed unnecessary treatment and procedures, and provided false documentation and testimony with the understanding that in exchange for doing so, the Law Firm Defendants would continue to funnel patients to him.

**B.    Uber Is a Victim of the Scheme and Has Suffered Injury**

296.    Uber is a victim of Defendants' RICO scheme because it has incurred substantial expense in defending these false or inflated claims, including responding to claims that would otherwise be barred by operation of New York State Insurance Law § 5104, that it would not otherwise have incurred but-for Defendants' fraud.

297.    The unnecessary medical treatments provided through Defendants' scheme of bribery and fraud, and the false statements supporting the necessity of those treatments, allowed the Law Firm Defendants to fraudulently induce significantly larger settlement payments out of Uber in personal injury lawsuits or attempt to do so. As such, Uber has been forced to incur legal costs in defending these lawsuits in excess of what would have otherwise been required. These inflated

88

costs damaged Uber in its business or property. This damage was the direct result of Defendants' pattern of racketeering activity.

298.    Uber is not the only victim of this scheme. As demonstrated in Part II, Defendants' widespread scheme also targets other personal injury defendants and has injured them in their business or property. The courts of the State of New York, whose resources have been wasted by Defendants in adjudicating frivolous and fraudulent claims, are also victims. Even the personal injury plaintiffs themselves have suffered from unnecessary surgery and medical treatment resulting from Defendants' greed. They receive little in exchange. The proceeds of the scheme are instead split between the Doctor Defendants, the Law Firm Defendants, and the litigation funders who help provide above-market payments to the Doctor Defendants in exchange for a lien on the personal injury plaintiffs' recovery typically at exorbitant interest rates.

### C.    The RICO Enterprise

299.    The Wingate Defendants, the Banilov Defendants, and the Doctor Defendants are a group of persons associated together in fact for the common purpose of carrying out the ongoing fraudulent course of conduct directed at Uber and others described above. Each of these Defendants understood that their ability to extract financial rewards from pursuit of fraudulent claims against Uber and others—whether through the lawyers' recovery of litigation settlements or the doctors' receipt of inflated medical payments—depended on (i) manufacturing unnecessary and/or causally unconnected medical treatment for potential personal injury plaintiffs, (ii) creating associated medical records that could be used in resulting litigation for the purpose of establishing necessity and causation, and (iii) generating and propounding false and misleading testimony from the medical providers to advance such litigation claims. These Defendants worked together and functioned as a unit to achieve that purpose and shared a common intent to act unlawfully in furtherance of the common goal of extracting ill-gotten gains from the personal injury defendants.

89

300.    The Wingate Defendants, the Banilov Defendants, and the Doctor Defendants shared long-standing relationships with each other, acted for each other's common benefit, and depended on one another and their respective activities for such benefit:

a. The Banilov Defendants each shared relationships with each of the Doctor Defendants. They referred patients to Reyfman, Gerling, and their associated medical practices in the cases described above and in numerous other cases. The relationship was cemented by payments made directly or indirectly by the Banilov Defendants to each of the Doctor Defendants.

b. The Wingate Defendants shared a relationship with each of the Doctor Defendants. In the cases described above as well as in other cases, the Wingate Defendants worked with the Doctor Defendants to utilize their false or misleading medical records and/or testimony to litigate the fraudulent claims against Uber or others. The relationship was cemented by payments made directly or indirectly by the Wingate Defendants to each of the Doctor Defendants.

c. The Banilov and Wingate Defendants shared a relationship with each other and have worked together on these and other cases. Where claims arose involving Uber or other ride matching defendants, the Banilov firm referred cases to the Wingate firm, which was larger and had more resources to litigate against a corporate defendant. In each case, the relationship was cemented through fee-sharing arrangements as discussed above.

d. The Doctor Defendants shared a relationship with each other. Gerling and Reyfman had a long-standing professional relationship extending back to 2007, referred numerous patients to one another, and had worked together on numerous personal

injury cases, including the ones described above. During the relevant period, both Gerling and Reyfman regularly performed medically unnecessary surgeries and procedures at Island Ambulatory Surgery Center in Brooklyn, New York, a facility owned and operated by Reyfman. A portion of the above-market fees charged by Gerling for procedures at Island Ambulatory Surgery Center were thus funneled to Reyfman. Reyfman and Gerling are also equal partners in 23rd Street SC, LLC d/b/a Hudson Surgery Center, a special purpose vehicle that they created to operate Hudson Surgery Center, an ambulatory surgery center in Manhattan, New York.

e.  Each of these Defendants share geographical proximity in that their respective legal and medical practices are concentrated in Kings County and the surrounding area. They came to work together as a result of their long involvement in representing or treating personal injury plaintiffs in that jurisdiction.

301.  The acts of wire and mail fraud described above could not have been accomplished without the participation and assistance of each of the members of the enterprise. Each party played a critical role and depended on the others to carry out their respective roles in furtherance of the scheme, including the initial intake and referral work of the Banilov firm; the delivery of medical treatment, creation of medical records, and provision of testimony by the Doctor Defendants; and the added scale and resources to litigate claims against ride matching defendants provided by the Wingate firm.

302.  The Wingate Defendants, the Banilov Defendants, and the Doctor Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of these Defendants participated in the operation or management of the enterprise. The enterprise itself is distinct from the culpable persons of Banilov, Tarasov, Wechsler, Reyfman, and

91

Gerling and their respective corrupt activities. Banilov, Tarasov, Wechsler, Reyfman, and Gerling are employees or partners of their own respective law firms and medical practices, and each worked to operate the larger association-in-fact enterprise and manage its affairs through their corrupt patterns of referrals, making and accepting bribery payments, and false statements. The Lavelle Defendants conspired with such Defendants as set forth above.

303. The enterprise was of sufficient duration to accomplish its purposes, originating at least as early as 2019 and threatening to continue into the future.

304. In the alternative, each of the Doctor Defendants' respective medical practices, namely Gerling Institute and Pain Physicians NY with their affiliates, constitutes an enterprise. Gerling and Reyfman each operated, managed and controlled their respective medical practices directly and/or indirectly through an ongoing referral relationship in furtherance of the scheme. The Law Firm Defendants participated in the management and control of each such enterprise through the corrupt referrals and payments described above.

305. At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate wires and because its activities were directed at and intended to influence an out-of-state corporation.

### D. Pattern of Racketeering Activity

306. Defendants' scheme constitutes a pattern of racketeering activity. The pattern of racketeering activity includes, among others, commission of the predicate acts and specific statutes violated described above.

307. Defendants committed these acts willfully and knowingly.

308. The predicate acts relate to each other as a part of a common plan. The Defendants' roles in the scheme all depended on each other—the Doctor Defendants accepted bribes in the

92

form of client referrals and illegal payments to provide unnecessary treatments and false documentation and testimony. The Law Firm Defendants then used this false testimony to fraudulently attempt to induce larger settlement payments. Each Defendant was aware of its respective role within the larger scheme.

309. The predicate acts further relate to the association-in-fact described above as well as to each of the Doctor Defendants' respective medical practices. The Law Firm Defendants referred clients and made, directly or indirectly, corrupt payments to the Doctor Defendants in exchange for the provision of unnecessary medical treatment and false testimony and documentation. The Law Firm Defendants then used these false statements and unnecessary treatment to initiate and advance litigation against Uber and fraudulently attempt to induce larger settlements. A specific threat of repetition exists with respect to such acts. Such predicate acts are a regular way of conducting the ongoing medical practices at issue herein. Such acts are also attributable to the Law Firm Defendants and Doctor Defendants operating as part of the long-term association-in-fact that exists for criminal purposes as described herein. Hence, the pattern of activity is part of an open-ended and ongoing scheme.

310. The acts also occurred over a substantial period of time and hence constitute a pattern of activity even if the scheme were not ongoing.

### E.     Equitable Tolling

311. Defendants also wrongfully concealed material facts relating to their scheme. Such concealment included Defendants' failure to disclose the causes and extent of the personal injury plaintiffs' claimed injuries and the necessity of treatment resulting from the alleged accidents. Indeed, Defendants actively misled Uber about the cause and extent of injury and the necessity of treatment through the numerous false statements described above.

312.    Uber exercised due diligence by investigating the circumstances of the claim it asserts here. In particular, Uber diligently used the disclosure tools available to it in the underlying personal injury litigation. However, Defendants' ongoing concealment and affirmative false statements in response to such disclosure requests prevented Uber from discovering the nature of the scheme. Although Uber brings this claim within the applicable statute of limitations, any such statute is in any event tolled as a result of Defendants' fraudulent concealment.

## CAUSES OF ACTION

### COUNT I
### Civil RICO (18 U.S.C. § 1962(c))
### Association-in-Fact Enterprise
### (Against the Wingate Defendants, the Banilov Defendants, and the Doctor Defendants)

313.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 312 above.

314.    At all relevant times herein, the Wingate Defendants, the Banilov Defendants and the Doctor Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). These Defendants constituted a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce. Each of these Defendants participated in the operation or management of the enterprise.

315.    The enterprise's racketeering activities, as described throughout this Amended Complaint, included:

 a. Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

94

b. Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations; and

c. Violations of the New York State witness bribery statute, N.Y. Penal Law §§ 215.00 and 215.05, based upon agreeing to confer benefits on medical providers with the understanding that such benefits would influence the testimony of the medical providers and the acceptance of such bribes.

316. Each of these Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

317. Uber has been injured in its business and property by reason of the above-described conduct.

318. By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**RICO Enterprise Violation (18 U.S.C. § 1962(c))**
**Gerling Institute Enterprise**
**(Against Gerling, Reyfman, and the Law Firm Defendants)**

319. Uber incorporates herein by reference each and every allegation in paragraphs 1 through 312 above.

95

320. Gerling Institute is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

321. Gerling, Reyfman, the Wingate Defendants, the Lavelle Defendants, and the Banilov Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of Gerling Institute's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

322. Defendants' racketeering activities, as described in detail in this Amended Complaint, included:

    a. Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

    b. Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations; and

    c. Violations of the New York State witness bribery statute, N.Y. Penal Law §§ 215.00 and 215.05, based upon agreeing to confer benefits on medical providers with the understanding that such benefits would influence the testimony of the medical providers and the acceptance of such bribes.

323. Each of the Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

324. Uber has been injured in its business and property by reason of the above-described conduct.

325. By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III**
**RICO Enterprise Violation (18 U.S.C. § 1962(c))**
**Pain Physicians NY Enterprise**
**(Against Gerling, Reyfman, and the Law Firm Defendants)**

326. Uber incorporates herein by reference each and every allegation in paragraphs 1 through 312 above.

327. Pain Physicians NY is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

328. Reyfman, Gerling, and each of the Law Firm Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of Pain Physicians NY's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

329. Defendants' racketeering activities, as described in detail in this Amended Complaint, included:

  a. Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by

means of materially false representations and use of the mail for the purpose of executing the scheme;

b. Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing the scheme; and

c. Violations of the New York State witness bribery statute, N.Y. Penal Law §§ 215.00 and 215.05, based upon agreeing to confer benefits on medical providers with the understanding that such benefits would influence the testimony of the medical providers and the acceptance of such bribes.

330. Each of the Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

331. Uber has been injured in its business and property by reason of the above-described conduct.

332. By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT IV
### RICO Conspiracy Violation (18 U.S.C. § 1962(d))
### (Against All Defendants)

333. Uber incorporates herein by reference each and every allegation in paragraphs 1 through 312 above.

334.    For at least the time period referenced herein, Defendants did unlawfully, knowingly, and intentionally combine, conspire, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and/or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

335.    This pattern of racketeering activity in which the Defendants intentionally conspired to engage involved the specific acts as described in detail in this Amended Complaint constituting wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, and witness bribery in violation of N.Y. Penal Law §§ 215.00 and 215.05.

336.    All of these predicate acts constituted "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

337.    Uber has been injured in its business and property by reason of the above-described conduct.

338.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT V
### N.Y. Judiciary Law § 487
### (Against the Law Firm Defendants)

339.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 312 above.

340.    In the course of the pattern of conduct described herein, the Law Firm Defendants colluded with each other, with the other Defendants, and with other known and unknown individuals to intentionally deceive the courts of the State of New York, Uber, and the other defendants

in the above cases concerning the cause and severity of their personal injury clients' injuries and such clients' entitlement to litigate vehicle negligence claims pursuant to the requirements of New York no-fault insurance law.

341.    As discussed herein, the Law Firm Defendants' intentional deceit includes filing of false and/or frivolous complaints, affirmations, and other pleadings and motions made in the course of the above-referenced litigations.

342.    As a result of this deceit and collusion, Uber has been injured as alleged above because it has been required to incur substantial legal expenses in an amount in excess of $75,000.

343.    By reason of its injury, Uber is entitled to treble damages and reasonable attorneys' fees.

## COUNT VI
### Unjust Enrichment
### (Against the Doctor Defendants)

344.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 312 above.

345.    The Doctor Defendants have been and will continue to be unjustly enriched by benefits received pursuant to the fraudulent scheme, including through payments derived directly or indirectly from the Law Firm Defendants. Such benefit was received at Uber's expense given that Uber has been required to incur substantial legal expense as a result of the scheme.

346.    Principles of equity and good conscience require restitution of any such benefits received by the Doctor Defendants.

347.    Uber demands judgment against the Doctor Defendants, jointly and severally, for restitution of all such benefits received.

100

## **PRAYER FOR RELIEF**

1.    For general damages according to proof at trial, trebled according to statute;

2.    For restitution;

3.    For prejudgment interest;

4.    For reasonable attorneys' fees and costs;

5.    For punitive damages;

6.    For equitable relief as appropriate pursuant to applicable law, including but not limited to issuance of a temporary restraining order, a preliminary and permanent injunction, disgorgement, imposition of a constructive trust, and appointment of a monitor and/or receiver;

7.    For an order under 18 U.S.C. § 1964(a) preventing and restraining violations of 18 U.S.C. § 1962 by directing Defendants to divest themselves of any interest, direct or indirect, in the above enterprises; imposing restrictions on the future activities of such Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the above enterprises engaged in; and dissolving or reorganizing the above enterprises;

8.    For such other relief as the Court may deem appropriate.

101

Dated: New York, New York.
      July 23, 2025

Respectfully submitted,

PERKINS COIE LLP


By*: /s/ David W. T. Daniels*
    David W. T. Daniels
    Michael R. Huston (*pro hac vice*)
    700 Thirteenth Street NW
    Washington, DC 20005-3960
    Tel: +1.202.654.6200
    Fax: +1.202.654.6211
    DDaniels@perkinscoie.com
    MHuston@perkinscoie.com

    David Massey
    Jacob J. Taber
    William P. Wilder
    1155 Avenue of the Americas, 22nd Floor
    New York, NY 10036-2711
    Tel: +1.212.262.6900
    Fax: +1.212.977.1649
    DMassey@perkinscoie.com
    JTaber@perkinscoie.com
    WWilder@perkinscoie.com

## JURY DEMAND

Uber demands a trial by jury on all issues so triable.

Dated: New York, New York.
        July 23, 2025

Respectfully submitted,

PERKINS COIE LLP


By: */s/ David W. T. Daniels*
    David W. T. Daniels
    Michael R. Huston (*pro hac vice*)
    700 Thirteenth Street NW
    Washington, DC 20005-3960
    Tel: +1.202.654.6200
    Fax: +1.202.654.6211
    DDaniels@perkinscoie.com
    MHuston@perkinscoie.com

    David Massey
    Jacob J. Taber
    William P. Wilder
    1155 Avenue of the Americas, 22nd Floor
    New York, NY 10036-2711
    Tel: +1.212.262.6900
    Fax: +1.212.977.1649
    DMassey@perkinscoie.com
    JTaber@perkinscoie.com
    WWilder@perkinscoie.com

103