## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

UBER TECHNOLOGIES, INC.,

        Plaintiff,

    v.

WINGATE, RUSSOTTI, SHAPIRO, MOSES
& HALPERIN, LLP, JAY WECHSLER,
BANILOV & ASSOCIATES, P.C., NICK
BANILOV, IGOR TARASOV, THE LAW
OFFICE OF DOMINICK W. LAVELLE d/b/a
LAVELLE LAW FIRM, EMILY K.
LAVELLE, MICHAEL GERLING,
GERLING INSTITUTE, LEONID
REYFMAN, AND PAIN PHYSICIANS NY
PLLC,

        Defendants.

No. 1:25-cv-00522-OEM-VMS

## LAVELLE, BANILOV, AND TARASOV MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION TO DISMISS UBER'S AMENDED COMPLAINT

Jennifer M. Schubert
Eric Rolston
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
(212) 607-8160
jschubert@mololamken.com
erolston@mololamken.com

Justin V. Shur
Kenneth E. Notter III (*pro hac vice*)
Zakary Kadish (*pro hac vice*)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jshur@mololamken.com
knotter@mololamken.com
zkadish@mololamken.com

*Counsel for The Law Office of Dominick W. Lavelle d/b/a Lavelle Law Firm,*
*Emily K. Lavelle, Banilov & Associates, P.C., Nick Banilov, and Igor Tarasov*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.     The State-Court Cases Not Involving Uber ................................................................. 5

II.    The State-Court Cases Involving Uber ..................................................................... 7

ARGUMENT .................................................................................................................... 13

I.     Uber Fails to State a RICO Claim Against Lavelle, Banilov, or Tarasov ....................... 14

     A.     Uber Lacks RICO Standing ................................................................. 15

          1.     Uber's Claims Are Unripe Because Its Damages Are Not
                Clear and Definite .......................................................................... 15

          2.     Uber Fails to Allege Proximate Cause ............................................... 18

              a.     Legal Filings Did Not Cause Injury .......................................... 19

              b.     "Bribes" Did Not Cause Injury ................................................. 21

              c.     Uber's Efforts to Plead Direct Injury Are Deficient ..................... 22

     B.     Uber's Claims Are Untimely ............................................................... 23

     C.     Uber Fails to Allege a Pattern of Racketeering ....................................... 24

          1.     Uber Cannot Transform Litigation Activity Into RICO Predicates .......... 25

          2.     Uber Fails to Plead Either Fraud or Bribery ...................................... 26

          3.     Uber Does Not Allege a Continuous Pattern of Predicate Acts ............... 28

     D.     Uber Fails to Allege a RICO "Enterprise" ............................................ 30

     E.     Uber's Conspiracy Claim Fails for the Same Reasons ............................. 31

II.    Uber Cannot State a Claim Under New York's Judiciary Law ...................................... 31

III.   The *Noerr-Pennington* Doctrine Requires Dismissal ................................................. 32

CONCLUSION .................................................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Acres Bonusing, Inc. v. Ramsey*,
No. 19-cv-5418, 2022 WL 17170856 (N.D. Cal. Nov. 22, 2022) ....................................25, 27

*Allstate Ins. Co. v. Lyons*,
843 F. Supp. 2d 358 (E.D.N.Y. 2012) ...................................................................................18

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ..............................................................................................................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................................................14

*Bankers Tr. Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro*,
187 A.D.2d 384 (N.Y. Sup. Ct. App. Div. 1992) ..................................................................31

*Bankers Tr. Co. v. Rhoades*,
859 F.2d 1096 (2d Cir. 1988) ..........................................................................................17, 18

*BE&K Constr. Co. v. N.L.R.B.*,
536 U.S. 516 (2002) ..........................................................................................................32, 34

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..............................................................................................................14

*Chevron Corp. v. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014) ..................................................................................23

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
187 F.3d 229 (2d Cir. 1999) ................................................................................................29

*Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq.*,
758 F. Supp. 2d 153 (E.D.N.Y. 2010) ..................................................................................15

*Curtis v. Greenberg*,
No. 20-cv-824, 2021 WL 4340788 (E.D.N.Y. Sept. 23, 2021) ............................................30

*D. Penguin Bros. v. City Nat'l Bank*,
587 F. App'x 663 (2d Cir. 2014) ..........................................................................................30

*D'Addario v. D'Addario*,
901 F.3d 80 (2d Cir. 2018) ...................................................................................................17

*DLJ Mortg. Cap., Inc. v. Kontogiannis*,
726 F. Supp. 2d 225 (E.D.N.Y. 2010) ..................................................................................16

*E. Sav. Bank, FSB v. Papageorge*,
   31 F. Supp. 3d 1 (D.D.C. 2014) ...........................................................................21

*In re Elysium Health-Chromadex Litig.*,
   354 F. Supp. 3d 330 (S.D.N.Y. 2019) ...........................................................33, 34

*Empire Merchs., LLC v. Reliable Churchill LLLP*,
   902 F.3d 132 (2d Cir. 2018) ........................................................................ *passim*

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004) .................................................................26, 29, 31

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994) ...........................................................................15, 17

*Flexborrow LLC v. TD Auto Fin. LLC*,
   255 F. Supp. 3d 406 (E.D.N.Y. 2017) ....................................................14, 15, 31

*GEICO v. Akiva Imaging Inc.*,
   No. 1:24-cv-6549, 2025 WL 1434297 (E.D.N.Y. May 19, 2025) ..........................16

*Grace Int'l Assembly of God v. Festa*,
   797 F. App'x 603 (2d Cir. 2019) .........................................................................29

*Greenfield v. Schultz*,
   173 Misc. 2d 31 (N.Y. Sup. Ct. N.Y. Cnty. 1997 ...............................................31

*Gross v. Waywell*,
   628 F. Supp. 2d 475 (S.D.N.Y. 2009) ...........................................................14, 35

*Hecht v. Com. Clearing House, Inc.*,
   897 F.2d 21 (2d Cir. 1990) ...........................................................................15, 31

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992) .............................................................................................15

*Khan Funds Mgmt. Am., Inc. v. Nations Techs. Inc.*,
   No. 22-cv-5055, 2023 WL 6124801 (S.D.N.Y. Sept. 19, 2023) ...........................31

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012) .........................................................................23, 24

*Long v. Zhuang*,
   No. 22-cv-1293, 2024 WL 4250308 (E.D.N.Y. Aug. 8, 2024) ............................22

*In re Merrill Lynch Ltd. P'ships Litig.*,
   154 F.3d 56 (2d Cir. 1998) ............................................................................23, 24

iii

*Motorola Credit Corp. v. Uzan*,
 322 F.3d 130 (2d Cir. 2003) (per curiam) ......................................................16, 17

*New York v. Canepa*,
 295 A.D.2d 247 (N.Y. Sup. Ct. App. Div. 2002) ...........................................27, 28

*O'Brien v. Nat'l Prop. Analysts Partners*,
 719 F. Supp. 222 (S.D.N.Y. 1989) ....................................................................24

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
 822 F.3d 650 (2d Cir. 2016) ..............................................................................26

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
 508 U.S. 49 (1993) ......................................................................................32, 33

*Rajaratnam v. Motley Rice, LLC*,
 449 F. Supp. 3d 45 (E.D.N.Y. 2020) ...........................................................22, 28

*Reich v. Lopez*,
 858 F.3d 55 (2d Cir. 2017) .....................................................................24, 28, 30

*Roberto's Fruit Mkt., Inc. v. Schaffer*,
 13 F. Supp. 2d 390 (E.D.N.Y. 1998) ................................................................28

*Rothman v. Gregor*,
 220 F.3d 81 (2d Cir. 2000) ................................................................................4

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
 75 F.3d 801 (2d Cir. 1996) ................................................................................4

*Schlaifer Nance & Co. v. Est. of Warhol*,
 119 F.3d 91 (2d Cir. 1997) ................................................................................29

*Schmidt v. Am. Package Co.*,
 No. 23-cv-5821, 2024 WL 85073 (E.D.N.Y. Jan. 8, 2024) ................................23

*Seidler v. Knopf*,
 186 A.D.3d 886 (N.Y. Sup. Ct. App. Div. 2020) ...............................................19

*Sergeants Benevolent Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP*,
 806 F.3d 71 (2d Cir. 2015) ................................................................................20

*Shields v. Citytrust Bancorp, Inc.*,
 25 F.3d 1124 (2d Cir. 1994) ..............................................................................27

*In re Simels*,
 94 A.D.3d 108 (N.Y. Sup. Ct. App. Div. 2012) ................................................27

*Singh v. NYCTL 2009-A Tr.*,
683 F. App'x 76 (2d Cir. 2017) ........................................................32

*Sky Med. Supply Inc. v. SCS Supp. Claims Servs., Inc.*,
17 F. Supp. 3d 207 (E.D.N.Y. 2014) ....................................15, 16, 17, 18

*Sykes v. Mel Harris and Assocs., LLC*,
757 F. Supp. 2d 413 (S.D.N.Y. 2010) ................................................34

*Tooker v. Guerrera*,
No. 15-cv-2430, 2017 WL 3475994 (E.D.N.Y. Aug. 11, 2017) ..........30

*Turner v. N.Y. Rosbruch/Harnik, Inc.*,
84 F. Supp. 3d 161 (E.D.N.Y. 2015) ..................................................26

*U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chi., Inc.*,
953 F.3d 955 (7th Cir. 2020) ..............................................................32

*Uber Sexual Assault Survivors for Legal Accountability v. Uber Techs., Inc.*,
562 P.3d 519 (Nev. 2025) ......................................................................1

*Uber Techs., Inc. v. Downtown LA Law Grp. LLP*,
25-cv-6612 (C.D. Cal. July 20, 2025)....................................................1

*Uber Techs., Inc. v. Law Grp. of South Florida, LLC*,
25-cv-22635 (S.D. Fla. June 11, 2025)..................................................1

*Uber Techs., Inc. v. U.S. Jud. Panel on Multidistrict Litig.*,
131 F.4th 661 (9th Cir. 2025) ................................................................1

*Walker v. Senecal*,
130 F.4th 291 (2d Cir. 2025) ..............................................................14

*Zamora v. FIT Int'l Grp.*,
834 F. App'x 622 (2d Cir. 2020) ........................................................31

## STATUTES & RULES

18 U.S.C. § 1964(c)...............................................................14, 15, 23

22 N.Y.C.R. § 130-1.1 ........................................................................16

22 N.Y.C.R. § 130-1.2 ........................................................................16

N.Y. C.P.L.R. § 8101 ..........................................................................16

N.Y. C.P.L.R. § 8106 ..........................................................................16

N.Y. C.P.L.R. § 8301 ..................................................................................16

N.Y. C.P.L.R. § 8303 ..................................................................................16

N.Y. C.P.L.R. § 8303-a ...............................................................................16

N.Y. Jud. Law § 487 ...............................................................................31, 32

N.Y. Penal Law § 215.00 ........................................................................26, 27

Fed. R. Civ. Proc. 8 .................................................................................26, 27

Fed. R. Civ. Proc. 9 .................................................................................26, 27

N.Y. R. Pro. Conduct 1.8, cmt. 9B ...........................................................4, 27

N.Y. R. Pro. Conduct 7.2(a)(2) .....................................................................4

### OTHER AUTHORITIES

*About Us*, Lavelle Law Firm ...........................................................................3

Emily Steel, *Uber's Festering Sexual Assault Problem*, N.Y. Times
    (Aug. 7, 2025) ...........................................................................................1

Natalie Lung, *Uber Targets Personal Injury Lawyers in Multimillion Dollar Ad
    Campaign,* Bloomberg (Feb. 14, 2025) .................................................1

N.Y.C. Formal Op. 2011-2 ............................................................................4

# INTRODUCTION

Uber is waging a multimillion-dollar campaign to close the courthouse doors to plaintiffs and their attorneys. It has championed a "misleading" ballot initiative in Nevada to cap contingency fees. *Uber Sexual Assault Survivors for Legal Accountability v. Uber Techs., Inc.*, 562 P.3d 519 (Nev. 2025). It has gone to great lengths to stop sexual assault survivors from pursuing relief through multidistrict litigation. *Uber Techs., Inc. v. U.S. Jud. Panel on Multidistrict Litig.*, 131 F.4th 661 (9th Cir. 2025). And it has spent millions on media ads attacking personal injury lawyers. *See* Natalie Lung, *Uber Targets Personal Injury Lawyers in Multimillion Dollar Ad Campaign*, Bloomberg (Feb. 14, 2025).

Uber now co-opts the civil RICO statute to further its campaign, filing "racketeering" charges against plaintiffs' attorneys across the country. In cases filed in several different federal districts, Uber asks courts to believe that Uber is the victim of ***multiple, independent*** racketeering schemes, and that ***multiple, independent*** criminal enterprises consisting of ***multiple, independent*** plaintiffs' lawyers and doctors are conspiring to cause Uber's demise.[1] The unluckiest company in the world? Certainly not. Uber is a sprawling company with a history of troubling conduct. *See* Emily Steel, *Uber's Festering Sexual Assault Problem*, N.Y. Times (Aug. 7, 2025). That leads to lawsuits. Instead of simply defending against those lawsuits, Uber has instead decided to fire the first shot—to bring lawsuits against plaintiffs' lawyers, to deter them from suing Uber at all. ***That*** is an inappropriate use of the legal system. It cannot persist.

This is now Uber's second attempt to paint plaintiffs' attorneys Lavelle and Banilov as "racketeers." Defendants moved to dismiss Uber's original complaint, laying out its defects in great detail and resulting in Uber seeking leave to amend. In its amended complaint, Uber tries—

---

[1] *See Uber Techs., Inc. v. Downtown LA Law Grp. LLP*, 25-cv-6612 (C.D. Cal. July 20, 2025); *Uber Techs., Inc. v. Law Grp. of S. Fla., LLC*, 25-cv-22635 (S.D. Fla. June 11, 2025).

but fails—to cure those many defects by adding another purported conspirator (Tarasov) to pad its "enterprise" and packing in state-court cases unrelated to Uber to beef up its supposed "pattern" of predicate acts. In reality, after months of trawling thousands of personal injury cases brought by four plaintiffs' firms over nearly a decade, Uber came back with fewer than twenty cases it claims are products of fraud and bribery—only five of which involved Uber at all. In none of those cases did a state litigant ever accuse an attorney of committing fraud, bribery, or conspiracy.

None of Uber's revisions cure the complaint's defects. Uber's amended allegations against Emily Lavelle, Nick Banilov, and Igor Tarasov (and the Lavelle and Banilov firms) are particularly deficient. At the threshold, Uber's claims are unripe and untimely. They also fail on the merits. Uber attributes fifteen state cases to Lavelle, Banilov, or Tarasov. Only four involve Uber, and three remain ongoing in state court. Any supposed injury to Uber will not be "clear and definite" until each case ends, rendering Uber's RICO claims unripe. Nor has Uber linked any supposed injury to the racketeering acts it attributes to Lavelle, Banilov, or Tarasov, as required for RICO standing. Indeed, Uber nowhere alleges that Lavelle or Banilov ever sued it, so they could not have directly injured Uber. Beyond that, in all four of its state cases, Uber sought indemnification and expenses from the Uber drivers, effectively attributing any injury to its *drivers*, not Lavelle, Banilov, or Tarasov. Beyond the lack of RICO standing, Uber's claims are untimely. Uber knew of what it claims to be injury *seven* years ago, far outside the four-year limitations period.

Any of these threshold defects warrant dismissal, but Uber also fails to state a RICO claim. Uber has not adequately alleged basic RICO elements, such as the requisite predicate acts, a continuous pattern of predicate acts, or a RICO "enterprise." Its other claims fare no better: Uber's RICO "conspiracy" claim necessarily falls with its substantive RICO claims. And Uber's claim for "deceit" under New York's Judiciary Law is facially defective as to Tarasov, and particularly

untenable as to Lavelle and Banilov, who never made deceptive statements in any filing to which Uber was a party. Even if Uber cleared each hurdle (and it must clear them all), the First Amendment *Noerr-Pennington* doctrine, which immunizes litigation activity from liability—and all of Uber's alleged predicate acts are indeed litigation activity—independently bars all claims.

Even one of these incurable defects requires dismissal with prejudice. But together, they unmask Uber's amended complaint for what it is—a ploy to close the courtroom door to the plaintiffs' bar—and substantiate the need for immediate dismissal with prejudice.

## BACKGROUND

Just as in its initial complaint, Uber uses conclusory labels and rampant information-and-belief allegations to transform otherwise innocuous litigation conduct by plaintiffs' attorneys into "racketeering." *E.g.*, Dkt. 68 (Compl.) ¶¶ 119-120. Uber now uses more than 100 pages to brand plaintiffs' lawyers and doctors as criminals, calling their litigation statements "fraudulent" or "knowingly false," and deeming their referral of injured clients to doctors a conspiracy. *E.g., id.* ¶¶ 126-127, 135-136, 150-151. Uber labels any payment to a doctor as "corrupt[ ]" or "bribery," and it calls any legal or medical opinion it disagrees with "fraud." *E.g., id.* ¶¶ 61, 72, 87. Uber degrades the state-court plaintiffs' injuries as "not serious[ ]," effectively accusing nearly every victim of a car crash as complicit in the conspiracy against Uber. *E.g., id.* ¶¶ 96, 115, 138. And because it must, Uber recites full elements of its claims without ***any*** accompanying facts. *E.g., id.* ¶¶ 302-304, 311-312.

Uber's say-so does not make it so. Emily Lavelle is one of four lawyers at the Lavelle Law Firm, founded by her father. *About Us*, Lavelle Law Firm, https://tinyurl.com/5n8vabep. Her clients are often low-income, non-native-English speakers. Nick Banilov and Igor Tarasov are solo practitioners who share office space and serve a similar clientele, but practice under separate professional corporations. *See* Ex. 103; Ex. 104. Between them, Lavelle, Banilov, and Tarasov

have been practicing for more than sixty years. All have clean disciplinary histories. *See* Ex. 102; Ex. 103; Ex. 104.

Much of the conduct Uber portrays as criminal is legitimate professional activity. While Uber paints a nefarious image of lawyers referring cases to each other, lawyers may and often do refer clients to other lawyers. *See* N.Y. R. Pro. Conduct 7.2(a)(2). Lawyers may also refer clients to medical providers. For clients who cannot afford medical care, practitioners may help them obtain litigation financing. *See* N.Y.C. Formal Op. 2011-2. To be sure, New York permits lawyers to pay for case-related "medical diagnostic work" and "treatment" in contingency cases. N.Y. R. Pro. Conduct 1.8, cmt. 9B.

Uber's second bite at the apple suffers from countless infirmities, many the same as in its original filing. In its amended complaint, Uber expands its effort to craft a criminal racketeering pattern by newly relying on nineteen state-court cases, fifteen of which involve Lavelle, Banilov, or Tarasov. Compl. ¶¶ 35-98, 114-139, 141-200, 209-269. Just four of those cases involved Uber. *Id.* ¶¶ 35-98, 114-139. In only **one** of those cases did **one** of these defendants—Tarasov—ever file even a single document while Uber was a party to the case. *Id.* ¶¶ 129-139.

Just like in its original complaint, and as elaborated below, each state-court case cited by Uber follows the same pattern: a passenger (sometimes in an Uber) is involved in an accident and hires a lawyer defendant. *E.g.,* Compl. ¶¶ 114-117. Using information from the client, the lawyer files a complaint in state court against the drivers and sometimes also Uber. *E.g.*, *id.* ¶ 121.[2] As alleged, the lawyer also refers the client to a doctor for treatment and sometimes assists the client

---

[2] The Court may take judicial notice of the state-court filings. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). It may also consider the filings because they are integral to Uber's complaint. *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996). All cited filings are exhibits to the Cogan Declaration.

in arranging financing for that treatment.  *E.g.*, *id.* ¶ 117.  The case proceeds in state court, and sometimes the lawyer refers the case to a larger law firm.  *E.g.*, *id.* ¶ 123.

## I.  THE STATE-COURT CASES NOT INVOLVING UBER

Fourteen of the state cases in Uber's amended complaint have nothing to do with Uber and date back ***nearly a decade***.  Eleven of those cases involve Lavelle, Banilov, or Tarasov.[3]  Of those, nine settled or survived summary judgment on the merits.  Ex. 60; Ex. 62; Ex. 65; Ex. 66; Ex. 67; Ex. 74; Ex. 75; Ex. 76; Ex. 91.  One was tried before a jury.  Ex. 84.  The defendants in these cases knew the facts first-hand, received discovery, or both.  No defendant claimed any attorney fabricated the claims or evidence, filed any false or fraudulent papers, or bribed any witness.

The *Ashurov* case in the amended complaint is illustrative of the state cases that settled.  Uber relies on this case to claim Banilov was purportedly engaged in a "conspiracy" with the doctor Defendants.  The truth speaks for itself.  While driving his car, state plaintiff Ashurov was rear-ended.  The "entire front" of the other driver's car "was smashed."  Ex. 69 at 28:2-3; Ex. 70.  Uber was not involved in the case, but now pleads on "information and belief" that Banilov directed Ashurov's treatment.  Compl. ¶ 194.  The information does not support Uber's "belief."  Dr. Buberman,[4] a spine and neck specialist, referred Ashurov just days after the accident to Dr. Reyfman, who later referred Ashurov to Dr. Gerling.  Ex. 69 at 32:20-33:3, 34:10-21, 37:14-39:5.  A year later, Banilov sued the other driver on Ashurov's behalf.  Ex. 68.  The case settled years ago—without any accusations of fraud, conspiracy, corruption, or bribery.  Ex. 71.

---

[3] Uber attributes a twelfth case—the *Asamov* case—to the "Banilov Defendants," even though Banilov (and Banilov & Associates P.C.) never appeared in the case.  Compl. ¶¶ 153-162.  For brevity, we do not discuss that case.  The legal defects discussed below, however, apply equally to the allegations regarding the *Asamov* case.

[4] Dr. Buberman's first name does not appear in Ashurov's deposition transcript.  The case settled before Ashurov's medical records were filed to the docket.  Ex. 67.

Uber also cites the *Tagiyev* case, which went to trial. Again uninvolved in the case, Uber now says this case proves a "conspiracy" involving Tarasov and the doctor Defendants. This is, again, belied by the evidence. Tagiyev "double-parked" his car;[5] it was then hit by a bus. Compl. ¶ 244. **Six** different doctors (one was Dr. Gerling) diagnosed and treated Tagiyev's injuries. Ex. 85 at 24, 29, 33, 37, 46, 55. Tagiyev, represented by Tarasov, sued the bus driver. Compl. ¶ 248. Fact and expert discovery followed, with nonparty experts testifying on Tagiyev's behalf. Ex. 84. The parties and their experts disagreed on many points. Had there been any conspiracy or corrupt bribery to "swing" the case for Tagiyev (there was not), it failed miserably: The jury ultimately found for the bus driver. Ex. 89. No one ever alleged the suit was fabricated, that counsel committed any misconduct, or that either side was entitled to costs or fees. *See* Ex. 84.

The *Perez* case is the only non-Uber case that neither settled nor survived summary judgment. State plaintiff Perez said he was involved in a car accident and retained Tarasov, who filed a complaint on Perez's behalf. Perez (not Tarasov) verified the complaint. Ex. 78 at 9. Wingate took over the case and shortly thereafter sought leave to be removed as counsel after learning that Perez and others allegedly fraudulently obtained insurance, staged car accidents, and made fraudulent insurance claims for the staged accidents. *See* Ex. 77. No one has ever alleged that Tarasov knew of Perez's fraud when filing the original complaint. *See* Compl. ¶¶ 237-243; *see generally* Ex. 79; Ex. 80; Ex. 81; Ex. 82; Ex. 83.

In none of these eleven non-Uber cases involving Lavelle, Banilov, or Tarasov did any defendant ever allege that counsel engaged in misconduct. In none did any defendant seek sanctions against counsel. In none did any defendant accuse counsel of misleading the defense or

---

[5] Incidentally, Tagiyev was an Uber driver, but the company was not and never became involved.

the court, or fabricating evidence.  Only now in its amended complaint does Uber claim to know

what happened better than the parties and courts involved in the state cases years ago.

## II.   THE STATE-COURT CASES INVOLVING UBER

The five cases in the amended complaint that involve Uber (four involved Lavelle, Banilov,

or Tarasov) are notably similar.  Each case involved a real (not staged) car accident.  In ***each*** case,

Uber cross-claimed against its ***co-defendants*** (typically, drivers) seeking indemnification for any

judgment against Uber, and its fees.  In ***no*** case did Uber argue the claims or injuries were fabri-

cated or accuse any participant (or witness) of misconduct.  In ***no*** case did Uber dispute the plain-

tiff's injuries at summary judgment; it argued only that it could not be liable because its drivers

are independent contractors or because the non-Uber driver caused the accident.  In three of the

cases, Uber was not named as a defendant in the original complaint.  Four are ongoing.

**Lavelle**.  Uber attributes only the *Callum* case to Lavelle.  Compl. ¶¶ 80-96.  That case

began after a fuel truck hit the Uber that Callum was riding in.  *Id.* ¶ 80; *see* Ex. 26 ¶ 4.  An

ambulance responded.  Compl. ¶ 80.  Callum's Uber driver told police that the crash caused "a lot

of damage[ ]."  Ex. 25 at 6.  Callum went to the emergency room.  Compl. ¶ 81.  She later received

medical treatment, spanning physical therapy to surgery, provided by Dr. Gerling and ***nine*** doctors

not alleged to be part of the conspiracy.  *Id.* ¶ 84; *See* Ex. 18 ¶ 13.  Dr. Gerling and another doctor

uninvolved in the alleged scheme attested to Callum's "significant" injuries.  Ex. 23 at 2.

In 2019, Callum retained Lavelle, who sued the Uber driver, the semi-truck driver, and the

company that owned the semi-truck.  *See* Compl. ¶ 83.  To draft the complaint, Lavelle relied on

records provided to her and "communications with the plaintiff."  Ex. 17 at 11.  Lavelle relied on

similar information to later draft a bill of particulars.  *See* Ex. 18 at 10.

Lavelle did not sue Uber.  In 2020, Lavelle withdrew from the case (when Uber was not a

party).  Compl. ¶¶ 90-91.  New counsel (Wingate) amended the complaint, adding Uber as a

defendant.  *Id.* ¶ 91.  Upon amendment, Uber now asserts that "Lavelle's plan from the outset" was to transfer the case to Wingate, who, she must have assumed, would then surely amend to sue Uber.  Compl. ¶ 91.  Uber never explains how it could possibly know this.  *Id.*  Nor does Uber offer facts from which Lavelle's alleged intent could be inferred.  *See id.* ¶¶ 80-96.

Once added, Uber filed cross-claims for contribution and indemnification against its driver co-defendants.  Ex. 19.  Uber claimed the drivers' "carelessness, recklessness, and/or negligent acts" caused Callum's injuries.  *Id.* at 15-16.  Uber therefore argued it was not liable for the accident and that the drivers (not Callum or her counsel) should pay its fees.  *Id.*  Uber never moved to dismiss the amended complaint as baseless, argued that any filing contained fraudulent statements, or sought sanctions or fees from Callum or her counsel.  *See* Ex. 16.

Callum's Uber driver moved for summary judgment, arguing Callum's injuries were not " 'serious.' "  Ex. 23 at 1.  In largely denying summary judgment, the court noted that Dr. Gerling's reports ***and*** evidence from another doctor supported the claimed "persisting" and "significant" injuries, leading it to find "issues of fact as to whether plaintiff sustained a serious injury." *Id* at 2.

Uber's motion for summary judgment, filed just last year, did not dispute Callum's injuries or raise concerns about purported fraud.  *See generally* Ex. 24.  Uber argued only that it could not be liable for the driver's conduct.  *Id.*  That motion and suit are pending.  *See* Ex. 16.

Uber's characterization of the *Callum* case here in federal court is very different.  Now, Uber speculates (on "information and belief") that Callum "was directed" to doctors "by her lawyers," who "fraudulently manufactured" the injuries for litigation.  Compl. ¶¶ 82, 84, 87.  Uber also hypothesizes that certain statements in Callum's state complaint and bill of particulars were "false" and that, again, "on information and belief," Lavelle purportedly knew so.  *Id.* ¶¶ 83, 89.  But Uber never addresses the ***independent*** medical evidence showing a dispute of fact over the

injuries Uber now labels "false." *See* Ex. 23 at 2. Uber also speculates that when Lavelle supposedly facilitated financing or "paid for" Callum's treatment, it was to "bribe" Dr. Gerling. Compl. ¶ 87. Uber relies exclusively on its "information and belief" that Lavelle's facially legit-imate conduct (even as alleged) was done to "influence" Dr. Gerling's testimony. *Id.* Indeed, Uber never alleges the financing was excessive or otherwise unusual. *See id.* Nor does Uber mention that **nine** other doctors also treated Callum for injuries she sustained. Ex. 18 ¶ 13. And even with its summary judgment motion pending, Uber still has not alerted the state court to its "belief" that a witness in that case was bribed.

**Banilov**. Gorbacevska was a passenger in an Uber driving behind a pickup truck. A box fell out of the truck. Compl. ¶ 35. The Uber driver "attempted to avoid the box by 'slamming' on his brakes and swerving his vehicle," which was travelling at "45-50 miles per hour." Ex. 9 ¶ 63. The drivers exchanged information. Compl. ¶ 38. Gorbacevska rode home in the pickup (not the Uber), at which point she reportedly told the pickup driver about her plan to use the incident to "ride the insurance claim and sue the [Uber] driver." *Id.* (brackets omitted).

Gorbacevska later retained Banilov, who filed a complaint on her behalf in 2020 against both drivers. Ex. 2. That complaint alleged that after the box fell, Gorbacevska's Uber "rear-end[ed]" the pickup, causing a "serious injury" to Gorbacevska. *Id.* ¶¶ 28, 33. Gorbacevska (not Banilov) verified the complaint. *Id.* at 8. Thereafter, Banilov ceased to represent Gorbacevska.[6]

In late 2020, new counsel (Wingate) took over the case and added Uber as a defendant. Compl. ¶¶ 63-64; Ex. 1. The new complaint chiefly alleged that Uber negligently hired the driver and that the Uber "app" encouraged distracted driving. Ex. 3 ¶¶ 48-63. Even after discovery

---

[6] Though Banilov did not withdraw from the case on the docket, it was clear Banilov was no longer involved, evidenced by Uber serving its subsequent filings on only Wingate. *E.g.*, Ex. 5.

yielded dashcam video showing that Gorbacevska's Uber collided with the cardboard box containing a sofa cushion, Uber did not move to dismiss the amended complaint as fraudulent, nor did it seek sanctions. It sought more time to complete discovery instead. Ex. 7 ¶¶ 5-7.

As in the *Callum* case, Uber cross-claimed, seeking contribution and indemnification for any judgment and fees from its ***co-defendants***. Ex. 5 at 12-15. Uber eventually moved for summary judgment in 2024, arguing it could not be held liable because the driver was an independent contractor. Ex. 9 ¶¶ 16-53. Uber never addressed the collision with the cardboard box. It did not challenge the degree of Gorbacevska's injuries. *Id.* ¶¶ 54-73. Nor did Uber mention the supposedly "fabricated" evidence or bribe-induced witness statements that it harps on here. Uber never sought sanctions or fees from Gorbacevska or her counsel. Ex. 1.

The state court granted Uber's motion for summary judgment, ruling it could not be held liable for an independent contractor's acts. Ex. 12. The court entered judgment "without costs." Ex. 13. The case remains pending against the drivers. Ex. 1.

Again, Uber spins a different tale here. More than four years after Banilov exited the case, Uber now says on "information and belief" that Banilov "fabricat[ed] evidence" by completing and submitting a Report of Motor Vehicle Accident form in July 2020. Compl. ¶¶ 39-42. Without facts, Uber speculates that Banilov knew the accident description he filed was "false." *Id.* ¶ 56.

Only after amendment, Uber claims on "information and belief" that "Gorbecevska's lawyers were also aware of her plans" to fabricate a claim against the insurance company. Compl. ¶ 38. Uber also now conveniently alleges, on "information and belief," that Banilov always "intended" to "add Uber as a defendant," but waited for a "strategic advantage" to do so. *Id.* ¶ 60. Uber never says what new "information" gave rise to its new "belief[s]" about events that happened years ago. *See id.* ¶¶ 38, 60. Uber also now adds that it "incurred hundreds of thousands

of dollars in unreimbursed defense costs," and that, for unexplained and unknowable reasons, it "relied on" the obsoleted original complaint Banilov had filed against **non-**Uber defendants when "evaluating" the case. *Id.* ¶¶ 64, 79. Even if true, Uber never plausibly alleges how a superseded complaint against non-Uber defendants caused it to incur any portion of its alleged expended costs.

Uber goes on to speculate, again on "information and belief," that Banilov "coordinated" Gorbacevska's medical care or "directed" supposedly "unnecessary" treatment. Compl. ¶¶ 42, 45. Resounding its chorus of "information and belief," Uber claims that unspecified counsel at an unknown date, through unknown means, "funded" medical treatments through "excessive" (but unspecified) payments to supposedly "induc[e] false statements and testimony" from the doctor Defendants. *Id.* ¶ 45. Uber offers no supporting facts.

**Tarasov (Khalilova)**. In 2016, state plaintiff Khalilova was in an Uber when it was "violently" struck by a car "fleeing the police and travelling at a high rate of speed." Ex. 46 at 2. She was taken to the emergency room in an ambulance, where she complained of injuries to her "spine, neck, back, and arm." Ex. 44 at 42:15-43:9. The next day, a doctor unconnected to the alleged scheme treated Khalilova and recommended additional care, including from Dr. Reyfman. Compl. ¶ 116; Ex. 44 at 54:10-16, 63:2-13. Uber claims Khalilova was uninjured because she rode the subway. Compl. ¶ 115. (Was she supposed to take another Uber?) Tarasov filed a complaint on Khalilova's behalf against the owner of the car that crashed into the Uber. *Id.* ¶ 121; Ex. 40 ¶ 31. That complaint did not name Uber or Khalilova's Uber driver. *See* Ex. 40.

In 2017, Wingate took over the case and added Uber and the Uber driver in an amended complaint. Compl. ¶¶ 123-124; *see* Ex. 41; Ex. 42. Uber again filed cross-claims against its co-defendants. Ex. 43 at 12-13. The court denied Uber's summary judgment motion, which did not contest Khalilova's injuries. *See generally* Ex. 45; Ex. 46. The "gist" of Uber's argument was

that its driver was not negligent, so it could not be vicariously liable. Ex. 46 at 3. But the Uber driver refused to be deposed, so the court could not say if the Uber driver was not negligent, as Uber claimed. *Id.*

Uber settled with Khalilova. Ex. 47. It settled after an "independent medical review" of Khalilova's records. Compl. ¶ 118. It settled after *years* of litigation and discovery. Ex. 39. It settled without claiming the facts were fabricated or accusing Khalilova's counsel of misconduct. *See id.* Uber never says whether its insurer covered the settlement or case costs. Compl. ¶ 128.

Though the facts are the same, Uber now claims that the case it settled three years ago was an "obvious" fabrication. Compl. ¶ 126. It says the 80-mph crash requiring an ambulance trip to the hospital was not "serious[ ]." *Id.* ¶¶ 114-15. With belief (but no "information"), Uber now claims the "Banilov Defendants" directed medical treatment that was unnecessary. *Id.* ¶ 117. And Uber alleges the "Banilov Defendants" always intended to sue Uber, but sought an unspecified advantage by first seeking "early non-party discovery from Uber." *Id.* ¶¶ 121-22. Uber's notion that gathering *more* information before suing someone suggests bad faith eludes reason.

**Tarasov (Lopez)**. A car hit the Uber that Lopez was riding in, injuring his neck. Compl. ¶ 129; Ex. 52 at 11:20-22, 14:16-18. Paramedics responded. Ex. 58 at 3. A doctor uninvolved in the supposed scheme documented injuries to Lopez's spine, including several "disc protrusion[s]," "annular fissure[s] causing impingement[s]," and contact with various "spinal nerves." Ex. 54 at 3-4. Another uninvolved doctor documented Lopez's pain and diagnosed various injuries, including "cervical sprain," "[t]horacic back sprain," and "derangement of right shoulder." Ex. 58 at 4-6. The report also notes that Lopez "was not wearing [his] seatbelt." *Id.* at 3. Lopez testified that he missed "[s]even to eight months" of work, and he could no longer play soccer. Ex. 52 at 29:6-10, 31:17-19.

After the accident, Lopez retained Tarasov, who sued the drivers and Uber.  Ex. 49.  Lopez

(not Tarasov) verified the complaint.  *Id.* at 10.  Uber did not move to dismiss or for summary

judgment.  In its only filing in the case, Uber cross-claimed against its co-defendants for indemni-

fication.  Ex. 50 at 11-12.  Uber has never sought sanctions, fees, or costs.  *See* Ex. 48.

The drivers unsuccessfully moved for summary judgment.  Their expert noted injuries to

Lopez's spine and shoulder, but speculated that those injuries were "degenerative" or "chronic,"

rather than the result of the car accident.  Ex. 51 at 4-7.  Lopez's experts (most unconnected to the

alleged scheme) disagreed with that opinion and confirmed his injuries.  *See* Ex. 53; Ex. 54; Ex. 55;

Ex. 56; Ex. 57; Ex. 58.  The state court denied summary judgment, finding a genuine dispute as to

whether Lopez "suffer[ed] a serious injury."  Ex. 59 at 2.  The case remains pending.

Uber again paints a different picture for this Court today.  Uber never mentions the indepen-

dent medical evidence documenting Lopez's injuries.  *See* Compl. ¶¶129-139.  Uber claims those

injuries were improbable for someone "wearing his seatbelt," *id.* ¶130—inexplicably ignoring the

report saying Lopez in fact was ***not*** wearing his seatbelt, Ex. 58 at 3; *but see* Ex. 56 at 3.  Uber

offers no facts, only its "belief" that any medical opinion or legal assertion it disagrees with is

"fraudulent."  *See* Compl. ¶¶131-135.  Uber claims it has "incurred substantial defense costs," *id.*

¶139, but never mentions its pending cross-claims against the state-court co-defendants for

indemnification, Ex. 50 at 11-12.  Nor does Uber connect its supposed "costs" to the specific

supposedly "fraudulent" legal or medical opinions in the court filings.

## ARGUMENT

Uber fails to state a single claim against Lavelle, Banilov, or Tarasov.  The RICO claims

fail for innumerable different reasons, but Uber's lack of RICO standing is so plain that the Court

can dismiss without reaching the other defects.  Uber also fails to plead a RICO enterprise or even

one predicate act, let alone a pattern.  And its claims are out of time.  The RICO conspiracy claims

must fall along with the substantive charges. Uber's New York Judiciary Law claim is equally defective—Uber never identifies even one "deceitful" court filing by Lavelle or Banilov to which Uber was a party, and the allegations against Tarasov are facially defective. Finally, all conduct Uber attributes to these defendants is immunized by *Noerr-Pennington*.

These defects all stem from Uber's tactic of simply alleging what it wishes to be true. Uber's unsupported allegations may serve as grenades in Uber's P.R. campaign against plaintiffs' lawyers, but they do not suffice in federal court, where a complaint must contain sufficient "factual matter" to survive a motion to dismiss. *Walker v. Senecal*, 130 F.4th 291, 297 (2d Cir. 2025). Mere "labels and conclusions" with "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nor will allegations susceptible to an "obvious alternative explanation," *id.* at 567, or that are "merely consistent with" liability, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And labels are all Uber relies on: "false" or "fraudulent" claims, "not serious" injuries, "unnecessary" medical procedures, and intent to "bribe" or "defraud." Rhetoric, without fact, is insufficient to allege legal claims. Dismissal is required.

## I.   UBER FAILS TO STATE A RICO CLAIM AGAINST LAVELLE, BANILOV, OR TARASOV

Civil RICO is "an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017). It carries treble damages, costs, and attorneys' fees, 18 U.S.C. § 1964(c), on top of the "extraordinary costs" it imposes on defendants to defend against such "complex charges." *Gross v. Waywell*, 628 F. Supp. 2d 475, 480 (S.D.N.Y. 2009). Beyond the financial toll, "the 'mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants.'" *Flexborrow*, 255 F. Supp. 3d at 414 (ellipses omitted). It labels them racketeers—criminals like the "mobsters and violent thugs who ordinarily fill the plots of organized crime." *Gross*, 628 F. Supp. 2d at 480.

Even a baseless accusation may inflict "permanent reputational injury." *Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 167 (E.D.N.Y. 2010).

Though "civil RICO may be a 'potent weapon,' plaintiffs wielding RICO almost always miss the mark." *Flexborrow*, 255 F. Supp. 3d at 414. To clear civil RICO's "many hurdles," a plaintiff must plausibly allege that each defendant (1) conducted or conspired to conduct, (2) the affairs of an "enterprise," (3) through a pattern, (4) of racketeering activity (*i.e.*, "predicate acts"), (5) that directly injured the plaintiff's business or property. *Id.* Courts strictly enforce each element specifically to "flush out frivolous RICO allegations at an early stage of the litigation." *Id.*

Uber's RICO claims typify the overreaching that courts have bemoaned. Each claim fails at the threshold for lack of RICO standing or as untimely, and fails on each substantive element.

## A.      Uber Lacks RICO Standing

Congress provided a civil cause of action only for plaintiffs "injured in [their] business or property by reason of [a RICO violation]." 18 U.S.C. § 1964(c). That element, known as "RICO standing," requires a plaintiff to show its claims are "ripe"—meaning its damages are "clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767-69 (2d Cir. 1994). RICO standing also requires that each defendant's predicate acts be the "but for" and "proximate" cause of the plaintiff's injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). The RICO standing test for conspiracy under § 1964(d) is substantively identical. *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990). Uber flunks that test—its claims are unripe because its damages are not clear and definite, and it does not allege Lavelle, Banilov, or Tarasov proximately caused its imagined injuries.

### 1.      *Uber's Claims Are Unripe Because Its Damages Are Not Clear and Definite*

Uber's supposed damages are not "clear and definite." *Sky Med. Supply Inc. v. SCS Supp. Claims Servs., Inc.*, 17 F. Supp. 3d 207, 231 (E.D.N.Y. 2014). Damages are neither clear nor

definite if they involve "contingencies." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 136 (2d Cir. 2003) (per curiam). Though the possibility of added future damages does not render an injury unripe, an injury *is* unripe if there are unexhausted "legal remedies" that might **reduce** a loss. *DLJ Mortg. Cap., Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 237 (E.D.N.Y. 2010); *see GEICO v. Akiva Imaging Inc.*, No. 1:24-cv-6549, 2025 WL 1434297, at *4 (E.D.N.Y. May 19, 2025) ("What matters is . . . damages will not decrease.").

Uber's "injury" is paradigmatically unripe because all but one of the state cases involving Uber remain pending. Ex. 1; Ex. 16; Ex. 27; Ex. 48. If the plaintiffs prevail, it would "reduce the amount that [Uber] could recover under RICO." *Sky Med. Supply*, 17 F. Supp. 3d at 233. That the *Khalilova* case settled in 2022 is irrelevant. Uber's damages are not definite "so long as *some* of the" state-court "claims that form the basis of plaintiff's RICO causes of action are still being litigated in state court." *Id.* at 232-33 (emphasis added). **Most are**.

The analysis does not change even if the state-court plaintiffs all lose the pending cases. Uber's damages would still turn on *how* each loss occurs. If, for example, one court finds triable facts on the merits but enters judgment for a technical reason, Uber could not recover costs associated with having to defend against the actual pleadings in that case. Or, if each state court rules that each case was frivolous, Uber would still have remedies that may reduce its damages, such as seeking costs or sanctions in state court. *See* N.Y. C.P.L.R. §§ 8101, 8106, 8301, 8303, 8303-a (costs); 22 N.Y.C.R. §§ 130-1.1, 130-1.2 (sanctions). That is true even for *Gorbacevska* (where Uber, but not the drivers, won summary judgment), since there is no time limit on such an award and Uber's cross-claims against its co-defendants for costs remain pending. *See, e.g.*, N.Y. C.P.L.R. § 8106 (entrusting to court discretion); Ex. 13 (no judgment on Uber's cross-claims in

*Gorbacevska*).  Under any scenario, Uber has unexhausted legal remedies that may reduce its damages.  Thus, its claims are unripe.

That conclusion follows directly from Second Circuit precedent.  In *Motorola Credit*, for example, Motorola sued under civil RICO for misconduct related to a series of loans.  322 F.3d at 132.  But there were "arbitrations . . . pending" that concerned "the same underlying transactions" and that might reduce the "amount of loss," rendering Motorola's claims unripe.  *Id.* at 136-37.  In *D'Addario v. D'Addario*, 901 F.3d 80 (2d Cir. 2018), the court similarly held that RICO claims contingent on ongoing probate proceedings were unripe.  *Id.* at 95.  And in *First Nationwide*, the court held a bank's RICO claims were unripe because the bank had not "exhausted" other "remedies available to it."  27 F.3d at 768-69.  Each case is dispositive here.

And this case is materially indistinguishable from *Sky Medical Supply*, which involved allegedly frivolous personal-injury claims under New York's "no-fault" insurance law.  17 F. Supp. 3d at 214.  The plaintiff there was still "litigating . . . at least some of the no-fault claims" underlying its RICO claims.  *Id.* at 231.  A win in those underlying cases "would [have] reduce[d] the amount that [the] plaintiff could recover under RICO."  *Id.* at 233.  Even legal "costs" already incurred in those proceedings might be reduced since some were recoverable under New York law.  *Id.* at 234 n.11.  Thus, the damages were not clear and definite because "the net amount of a plaintiff's damages [was] subject to change."  *Id.* at 232.  So too here.

Uber cannot evade that precedent by inventing inconsistency with *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988).  That case held that RICO claims accrue when the defendant discovers (or should have discovered) its injury and that certain claims had accrued for "legal fees and other expenses" for two cases that had ended nearly a decade earlier.  859 F.2d at 1103, 1105.  But claims for losses tied to still-pending bankruptcy proceedings had **not** accrued because,

depending on the outcome, the plaintiff's "injury could be significantly reduced." *Id.* at 1106. Under *Bankers Trust*, Uber's claims are unripe until each state-court case is "dealt with." *Id.*[7]

### 2. *Uber Fails to Allege Proximate Cause*

RICO standing has a strict proximate cause requirement. *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 145 (2d Cir. 2018). Unlike in other contexts, "foreseeability and intention have little to no import." *Id.* Instead, the "central question" is whether a RICO violation "directly" caused the alleged injuries. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). If a "theory of causation" goes past "'the first step' in the causal chain," the answer is "no." *Empire Merchs.*, 902 F.3d at 141-42.

Uber cannot pass that test for the simple reason that Uber has not alleged that ***it*** suffered any injury at all. Even if the vague "defense" costs mentioned in the complaint were incurred, Uber alleges only one case (*Gorbacevska*) in which it (not its insurer) paid litigation costs. Compl. ¶ 79. The only inference is that Uber's insurer paid the costs in every other case. And even in *Gorbacevska*, Uber has pending cross-claims for indemnification against its co-defendants, meaning that Uber ***still*** may not suffer ***any*** unreimbursed "injury" at all. (It is precisely this pending uncertainty that underscores why Uber should not be permitted to bring unripe claims, based on pending state-court litigation.)

---

[7] Nothing in *Allstate Insurance Co. v. Lyons*, 843 F. Supp. 2d 358 (E.D.N.Y. 2012) changes that conclusion. That case involved allegedly fraudulent insurance claims that had been paid and were not the subject of pending litigation. *Id.* at 365-66. Claims for those losses were thus ripe even though Allstate could theoretically file new "state lawsuits for fraud" to alleviate the loss. *Id.* at 374. But that ruling "says nothing about the situation . . . where there is pending litigation" in a different forum that "could reduce or eliminate the plaintiff's alleged RICO injury." *Sky Medical Supply*, 17 F. Supp. 3d at 234. Where ***that*** is true, Second Circuit precedent leaves no doubt—the claims are unripe.

a. *Legal Filings Did Not Cause Injury*

Regardless, Uber never directly links *any* expense to the predicates it attributes to Lavelle, Banilov, or Tarasov. Uber ostensibly relies on each attorney's purportedly "fraudulent" filings, but those plainly did not injure Uber in the *Callum*, *Gorbacevska*, or *Khalilova* cases. *See* Compl. ¶¶ 40, 60, 83, 88, 121. In *Callum*, Lavelle never sued Uber, and she withdrew from the case before Uber became a party. *Id.* ¶¶ 83, 90. Wingate then filed an amended complaint, rendering the original and all derivative filings of "no effect." *Seidler v. Knopf*, 186 A.D.3d 886, 888 (N.Y. Sup. Ct. App. Div. 2020). It is the same for *Gorbacevska* and *Khalilova*—Banilov and Tarasov sued the drivers, not Uber. Compl. ¶¶ 40, 60, 121. Wingate sued Uber in amended complaints, overwriting prior filings. *Id.* ¶¶ 64, 124.

Recognizing its problem, Uber now alleges the "plan" in the *Gorbacevska* and *Khalilova* cases was always to collect third-party discovery from Uber and then sue it. Compl. ¶¶ 60, 91, 122. That conclusory allegation makes no sense. No lawyer in a contingency case would haggle for third-party discovery if the plan all along is to add that third-party as a defendant. Nor would "obtaining some discovery from the driver defendant" be needed if, as Uber claims, the whole case was fabricated. *Id.* ¶ 60. In fact, gathering that information would *impede* a quick settlement from the deeper-pocketed defendant. And in the *Callum* case, Uber inexplicably alleges that Lavelle's "plan" was to transfer the case so that new counsel "could add Uber." *Id.* ¶ 91. Why Lavelle would need to transfer the case to have another lawyer add Uber is unclear. Regardless, Uber's irresponsible speculation that Lavelle, Banilov, and Tarasov foresaw or even planned that Wingate would later add Uber as a defendant is irrelevant, because "foreseeability and intention have little to no import." *Empire Merchs.*, 902 F.3d at 145. Uber must link its injuries to Defendants' *acts*, not their intentions. *Id.* at 140. That it cannot do.

Even where Uber was sued directly, Uber cannot tie its "injuries" to any of Defendants' filings. Uber cross-claimed for indemnification from its co-defendants, stating it could not be liable even if the state-court plaintiffs' allegations were entirely accurate. *See* pp. 7-13, *supra*. And Uber's defense in each case had nothing to do with the merits of the allegations. In each case, Uber argued it could not be liable for its independent contractor's conduct or that any injuries were caused by the non-Uber driver. *See* Ex. 12 at 1; Ex. 24 ¶¶ 23-65; Ex. 45. Uber thus "would have acted in the same way" even had it been named in the original complaints and the allegations were wholly accurate. *Sergeants Benevolent Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015). Any supposedly false statements in those filings thus "cannot be a but-for, much less proximate, cause of the plaintiffs' injury." *Id.*

Nor does Uber plausibly allege any expenses were caused by Defendants' supposed racketeering. Uber newly alleges it "relied upon" the state-court plaintiffs' filings. Compl. ¶ 64. But actions speak louder than conclusory words. In the state courts, Uber disclaimed all liability for reasons unrelated to the validity of the allegations and sought costs from its ***co-defendants***, not the state-court plaintiffs or their counsel. *See* pp. 7-13, *supra*. And its new story is hot air. Uber claims, for example, it settled the *Khalilova* case only because its outside counsel and army of in-house lawyers were tricked into settling an "obvious" sham suit. Compl. ¶ 126. But it did so after discovery and while reporting to the state court that it willingly settled the (obvious sham) case "without costs." Ex. 47 at 1.[8]

---

[8] For similar reasons, Uber cannot claim RICO standing based on the eleven state-court cases in which it was never involved. *See* pp. 5-7, *supra*. Those cases obviously caused Uber no injury.

Uber also fails to establish that any so-called "bribes" proximately injured it.  Compl. ¶¶ 72, 87, 119.  Uber does not allege any bribery occurred in the *Lopez* or *Khalilova* cases.  *Id.* ¶¶ 114-139.  Elsewhere, Uber speculates that Lavelle and the "Banilov Defendants" bribed the doctor defendants to influence their potential testimony—before "hand[ing] off" the case to other attorneys who sued Uber.  Dkt. 52 at 5.  Supposedly, those "bribes" supply RICO standing.  But that "hand-off" alone takes Uber's theory of causation "'beyond the first step' in the causal chain." *Empire Merchs.*, 902 F.3d at 142.  And there are still more steps in that chain: after the (1) hand-off, the new lawyer would have had to (2) sue Uber, and (3) use the bribe-induced testimony as evidence.  Uber would then have had to (4) decide the evidence required a response, (5) decide to incur costs as a result, and (6) lose its cross-claims for indemnification.  That is six steps too many.

And the problem runs even deeper.  Tracing any given expense to the testimony of one witness versus another or to some other evidence entirely is "'speculative in the extreme.'" *Empire Merchs.*, 902 F.3d at 143.  Take *Callum*:  Both Dr. Gerling and a physician unconnected to the alleged scheme attested to Callum's injuries.  *See* Ex. 23 at 2.  Uber did not challenge those injuries, but even if it had, it cannot say Dr. Gerling's testimony versus the other physician's caused any given cost.  Similarly, in *Lopez*, Tarasov submitted reports from Dr. Reyfman, and ***five*** doctors who are unconnected to the alleged scheme.  Ex. 53; Ex. 54; Ex. 55; Ex. 56; Ex. 57; Ex. 58.  Similar questions loom in *Khalilova*, which also involved multiple unconnected doctors.  Compl. ¶¶ 114-116.

Uber also does not plead ***facts*** connecting any "bribes" to Uber's supposed injury, as required for bribery RICO predicates.  *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 15 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015).  Uber instead alleges it incurred "legal costs in defending these lawsuits" ***generally***, without alleging any "bribe" specifically caused it

injury.  Compl. ¶297; *see id.* ¶¶55, 78, 109, 112.  Or Uber asserts a legal conclusion—that the plaintiffs "would have no state court claim" without the doctors' testimony.  *Id.* ¶71.  Even if Uber's claims were not contradicted by testimony from multiple experts not alleged to be part of the "scheme" (which Uber conveniently omits), " 'legal conclusions masquerading as factual conclusions will not suffice.' "  *Long v. Zhuang*, No. 22-cv-1293, 2024 WL 4250308, at *4 (E.D.N.Y. Aug. 8, 2024).  Such paltry allegations do not entitle Uber to the " 'thermonuclear' " remedy of civil RICO.  *See Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 64 (E.D.N.Y. 2020).

c.  *Uber's Efforts to Plead Direct Injury Are Deficient*

Uber's deficiencies are illustrated by *Empire Merchants*, 902 F.3d at 135.  There, the exclusive New York distributor of certain liquor brands (Empire) sued a competitor under civil RICO for smuggling those brands into New York.  *Id.*  Empire alleged that "every crate of every Empire-exclusive brand smuggled into New York cost it a sale."  *Id.* at 142.  The Second Circuit held that causal relationship was too remote.  *Id.*  The smuggling may have set in motion events that eventually cost Empire sales, but it was the " 'separate act' " of retailers " 'not buying Empire's liquor' " that directly caused any injury.  *Id.* at 143.  Connecting lost sales to the smuggling required too much speculation.  *See id.*  Indeed, the court held, Empire may have lost sales "for many [other] reasons."  *Id.*  Those "alternative causal explanations" might not normally be a problem at "the pleadings phase," but "the RICO context" is different, and the direct-cause requirement exists precisely to prevent courts from undertaking "intricate, uncertain inquiries" of causation.  *Id.*  The court thus affirmed dismissal of Empire's complaint with prejudice.  *Id.* at 146.

The same reasoning leads to the same conclusion here.  Like the smuggling in *Empire Merchants*, the legal filings and bribes alleged did not themselves injure Uber.  The filings or "bribes" may have set in motion circumstances in which Uber ultimately decided to incur legal costs.  *Empire Merchs.*, 902 F.3d at 143.  But that requires going " 'beyond the first step' in the

22

causal chain." *Id.* at 142.  Indeed, assessing whether any supposed fraudulent filing or bribery even ***indirectly*** injured Uber requires "intricate, uncertain inquiries." *Id.* at 143.  Much like retailers who may or may not buy liquor for various reasons, litigants, too, incur legal costs "'for many reasons'" unrelated to the substance of filings or testimony, such as business concerns, political interests, inefficiency, adverse rulings, and more. *Id.*  Those "alternative causal explanations" underscore that, even at "the pleadings phase," Uber's complaint must be dismissed for lack of RICO standing. *Id.*

That Uber requests "equitable relief" is irrelevant.  Only a private plaintiff "injured in his business or property by reason of" a RICO violation may seek equitable relief.  18 U.S.C. § 1964(c).  And "[e]quitable relief under RICO is constrained by the same causation requirements" as a suit for damages. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 600-01 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016).  To satisfy those requirements, Uber must show a direct injury from Lavelle's, Banilov's, and Tarasov's alleged racketeering.  It cannot.

### B.    Uber's Claims Are Untimely

RICO's four-year limitations period starts as soon as there are "'storm warnings' that should have prompted an inquiry" that would reveal to a "'person of ordinary intelligence'" that it was "'probable'" a RICO injury had occurred. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150-51 (2d Cir. 2012).  Future injuries arising from the same "common scheme" do not restart the limitations period. *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59-60 (2d Cir. 1998).  And where the relevant facts "'are clear from the pleadings,'" courts must dismiss RICO claims as untimely. *Schmidt v. Am. Package Co.*, No. 23-cv-5821, 2024 WL 85073, at *5 (E.D.N.Y. Jan. 8, 2024).

Uber knew or should have known of its supposed injuries nearly ***seven*** years before its 2025 complaint.  By early 2018, Uber had been added as a defendant in the *Khalilova* case.

Compl. ¶ 124. If that case were, as Uber now imagines, patently fraudulent, Uber should have immediately known of its injury. *See id.* But at the latest, Uber knew of its "injury" when it moved for summary judgment in 2020. By then, paper discovery was complete and Uber had deposed Khalilova. Uber never alleges any new facts about Khalilova's case came to light after that date. At the latest, the limitations period closed in 2024, rendering Uber's 2025 complaint untimely.

That Uber alleges later "injuries" is irrelevant. Even after Defendants pointed out the limitations problem, Uber still chose to plead its case as a singular "common plan." Compl. ¶ 308. That choice has consequences. It means the limitations period started with the first storm warnings and that all future injuries relate back to that date for purposes of the statute of limitations. *Merrill Lynch*, 154 F.3d at 59. And so, Uber's claims are untimely.

Uber cannot invoke fraudulent concealment to extend the limitations period. That would require allegations pleaded with particularity showing Lavelle, Banilov, and Tarasov "wrongfully concealed" their alleged wrongdoing. *Koch*, 699 F.3d at 157. Uber, however, merely speculates that unspecified "Defendants" somehow "misled" Uber during discovery. Compl. ¶ 311. Even if such conclusory allegations were sufficient, those allegations are irrelevant to Lavelle or Banilov, neither of whom participated in discovery against Uber. *See O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989) (fraudulent concealment applies "***only*** as to those defendants who committed the concealment"). On the face of the complaint, Uber's RICO claims are untimely and must be dismissed.

### C.    Uber Fails to Allege a Pattern of Racketeering

Beyond these threshold defects, Uber's complaint fails to plausibly allege the basic elements of a RICO claim—starting with a "pattern of racketeering." *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017). That element requires plausible allegations that ***each*** defendant committed two or more predicate acts that "pose a threat of continuous criminal activity." *Id.* Uber pleads fifty-

seven predicate acts against Lavelle, Banilov, and Tarasov, consisting of court filings ("fraud") and several alleged payments for clients' medical expenses ("bribery"). Despite its effort to add volume, Uber still comes up short: (1) litigation activity cannot constitute a RICO predicate; (2) Uber fails to plausibly allege fraud or bribery; and (3) Uber does not allege a "continuous" pattern of "related" predicate acts.

1.    *Uber Cannot Transform Litigation Activity into RICO Predicates*

As Wingate explains, activity incident to litigation cannot constitute a predicate act. Wingate Br. 13-18. That principle applies with special force to Lavelle, Banilov, and Tarasov. Seventeen of the eighteen predicate acts Uber attributes to Lavelle are ***court filings***, twenty-two of the twenty-six for Banilov are court filings or filings incident to litigation, and the same is true for all thirteen for Tarasov. Compl. ¶¶40, 45, 61, 83, 87-88, 121, 135-138, 145, 148, 150, 152, 165-166, 180-181, 189-190, 198-199, 213-214, 220, 222, 230, 232-233, 235, 240, 248-249, 259, 261. All remaining predicates involve referrals or payments of medical expenses to doctors who would testify to the injuries they diagnosed and treatments they provided—bedrock litigation activity. *Cf. Acres Bonusing, Inc. v. Ramsey*, No. 19-cv-5418, 2022 WL 17170856, at *12 (N.D. Cal. Nov. 22, 2022) (alleged "bribes" and "fraud" still litigation activity). Even if these acts were well-pleaded (they are not), Uber cannot evade controlling precedent with allegations on information and belief that any witnesses in the underlying litigation were induced to provide false testimony. *See id.*; Wingate Br. 13-14. Whatever the exact contours of the rule barring RICO plaintiffs from relying on litigation activity, the handful of cases Uber plucked from thousands of cases spanning a decade are plainly more like the protected litigation activity in *Kim v. Kimm* than the systemic weaponization of the judicial system in the few cases Uber is bound to rely on to support its untenable predicates. 884 F.3d 98, 105 (2d Cir. 2018).

2. *Uber Fails to Plead Either Fraud or Bribery*

Uber also fails to sufficiently plead the elements of either fraud or bribery. The former requires satisfying Rule 9(b)'s heightened standard by alleging with particularity that each defendant made knowingly false statements with an intent to defraud. *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016) (elements); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179-80 (2d Cir. 2004) (Rule 9(b)). Pleading bribery under N.Y. Penal Law § 215.00 requires alleging a defendant conferred a benefit on a prospective witness "upon an agreement" that their testimony will "be influenced."

**Fraud**. Uber calls any statement it dislikes "fraud," but even if each statement were in fact incorrect, Uber never alleges "facts that give rise to a strong inference" of "fraudulent *intent*." *First Cap.*, 385 F.3d at 179 (emphasis added). Fraudulent intent requires proof that "at the time" of filing, Lavelle, Banilov, and Tarasov *knew* their statements were false. *O'Donnell*, 822 F.3d at 658. Under Rule 9(b), Uber cannot satisfy that burden if an innocent explanation remains unrebutted—*e.g.*, Lavelle, Banilov, and Tarasov relied in good faith on information from their clients. *Turner v. N.Y. Rosbruch/Harnik, Inc.*, 84 F. Supp. 3d 161, 169 (E.D.N.Y. 2015). Even after full discovery in state court, Uber alleges no *facts* suggesting the attorneys knew at the time that any statements in their filings were even incorrect. *See* Compl. ¶¶ 35-96, 114-139. At most, Uber alleges *later*-arising circumstances, such as the *Gorbacevska* dashcam video, that may have cast rearview doubt on earlier allegations. *Id.* ¶¶ 35, 85, 118, 133. Hindsight is the opposite of "contemporaneous intent to defraud." *O'Donnell*, 822 F.3d at 658. Other than that, Uber is left with only legal conclusions, which would not satisfy Rule 8, let alone Rule 9(b). Nor does any alleged "intent" to add Uber to a case suffice, absent well-pleaded allegations that Lavelle,

Banilov, and Tarasov **knew** their allegations were false and would be used to **defraud** Uber.  Uber alleges nothing of the sort.[9]

**Bribery**.  Uber fails to plausibly allege bribery under N.Y. Penal Law § 215.00, which stringently requires "the existence of 'an agreement or understanding that . . . the testimony of such witness will thereby be influenced.'" *In re Simels*, 94 A.D.3d 108, 112 (N.Y. Sup. Ct. App. Div. 2012).  Uber alleges no such corrupt quid pro quo in anything but conclusory terms.

*Lavelle.*  Uber falsely alleges Lavelle bribed Dr. Gerling to treat Callum.  Compl. ¶ 87.  But in New York, lawyers may fund "medical diagnostic work" and related treatment in contingency cases.  N.Y. R. Pro. Conduct 1.8, cmt. 9B.  And Uber offers only conclusory, information-and-belief say-so to turn that into bribery.  Uber never alleges, for example, that the payments exceeded "the prevailing rate" or that Dr. Gerling failed to perform paid-for services.  *New York v. Canepa*, 295 A.D.2d 247, 247 (N.Y. Sup. Ct. App. Div. 2002) (prevailing rate not a bribe); Compl. ¶ 87.  In fact, the record refutes any inference of bribery:  **Nine** independent doctors treated Callum.  Ex. 18 ¶ 13.  It defies reason that Callum, or any plaintiff, would consent to invasive medical procedures if uninjured—or that so many doctors would treat uninjured patients without objection.  *See Acres*, 2022 WL 17170856, at *12 ("'bribe[ ]'" better "understood" as legitimate payment).[10]

---

[9] Nor can Uber sidestep Rule 9(b) by saying Lavelle, Banilov, and Tarasov had "motive" and "opportunity" to commit fraud simply because they could share in the profit if the state claims prevailed.  By that logic, every lawyer who takes a contingency case has a "motive" to commit fraud, and each filing would be an "opportunity" to do so.  Such lawyers could be branded racketeers on conclusory allegations of generic "motive" and "opportunity."  Precisely because such generalized motives "would be no realistic check on aspersions of fraud," broadly held motives like staying employed cannot suffice to allege fraud, let alone satisfy Rule 9(b)'s heightened standard.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

[10] Uber insinuates that Lavelle improperly financed treatment for two additional state-court plaintiffs, but never actually accuses Lavelle of committing bribery in those cases.  *See* Compl. ¶¶ 221, 223, 228.  These allegations do not sufficiently allege a predicate act.

*Banilov.*  The allegations against Banilov fare no better.  Compl. ¶¶ 45, 145, 148, 156.  For two supposed "bribes," Uber never alleges the payments were excessive for the legitimate services provided.  *See Canepa*, 295 A.D.2d at 247; Compl. ¶¶ 145, 196.  For the others, Uber adds conclusory "excessive" or "above-market" qualifiers.  *Id.* ¶¶ 45, 148, 156.  Such "conclusory and self-serving" assertions are not enough even under Rule 8.  *Roberto's Fruit Mkt., Inc. v. Schaffer*, 13 F. Supp. 2d 390, 399 (E.D.N.Y. 1998); *see Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 77-78 (E.D.N.Y. 2020) (similar).  Indeed, those assertions make no sense given that Banilov used litigation funders—who would have a refined understanding of market rates and no incentive to pay a penny more—to finance the supposed bribes.  *E.g.*, Compl. ¶ 157.[11]

*Tarasov.*  Uber does not allege a single act of bribery against Tarasov.  *See generally* Compl.  Although Uber insinuates that Tarasov acted improperly by paying Drs. Gerling and Reyfman "to provide false causation testimony," it never alleges Tarasov violated any bribery statute.  *Id.* ¶¶ 119-120.  For good reason:  Uber has no facts suggesting any medical procedure was unnecessary or that facially legitimate payments or referrals were bribes.

Uber thus fails to plead even a single viable predicate act.  Its fifty-seven failed attempts evinces Uber's strategy of creating smoke to infer fire.

### 3.  *Uber Does Not Allege a Continuous Pattern of Predicate Acts*

Even if it pleaded viable predicates, Uber still falls short of alleging a continuous pattern of predicate acts.  Continuity can be open- or closed-ended.  *Reich*, 858 F.3d at 59.  The former requires facts showing the "predicate acts were the regular way of operating" or that the acts themselves imply "'a threat of continued criminal activity'" or were "'inherently unlawful.'"

---

[11] Uber similarly alleges impropriety (without illegality) with respect to Banilov.  *See* Compl. ¶¶ 196-197, 212.  These allegations likewise do not sufficiently allege a predicate act.

*Grace Int'l Assembly of God v. Festa*, 797 F. App'x 603, 606 (2d Cir. 2019).   Closed-ended continuity requires "'a series of related predicates'" spanning at least two years.   *Id.* at 605. Conclusory assertions are insufficient to establish either form of continuity, *id.*, and continuity must be alleged "with respect to each defendant individually," *First Capital*, 385 F.3d at 180.

Uber fails to plead open-ended continuity.  Filing personal-injury cases and compensating potential experts are not inherently unlawful acts, so Uber must plead either that Lavelle, Banilov, and Tarasov regularly operate through fraud and bribery, or that the acts themselves necessarily suggest "'a threat of continued criminal activity.'"  *Grace Int'l*, 797 F. App'x at 606.  Uber has not.  From ***thousands*** of cases, Uber came up with a pittance that it spins as fraudulent or as involving bribery, and only four that involve Uber.  That ratio of valid litigation to questionably problematic is beyond insufficient to show Lavelle, Banilov, or Tarasov regularly operate through fraud or bribery or pose a "threat of continued criminal activity."  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 243 (2d Cir. 1999).

Uber's failure to allege closed-ended continuity is equally plain.  For Lavelle, Uber alleges eighteen acts across four cases (one involving Uber); for Banilov, twenty-six acts across seven cases (one involving Uber); and for Tarasov, thirteen acts across four cases (two involving Uber). Even if Uber adequately alleges bribery or fraud (it does not), Uber asserts only in conclusory terms that these acts are "'related'" to each other.  *Grace Int'l*, 797 F. App'x at 605.  The mere allegation that these acts spanned more than two years cannot, without more, establish a "'pattern'" of racketeering activity. *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).  Regardless, even if Uber pleads closed-ended continuity, it is still missing the "pattern."  Even taking Uber's allegations on their face, a few bad eggs in thousands of litigated

cases hardly constitute a pattern or a criminal enterprise. *See Reich*, 858 F.3d at 61-62 (three-year span not "pattern" because alleged acts were not related to alleged enterprise's business).

### D.    Uber Fails to Allege a RICO "Enterprise"

As Wingate explains, Uber has not alleged a RICO enterprise. Wingate Br. 28-34. The defects in the allegations against Lavelle, Banilov, and Tarasov are particularly glaring. Uber does not bother bringing its "association in fact" claim against Lavelle. Compl. ¶¶299-305. Uber also does not plausibly allege ***any*** members operated in a structured, continuing unit, or that Lavelle, Banilov, or Tarasov directed that unit. *See* Wingate Br. 29-32, 33-34. The alleged predicates date to early 2017 and represent a tiny fraction of the cases Banilov and Tarasov handled over that period. Even in those dozen cases involving Banilov or Tarasov that Uber cherry-picks, ***half*** did not involve any referral to Wingate, the relationship Uber casts as a racketeering one. Compl. ¶300(c). What Uber has alleged is that Banilov and Tarasov have crossed paths with Wingate in a handful of cases over nearly a decade. That is insufficient. *Curtis v. Greenberg*, No. 20-cv-824, 2021 WL 4340788, at *15 (E.D.N.Y. Sept. 23, 2021). And the involvement of a shocking number of participants who would have had to bury their head in the sand or act with complicity in each case—including different plaintiffs and multiple doctors unconnected to the supposed racketeering—also renders the claimed association-in-fact facially implausible. *See id.* at *11.

Uber barely develops its legal-entity enterprise claims. Compl. ¶¶326-332. These claims fail because Uber does not plead any facts that Lavelle, Tarasov, or Banilov directed the doctors' offices' activities or that there was a nexus between the offices and their alleged predicate acts. Wingate Br. 32-33. Vague allegations of control are inadequate. *Tooker v. Guerrera*, No. 15-cv-2430, 2017 WL 3475994, at *9 (E.D.N.Y. Aug. 11, 2017) (citing *D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 667 (2d Cir. 2014)).

### E.     Uber's Conspiracy Claim Fails for the Same Reasons

Uber's conspiracy claim under § 1962(d) necessarily falls with its substantive RICO claims because Uber relies "on the same fact[s]" to plead it. *Zamora v. FIT Int'l Grp.*, 834 F. App'x 622, 626 (2d Cir. 2020); *see First Cap.*, 385 F.3d at 182 (similar).  In any event, to plead conspiracy under § 1962(d), Uber must also allege that Lavelle, Banilov, and Tarasov each knowingly entered an ***agreement*** to commit RICO violations.  But Uber has "only summarily alleged that there was an illicit agreement," which "is insufficient to state a RICO conspiracy claim." *Flexborrow*, 255 F. Supp. 3d at 425; *see Hecht*, 897 F.2d at 25-26 (similar); *Khan Funds Mgmt. Am., Inc. v. Nations Techs. Inc.*, No. 22-cv-5055, 2023 WL 6124801, at *14 (S.D.N.Y. Sept. 19, 2023) (similar).  In fact, Uber's "conspiracy" allegations merely recite that each defendant "conspired with the other Defendants." Compl. ¶¶ 282, 302.  That's it.  No facts suggesting an agreement.  Such conclusory allegations independently doom Uber's conspiracy claim.

## II.     UBER CANNOT STATE A CLAIM UNDER NEW YORK'S JUDICIARY LAW

As Wingate explains, Uber has not pleaded a claim under § 487 of New York's Judiciary Law.  Wingate Br. 34-35.  The § 487 claim against Lavelle and Banilov also fails for the more obvious reason that their "alleged deceit did not occur during a pending judicial proceeding in which [Uber] was a party" at the time. *Bankers Tr. Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro*, 187 A.D.2d 384, 386 (N.Y. Sup. Ct. App. Div. 1992); *see Greenfield v. Schultz*, 173 Misc. 2d 31, 39 (N.Y. Sup. Ct. N.Y. Cnty. 1997), *aff'd in relevant part*, 251 A.D.2d 67 (N.Y. Sup. Ct. App. Div. 1998) ("Section 487 is clearly inapplicable" if the plaintiff was not a party to the case "when the alleged deceit occurred.").  That is dispositive.  And in the *Lopez* case (the only case in which Tarasov filed anything when Uber was a party), Uber merely alleges that it disagrees with certain statements and then jumps to the conclusion that Tarasov knowingly lied.  *See* Compl. ¶¶ 131-136.  Even Uber admits that there was conflicting evidence regarding Lopez's injuries. *Id.*

¶ 133. That Tarasov took a different view of the evidence is nowhere near the "'extreme or egregious'" deceit required to plead a § 487 claim. Wingate Br. 34. This claim must fall.

## III.  THE *NOERR-PENNINGTON* DOCTRINE REQUIRES DISMISSAL

The *Noerr-Pennington* doctrine independently requires dismissal. That doctrine derives from the First Amendment's protection of the right to "petition" the government, including courts, for redress. *Singh v. NYCTL 2009-A Tr.*, 683 F. App'x 76, 77-78 (2d Cir. 2017). It thus immunizes litigation and "efforts incident to litigation" from liability. *Id.*

The conduct Uber attributes to Lavelle, Banilov, and Tarasov is classic litigation activity that *Noerr-Pennington* protects. It uniformly involves filing pleadings, referring clients to other lawyers or doctors for case-related medical treatment, or obtaining evidence. *See* Compl. ¶¶ 35-96, 114-139. That all falls squarely under *Noerr-Pennington*'s protection.

The doctrine's "'extraordinarily narrow'" exception for "sham" litigation does not apply here. *U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chi., Inc.*, 953 F.3d 955, 963 (7th Cir. 2020). Litigation activity loses its immunity only if the suit was both "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and subjectively baseless in that the motive for the suit was to weaponize the litigation "***process***"—"as opposed to the ***outcome*** of that process." *BE&K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 526 (2002). Even "'a chance that a claim may be held valid upon adjudication'" renders the sham exception inapplicable. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62-63 (1993) (brackets omitted). By definition, a "successful" suit "'cannot be characterized as a sham.'" *Id.* at 58. But the inverse is not necessarily true—"a party may have an entirely reasonable ground for bringing suit" even if it proves "ultimately unsuccessful." *Id.* at 60 n.5.

The eleven cases Uber pleaded to support claims against Lavelle, Banilov, and Tarasov that did not involve Uber were not shams—with one exception where the plaintiff, not his attorney,

staged the accident. Indeed, eight settled favorably. Ex. 60; Ex. 62; Ex. 66; Ex. 67; Ex. 74; Ex. 75; Ex. 76; Ex. 91; *see In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 338 (S.D.N.Y. 2019) (settled case not a sham). One is ongoing. Ex. 65; *see Pro. Real Est.*, 508 U.S. at 62. One went to trial and lost. Ex. 84; *see Pro. Real Est.*, 508 U.S. at 60 n.5 (losing does not make case a *de facto* "sham"). With one exception, these cases involved real people and real injuries. Ex. 69 at 32:20-33:3; Ex. 85 at 24, 29, 33, 37, 46, 55. They involved "smashed" vehicles, high speeds, and law enforcement. Ex. 69 at 28:2-3; Ex. 46 at 2. And none of the defendants—not even in *Perez*—accused the plaintiffs' attorneys of misconduct. *See* Ex. 77.

The five cases involving Uber were not shams either. In Lavelle's case (*Callum*), the plaintiff was in a crash that caused "a lot of damage[ ]." Ex. 25 at 6. She went to the emergency room. Compl. ¶81. *Nine* doctors not alleged to be involved in any purported racketeering treated her. *Id.* ¶84; Ex. 18 ¶13. Dr. Gerling and another physician each independently attested to Callum's "significant" injuries. Ex. 23 at 2. The state court denied summary judgment, finding that Dr. Gerling's reports and evidence from another physician supported the allegations of "persisting" and "significant" injuries. *Id.*

Banilov's case (*Gorbacevska*) was also not a sham. Gorbacevska's Uber driver "'slamm[ed]' on his brakes and swerv[ed] his vehicle" at "45-50 miles per hour" to avoid a box that fell on the road. Ex. 9 ¶63; Compl. ¶35. Even after a video showed what occurred, Uber continued to engage in discovery and later moved for summary judgment on a defense unrelated to the merits. Ex. 7 ¶¶5-7.

Nor were Tarasov's cases (*Khalilova* and *Lopez*) shams. Khalilova was in an Uber that "was violently struck in the rear by a vehicle that was apparently fleeing the police and travelling at a high rate of speed." Ex. 46 at 2. An ambulance took her to the hospital. Ex. 44 at 42:15-43:6. Uber's

motion for summary judgment was denied, and Uber settled both Khalilova's claims and its cross-claims. Ex. 46 at 3; Ex. 47. *See Elysium Health-Chromadex*, 354 F. Supp. 3d at 338 (settled case not a sham). Lopez was in a real crash and suffered real injuries. Compl. ¶ 129; Ex. 52 at 11:20-22, 14:16-20; Ex. 58 at 3. Multiple doctors treated Lopez, and he missed "[s]even to eight months" of work. Ex. 58 at 4-5; Ex. 52 at 29:6-10. The court denied summary judgment. Ex. 59.

And Uber's decision to file cross-claims against its co-defendants in the five cases belies *any* argument that the cases were "shams." If the state-court plaintiffs' cases were such obvious frauds, it does not stand to reason that Uber would litigate as it did. Even after investigation and discovery, Uber never claimed the suits themselves were fabricated, never claimed any filing was fraudulent, and never sought sanctions or fees against the plaintiffs or their counsel. Uber's actions prove what is already obvious—none of the cases here was objectively baseless.

Uber also pleads no facts suggesting Lavelle, Banilov, or Tarasov intended to wield litigation as a weapon, rather than to pursue the claims on their merits. *See BE&K*, 536 U.S. at 526. It does not, for example, allege they filed droves (let alone thousands) of cases to drown opposing parties in suits to prevent examination of those cases on the merits. *Cf. Sykes v. Mel Harris and Assocs., LLC*, 757 F. Supp. 2d 413, 419 (S.D.N.Y. 2010) (defendant filed "104,341 debt collection actions" over three years). That lack of subjective baselessness alone renders the sham litigation exception inapplicable. *Noerr-Pennington* thus bars each of Uber's claims.

*   *   *

Lavelle, Banilov, and Tarasov are not racketeers. They are hardworking lawyers who assist injured plaintiffs in navigating the court system. They are now also victims of Uber's nationwide campaign against personal injury attorneys who dare to sue the $200 billion behemoth. Uber's efforts to silence its adversaries by branding them racketeers in a defective complaint is not justice.

It is a "vengeful blow." *Gross*, 628 F. Supp. 2d at 480. Dismissing Uber's claims will not undo the harm to Emily Lavelle, Nick Banilov, and Igor Tarasov. But it is an essential first step.

<u>**CONCLUSION**</u>

Uber's Amended Complaint should be dismissed with prejudice.

Dated:    September 15, 2025

Respectfully submitted,

/s/ Jennifer M. Schubert

| | |
|---|---|
| Jennifer M. Schubert | Justin V. Shur |
| Eric Rolston | Kenneth E. Notter III (*pro hac vice*) |
| MOLOLAMKEN LLP | Zakary Kadish (*pro hac vice*) |
| 430 Park Avenue | MOLOLAMKEN LLP |
| New York, NY 10022 | 600 New Hampshire Avenue, N.W. |
| (212) 607-8160 | Washington, D.C. 20037 |
| jschubert@mololamken.com | (202) 556-2000 |
| erolston@mololamken.com | jshur@mololamken.com |
| | knotter@mololamken.com |
| | zkadish@mololamken.com |

*Counsel for The Law Office of Dominick W. Lavelle d/b/a Lavelle Law Firm,*
*Emily K. Lavelle, Banilov & Associates, P.C., Nick Banilov, and Igor Tarasov*