**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

UBER TECHNOLOGIES, INC.,

Plaintiff,

v.

WINGATE, RUSSOTTI, SHAPIRO, MOSES & HALPERIN, LLP, JAY WECHSLER, BANILOV & ASSOCIATES, P.C., NICK BANILOV, IGOR TARASOV, THE LAW OFFICE OF DOMINICK W. LAVELLE d/b/a LAVELLE LAW FIRM, EMILY K. LAVELLE, MICHAEL GERLING, GERLING INSTITUTE, LEONID REYFMAN, AND PAIN PHYSICIANS NY PLLC,

Defendants.

Case No. 1:25-cv-00522-OEM-VMS

---

## MEMORANDUM OF LAW IN SUPPORT OF
## WINGATE DEFENDANTS' MOTION TO DISMISS

KOBRE & KIM LLP
1919 M Street, NW
Washington, D.C. 20036
Telephone: (202) 664-1900
Facsimile: (202) 967-1920
Sydney S. Johnson

KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220
Jonathan D. Cogan
Michael Cinnamon

*Attorneys for Wingate, Russotti, Shapiro, Moses & Halperin, LLP and Jay Wechsler*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF RELEVANT ALLEGATIONS........................................................ 3

    I.      Personal Injury Cases Against Uber ...................................................... 4

    II.     Non-Uber Personal Injury Suits........................................................... 11

ARGUMENT ...................................................................................................... 12

    I.      Uber Fails to State A RICO Claim Against Wingate or Jay Wechsler................ 12

         A.   Uber Cannot Transform Litigation Activity Into A RICO Suit .................... 13

         B.   Uber Lacks RICO Standing.............................................................. 18

         C.   Uber Does Not Plausibly Allege the Wingate Defendants Committed Predicate Acts of Racketeering ...................................................... 20

         D.   Uber Fails to Allege a Pattern of Racketeering Activity............................. 28

         E.   Uber Fails to Allege Any RICO Enterprise, Much Less One in Which the Wingate Defendants Participated.................................................... 28

             i.    Uber does not plausibly allege an association-in-fact enterprise........ 29

             ii.   Uber fails to allege a legal enterprise.................................... 32

             iii. Uber fails to allege that the Wingate Defendants operated or managed any of the alleged enterprises........................................... 32

    II.     Uber Fails To Allege A RICO Conspiracy ............................................... 34

    III.    Uber Fails To Allege A Violation of New York's Judiciary Law ........... 34

    IV.    The Noerr-Pennington Doctrine Requires Dismissal .............................. 35

CONCLUSION.................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

**Cases**

*Abbott Laboratories v. Adelphia Supply USA,*
  2017 WL 57802 (E.D.N.Y. Jan. 4, 2017) ............................................................. 31

*Acres Bonusing, Inc. v. Ramsey,*
  2022 WL 17170856 (N.D. Cal. Nov. 22, 2022) ............................................... 13–14

*Alderman v. Pan Am World Airways,*
  169 F.3d 99 (2d Cir. 1999) ...................................................................................... 30

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................. 12

*Azima v. Dechert LLP,*
  2024 WL 4665106 (S.D.N.Y. Sept. 26, 2024) ................................................... 14–18

*Black v. Ganieva,*
  619 F. Supp. 3d 309 (S.D.N.Y. 2022), *aff'd*, 2023 WL 2317173 (2d Cir. Mar. 2, 2023).............
  ................................................................................................................................ 14

*Boyle v. United States,*
  556 U.S. 938 (2009) ................................................................................................. 29

*Bridge v. Phoenix Bond & Indemnity Co.,*
  553 U.S. 639 (2008) ................................................................................................. 18

*Brock v. Zuckerberg,*
  2021 WL 2650070 (S.D.N.Y. June 25, 2021), *aff'd*, 2022 WL 1231044 (2d Cir. Apr. 27, 2022)
  ................................................................................................................................ 13

*Browning Avenue Realty Corp. v. Rosenshein,*
  774 F. Supp. 129 (S.D.N.Y. 1991) .......................................................................... 22

*Bryant v. Silverman,*
  284 F. Supp. 3d 458 (S.D.N.Y. 2018)...................................................................... 34

*Butcher v. Wendt,*
  975 F.3d 236 (2d Cir. 2020)..................................................................................... 13

*Ciminelli v. United States,*
  598 U.S. 306 (2023).................................................................................................. 25

*Conopco, Inc. v. Campbell Soup Co.,*
  95 F.3d 187 (2d Cir. 1996)....................................................................................... 27

*Construction Technology, Inc. v. Lockformer Co.*,
704 F. Supp. 1212 (S.D.N.Y. 1989)...................................................................... 27

*Chevron Corp. v. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014)................................................................... 15

*Cresswell v. Sullivan & Cromwell*,
771 F. Supp. 580 (S.D.N.Y. 1991), *aff'd*, 962 F.2d 2 (2d Cir. 1992) ..................... 35

*Curtis & Associates v. Law Offices of David M. Bushman, Esq.*,
758 F. Supp. 2d 153 (E.D.N.Y. 2010), *aff'd*, 443 F. App'x 582 (2d Cir. 2011) ...... 14

*Curtis v. Greenberg*,
2021 WL 4340788 (E.D.N.Y. Sept. 23, 2021) .................................................. 20–21

*D. Penguin Bros. v. City National Bank*,
587 F. App'x 663 (2d Cir. 2014) ...................................................................... 31–32

*Department of Economic Development v. Arthur Andersen & Co. (U.S.A.)*,
924 F. Supp. 449 (S.D.N.Y. 1996) ...................................................................... 33

*Emergency Physician Services of New York v. UnitedHealth Group, Inc.*,
2021 WL 4437166 (S.D.N.Y. Sept. 28, 2021)........................................................ 19

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
902 F.3d 132 (2d Cir. 2018)................................................................................. 18

*First Capital Asset Management, Inc. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004)............................................... 12–13, 20, 22, 29, 31–32

*Flexborrow LLC v. TD Auto Finance LLC*,
255 F. Supp. 3d 406 (E.D.N.Y. 2017) .................................................................. 22

*Gross v. Waywell*,
628 F. Supp. 2d 475 (S.D.N.Y. 2009)................................................................... 13

*Gurung v. MetaQuotes Ltd.*,
2024 WL 3849460 (E.D.N.Y. Aug. 16, 2024)....................................................... 31

*Halvorssen v. Simpson*,
807 F. App'x 26 (2d Cir. 2020) ........................................................................... 28

*Jun An v. Zhang*,
2013 WL 6503513 (S.D.N.Y. Dec. 6, 2013) ......................................................... 22

*Kaczmarek v. International Business Machines Corp.*,
    30 F. Supp. 2d 626 (S.D.N.Y. 1998).......................................................................... 31

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018)................................................................................ 13–14, 17

*Lundy v. Catholic Health System of Long Island, Inc.*,
    711 F.3d 106 (2d Cir. 2013)..................................................................................... 12

*Lynn v. McCormick*,
    760 F. App'x 51 (2d Cir. 2019) ............................................................................... 32

*Moss v. BMO Harris Bank, N.A.*,
    258 F. Supp. 3d 289 (E.D.N.Y. 2017) .......................................................... 30, 32–33

*Oliveira v. 5462 125th Realty LLC*,
    2024 WL 3654031 (Sup. Ct. N.Y. Cnty. July 31, 2024) ................................... 30–31

*Paul Hobbs Imports Inc. v. Verity Wines LLC*,
    2023 WL 374120 (S.D.N.Y. Jan. 24, 2023) ..................................................... 20–21

*Piccone v. Board of Directors of Doctors Hospital Staten Island, Inc.*,
    2000 WL 1219391 (S.D.N.Y. Aug. 28, 2000)........................................................ 19

*Rajaratnam v. Motley Rice, LLC*,
    449 F. Supp. 3d 45 (E.D.N.Y. 2020) ............................................... 14–17, 19, 25

*Rao v. BP Products North America, Inc.*,
    589 F.3d 389 (7th Cir. 2009) ........................................................................... 29–30

*Reich v. Lopez*,
    858 F.3d 55 (2d Cir. 2017)..................................................................................... 28

*Remler v. Cona Elder Law, PLLC*,
    2022 WL 4586243 (E.D.N.Y. Sept. 29, 2022) ................................................. 34–35

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)....................................................................................... 5

*Rouse v. Rouse*,
    1990 WL 160194 (N.D.N.Y. Oct. 17, 1990) .................................................... 22–23

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996)....................................................................................... 5

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
    806 F.3d 71 (2d Cir. 2015) ................................................................................ 18–19

*Sky Medical Supply Inc. v. SCS Support Claims Services, Inc.*,
    17 F. Supp. 3d 207 (E.D.N.Y. 2014) ................................................................. 13

*Spiteri v. Russo*,
    2013 WL 4806960 (E.D.N.Y. Sept. 7, 2013) .................................................... 13

*Spool v. World Child International Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008) .............................................................................. 12

*Sykes v. Mel Harris & Associates*,
    757 F. Supp. 2d 413 (S.D.N.Y. 2010) ............................................................... 14

*Tacopina v. Kerik*,
    2016 WL 1268268 (S.D.N.Y. Mar. 31, 2016) .................................................. 34–35

*Turner v. New York Rosbruch/Harnik, Inc.*,
    84 F. Supp. 3d 161 (E.D.N.Y. 2015) ................................................................. 13, 17, 23

*United States v. Turkette*,
    452 U.S. 576 (1981) .......................................................................................... 29, 32

*Williams v. Bank Leumi Trust Co*,
    1997 WL 289865 (S.D.N.Y. May 30, 1997) .................................................... 27

**STATUTES**

18 U.S.C. § 1962(c) ................................................................................................ 12

New York Judiciary Law § 487 .............................................................................. 34–35

**RULES**

CPLR § 5015 ........................................................................................................... 16

CPLR § 8303 ........................................................................................................... 16

NY Comp. Codes R. & Regs. tit. 22, § 130-1.1 .................................................... 16

N.Y. Rules of Prof'l Conduct 1.5(g) ...................................................................... 4, 23

N.Y. Rules of Prof'l Conduct 7.2(a)(2) .................................................................. 4, 23, 30

N.Y. Rules of Prof'l Conduct 1.8, Comment 9B ................................................... 26–27, 31

## PRELIMINARY STATEMENT

This lawsuit is part of Uber's broader strategy to flex its corporate might and intimidate personal injury attorneys who dare sue it.[1] In this instance, Uber identifies a supposed "non-exhaustive sampling" of five personal injury cases against Uber and pronounces them evidence of a fraudulent RICO scheme between lawyers and doctors who purportedly are colluding to fabricate or exaggerate plaintiffs' injuries to extract higher settlements. Apparently recognizing that a mere five alleged instances of fraudulent personal injury cases against Uber does not paint a compelling picture of a broad racketeering scheme, Uber strains in its Amended Complaint to expand the purported scheme by adding a hodge podge of years-old personal injury cases with no connection whatsoever to Uber. These other cases were litigated against dozens of different defendants (none of whom ever raised complaints of fraud or misconduct) by an inconsistent mix of personal injury attorneys, some of whom Uber does not even allege are part of the scheme. Ultimately, however, Uber's attempt to convert a handful of state personal injury cases it thinks are frivolous into a federal RICO action fails on every front—especially with regard to the Wingate Defendants. The Amended Complaint should be dismissed.

To start, Uber's suit flies in the face of clear precedent in this circuit that has time and again held that parties cannot pursue RICO claims in federal court in retaliation for what they perceive as fraudulent or frivolous state court litigation. Absent limited exceptions not present here, such claims should be litigated before the presiding state courts to avoid undermining principles of res judicata and collateral estoppel and, critically, to prevent parties from chilling litigants' access to courts with the threat of a ruinous RICO countersuit, which is so obviously Uber's purpose here. Indeed, not only does Uber ask this Court to review the merits of *ongoing* personal injury suits

---

[1] *See, e.g.*, Kit Yona, *Driving a New Narrative: Uber Targets 'Unfair' Insurance Rates and Personal Injury Attorneys*, FindLaw (Feb. 21, 2025), https://tinyurl.com/mu44nhtp.

capably in the hands of New York state judges—before whom Uber notably has not raised *any* allegations of fraud, collusion, or bribery—but it asks this Court to issue sweeping and fundamentally absurd equitable relief, including the imposition of a court-appointed monitor over multiple law firms based merely on its vague, unsound allegations.

Beyond this fundamental problem with Uber's Amended Complaint, Uber also fails to satisfy *any* element or sub-element of the RICO statute, including plausibly alleging statutory RICO standing. It is not a defendant in an overwhelming majority of cases it claims (without basis) are "fraudulent" and thus has suffered no injury whatsoever in those matters. And for multiple reasons explained herein, it has not plausibly alleged proximate cause or sufficiently definite damages, as it must to meet RICO's standing requirements.

Further, Uber falls short of pleading the elements necessary to state a RICO claim: (1) conduct; (2) of an enterprise; (3) through a pattern (4) of racketeering (defined as "predicate acts"). As to the pattern of racketeering elements, Uber does not plausibly allege that the Wingate Defendants engaged in *any* predicate acts of fraud or bribery, let alone a pattern of them. Indeed, although Uber conclusorily asserts that Wingate made "fraudulent" court filings claiming exaggerated or fabricated injuries and, in the case of a single litigation against Uber, bribed doctors to provide "medically unnecessary" treatments and false diagnoses, Uber does not allege any *facts* to support that Wingate made or adopted any knowingly false statements (as opposed to relying on former counsel and the state court plaintiffs). As for the bribery allegations, Wingate was *not even hired* as counsel in any of the personal injury cases involving Uber until *after* the state court plaintiffs had already received the overwhelming majority of their medical treatment from the defendant physicians. Uber's Amended Complaint also ignores that nearly every state court plaintiff's case rested on evidence submitted by physicians who are not alleged to be part of the

scheme.

Uber's attempt to plead the enterprise element fares no better. Uber offers three alternative theories of a RICO "enterprise," but none succeeds because, among other defects explained herein, Uber does not plausibly allege that the defendants *worked together* to pursue a common purpose. That multiple law firms representing a claimant would agree to share proceeds from a personal injury case (particularly one litigated on a contingency basis) is hardly evidence of a criminal enterprise—it is a permitted practice under New York law. Moreover, even after amendment, the personal injury cases featured in the Amended Complaint involve a different combination of defendants and dozens of physicians and lawyers who are not alleged to be part of any scheme. For essentially these same reasons, both Uber's RICO conspiracy claim and its state judiciary law claim alleging intentional deceit by Wingate also miss the mark.

In short, Uber's claims fail at every juncture. They do not belong in this Court and should be dismissed.

## STATEMENT OF RELEVANT ALLEGATIONS

Wingate, Russotti, Shapiro, Moses & Halperin, LLP ("Wingate") is a personal injury and medical malpractice law firm located in Manhattan. https://www.wrshlaw.com/attorneys/. Jay Wechsler (collectively with Wingate, the "Wingate Defendants") is one of approximately 30 attorneys working at Wingate. Wingate has been in practice for more than 50 years. *Id*.

The Amended Complaint describes 19 state court personal injury cases prosecuted over a nine-year period. Approximately half involve the Wingate Defendants, and a mere five were pursued against Uber as a defendant. As it did in its original Complaint (which pled four cases total, with only three against Uber), Uber claims these 19 cases are a "non-exhaustive sampling"

of cases in the scheme.[2]  FAC ¶ 34.

In each of the Wingate Defendants' cases, their clients testified under penalty of perjury that they suffered serious injuries as a result of the respective car accidents.[3] Uber alleges that the state court plaintiffs are victims of the Defendants' scheme rather than perpetrators of it. *Id*. ¶ 298.

## I.    Personal Injury Cases Against Uber

Each of the five cases against Uber involves a state court plaintiff who sued for injuries sustained while riding in a vehicle. Uber acknowledges that each case was initially pursued by another law firm and further alleges that in the four cases where Wingate later became involved, it did so to provide "the added scale and resources to litigate claims against" Uber. *Id*. ¶ 301. Uber alleges upon information and belief that Wingate and the referring attorneys must have agreed to share proceeds from their cases because they represented their clients on a contingency basis. *Id*. ¶ 63, 90, 161, 278; *see also* N.Y. R. Prof'l Conduct 1.5(g), 7.2(a)(2) (fee sharing between lawyers in New York is ethical). Despite the allegations in its Amended Complaint, Uber has not made any allegations of fraud or bribery or otherwise sought sanctions in the five state court cases against it. Rather, Uber has pursued or is currently pursuing cross-claims against its co-defendants in those

---

[2] On June 18, 2025, Magistrate Judge Scanlon stayed discovery in this matter pending resolution of Defendants' motions to dismiss. ECF No. 62. At oral argument on the motion to stay, which occurred ***before*** Uber had amended its Complaint, Magistrate Judge Scanlon asked Uber's counsel how many state court cases it believed comprised the scheme. Uber responded that it had pled four in the (original) Complaint but that Uber believed "there's approximately 15 to 20" total, to which Judge Scanlon replied, "[a]nd you think that makes the scheme for RICO?" ECF No. 62, 21:1–8. As Uber's Amended Complaint reveals, the majority of the 15–20 total cases referenced do not actually involve Uber, as its Amended Complaint includes a mere two new cases against it. It is also curious that Uber maintains the 19 cases it now pleads in the Amended Complaint are still a "non-exhaustive" sampling, FAC ¶ 34, when it represented to Judge Scanlon that 15 to 20 cases comprised the entire scheme.

[3] *See* Ex. 14 at 63:4–14, 70:5–15 (Gorbacevksa); Ex. 20 at 20:2–9, 38:3–18, 72:8–19 (Callum); Ex. 36 at 95:15–25, 96:2–19, 128:4–21 (Clarke); Ex. 44 at 43:4–13, 54:2–7 (Khalilova); Ex. 61 at 94:7–22, 106:6–25 (Asamov); Ex. 64 at 81:4–12, 114:20–25, 115:2–23 (Vayman); Ex. 73 at 7:2–19, 16:8–16, 21:18–22 (Voltchenkov); Ex. 90 at 78:21–25, 79:2–24, 80:2–5 (Tagiyev); Ex. 92 at 159:10–22, 165:21–25, 166:2–17 (Currence); Ex. 97 at 88:2–22, 92:2–25 (Ikramov). As far as Wingate knows, Perez (whom Wingate represented for only a few weeks before requesting to withdraw from the case, as discussed below) was not deposed.

cases. *See* Exs. 5, 19, 29, 43, 50.[4]

***Ludmila Gorbacevska***. Ludmila Gorbacevska was a passenger in an Uber driving behind a pickup truck on July 4, 2020. FAC ¶ 35. While driving at a high speed, the Uber driver hit a large box that had fallen out of the back of a pickup truck. *Id*.; Ex. 9 ¶¶ 3, 64–66. Gorbacevska subsequently chose to ride home in the pickup truck from which the box fell and told the truck driver that she would use this incident opportunistically to "ride the insurance claim and sue [] the driver" and "use her prior medical procedure" to do so. FAC ¶ 38. Uber alleges "[u]pon information and belief" that Gorbacevska's lawyers were "also aware of her plans." *Id*.

After the incident, Gorbacevska hired Banilov, who filed a complaint on her behalf in November 2020. Ex. 2. Uber alleges "upon information and belief" that, months before initiating the case, Banilov purportedly "directed Gorbacevska to an extensive program of unnecessary and expensive medical treatment." FAC ¶ 42. Uber also alleges, again "upon information and belief," that Gorbacevska's "treatments" were "coordinated and funded by the Banilov and Wingate Defendants, directly or indirectly," yet Uber acknowledges that the Wingate Defendants did not even represent Gorbacevska at the time she received nearly all of her medical treatment. FAC ¶¶ 45, 51, 62. It was not until August 2021, more than a year after Gorbacevska's car accident and nine months after the filing of the complaint (verified by Gorbacevska), that Mr. Wechsler and Wingate entered an appearance in the case. *Id.* ¶ 62. By this time, Gorbacevska already was being treated by Dr. Gerling, as well physicians at Dr. Reyfman's practice, and had undergone shoulder surgery performed by Dr. Aleksandr Khaimov, a physician Uber does not allege to be part of any

---

[4] The Court may take judicial notice of the state-court filings. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). It may also consider the filings because they are integral to Uber's Complaint. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996) (permitting consideration of entire documents partially quoted in complaint). All cited filings are attached as exhibits to the Declaration of Jonathan D. Cogan accompanying this motion to dismiss.

scheme. *Id.* ¶¶ 46, 55–57, 62, 66. Uber's "information and belief" that Drs. Reyfman and Gerling were bribed appears based merely on Gorbacevska's deposition testimony that her "attorney . . . explained to [her] . . . where [she] could go" for medical treatment and a notation on a February 1, 2021 medical record that says her "surgery will be covered by her payment through lawyer." *Id.* ¶¶ 41, 72 (emphasis omitted).

Uber alleges that the Wingate Defendants made four false filings in Gorbacevska's case, beginning in August 2021, when Gorbacevska filed an amended complaint, "repeat[ing] false statements that the two vehicles 'came into contact with each other'" (as opposed to her Uber car hitting the large box) and that she "was severely injured." FAC ¶¶ 64–65. Uber alleges Wingate thereafter filed (1) a bill of particulars with false statements about the accident and Gorbacevska's injuries, which Uber claims the Wingate Defendants made "intentionally" and "with knowledge of its falsity," *id.* ¶¶ 66–67; (2) a handwritten "motor vehicle report" that falsely states "V1 rear ended V2," *id.* ¶¶ 40, 69; and (3) an extension request that falsely stated that Gorbacevska "was involved in a motor vehicle accident which resulted in multiple serious injuries." *Id.* ¶ 70.

On March 8, 2024, Mr. Wechsler and Wingate moved to withdraw as counsel for Gorbacevska. Ex. 8. Uber filed an opposition, Ex. 10, and the Court held oral argument on May 14, 2024. Uber acknowledges that a Wingate attorney revealed at oral argument that the firm had seen a dashcam video produced in discovery and believed there were inconsistencies in Gorbacevska's account of the accident. FAC ¶ 77; Ex. 15 at 2:9–13. The Court allowed Mr. Wechsler and Wingate to withdraw from representing Gorbacevska. Ex. 11. Thereafter, Uber successfully moved for summary judgment on the ground that it was not vicariously liable for the driver's conduct. Ex. 12. Uber did not dispute the seriousness of Gorbacevska's injuries or that a collision occurred and did not mention (much less seek sanctions for) any alleged "fraud" or

"bribes." Ex. 9.

*Fatima Callum*. Fatima Callum's case arose from an accident on March 1, 2019, in which a semi-truck side-swiped the Uber in which she was a passenger. FAC ¶ 80; Ex. 26 ¶ 3–4. After the crash, Callum visited the emergency room. FAC ¶ 81. She then hired the Lavelle Defendants, who filed a complaint on her behalf on March 29, 2019. FAC ¶ 83; Ex. 17. Between March 1 and December 9, 2019, Callum received medical treatment at 10 different facilities, including knee surgery in May 2019 by non-defendant Dr. Sean Thompson who identified a causal relationship between Callum's injuries and the accident in question. FAC ¶¶ 84–86; Ex. 18 ¶ 13; Ex. 21 at ¶¶ 8, 9, 14. Uber does not allege the Wingate Defendants were involved in coordinating Callum's medical treatment or making payment to any physicians.[5] *See* FAC ¶¶ 84, 87.

Wingate substituted as counsel in April 2020, more than a year after Callum filed her lawsuit and after all medical treatment by Drs. Gerling and Reyfman had been rendered.[6] *Id.* ¶ 90. On October 13, 2020, Wingate filed an amended complaint adding Uber as a defendant. *Id.* ¶ 91. Uber alleges Wingate repeated in the amended complaint the false statements contained in the original complaint regarding Callum's serious injuries. *Id.* ¶ 92. Uber also alleges that Wingate relied on a false affirmation signed by Dr. Gerling describing Callum's injuries in opposing a summary judgment motion filed by Callum's driver (i.e. not Uber). *Id.* ¶ 95. Uber alleges Wingate "knew or should have known" Callum was not seriously injured in the accident but does not make any factual allegations supporting this conclusory assertion. *Id.* ¶ 96.

The New York state court denied in part the driver's summary judgment motion, finding a triable issue of fact as to whether Plaintiff had a serious injury, Ex. 23 at 2, relying not only on Dr.

---

[5] Uber alleges "upon information and belief" that Callum's unnamed "lawyers" referred her to Dr. Gerling, FAC ¶ 84, though Callum herself testified that her friend referred her to Dr. Gerling. Ex. 20 at 40:9–17.

[6] Mr. Wechsler had no involvement with Callum's case.

Gerling's affirmation that Callum suffered serious injury caused by the accident but also on a similar report by an orthopedic surgeon (Richard Seldes, M.D.), whom Uber does not allege is part of any scheme. *Id.* at 2–3. Indeed, Dr. Seldes's report states that in his professional opinion Callum's injuries were proximately caused by the accident. Ex. 22 ¶¶ 8, 15–16. Uber's summary judgment motion argued that it could not be held vicariously liable for the driver's negligence but did not dispute that Callum's injuries were serious. Ex. 24. That motion remains pending, without any request for sanctions or accusations of "fraud" or "bribery" by Uber. Ex. 16.

***Cadeem Clarke.*** Cadeem Clarke was a passenger in an Uber that was rear-ended on December 4, 2019. FAC ¶ 97. The next day, Clarke went to the emergency room. *Id.* ¶ 99. One month later, Clarke began visiting a physical therapist at the direction of his "attorney," whom Uber does not identify or allege is part of any scheme. *Id.* ¶ 100. Clarke's "attorneys" referred Clarke to Dr. Reyfman's Pain Physicians NY practice in March 2020, where according to Uber he received "medically unnecessary" epidural steroid injections from Dr. Reyfman's "associates." *Id.* ¶¶ 102–03. Uber alleges Dr. Reyfman was the attending provider. *Id.* ¶ 102. Uber fails to mention that Clarke also had spinal surgery in August 2022 by Dante Leven of Total Orthopedics and Sports Medicine, who is not part of the alleged scheme. *See* Ex. 31 ¶ 10; Ex. 32 ¶ 2. Wingate did not represent Clarke when he received medical treatment, and Uber does not allege the Wingate Defendants were involved in coordinating or paying for Clarke's medical treatment.[7]

Following Clarke's treatment from Reyfman's associate and Dr. Leven, Clarke's attorney, Adam Oremland (who also is not alleged to be part of the scheme) filed a complaint in August 2022 against Uber and the two drivers involved in the collision. *See* Ex. 28. The complaint alleged

---

[7] Again, Uber alleges upon information and belief, that Clarke's unspecified "attorneys" "directly or indirectly" paid Dr. Reyfman's clinic. FAC ¶ 103.

that the driver defendants' vehicles "came into contact with each other" and that Plaintiff "sustain[ed] serious personal injuries" as a result. *Id*. ¶ 128. Neither of the two drivers contests that a multi-vehicle collision occurred; rather, they debate fault and comparative fault. *See* Exs. 37, 38.

On November 14, 2022, nearly three years after the accident and long after Clarke had received the above medical treatment and sued Uber, Oremland Law Group informed the court that it had "retained [Wingate] as trial counsel." Ex. 30. Mr. Wechsler entered a notice of appearance in Clarke's case on February 2, 2023. FAC ¶ 105. Wingate filed bills of particulars on March 7, 2023 and May 1, 2023, wherein Clarke detailed serious injuries to his cervical spine and the treatment he had undergone by Dr. Reyfman's associate and Dr. Leven. FAC ¶¶ 106, 110; Ex. 32 ¶ 2. Uber alleges that Wingate also submitted two affirmations in November 2023 and January 2024 that contained false statements in the preliminary paragraphs describing the action as one "commenced to recover damages for serious and permanent personal injuries." FAC ¶¶ 111–12; Exs. 33 ¶ 3, 34 ¶ 3. The Wingate Defendants submitted the affirmations in support of a motion to strike Uber's Answer because of Uber's refusal to comply with Clarke's discovery demands. *See* Exs. 33–34.

Uber makes conclusory allegations of fraudulent intent, alleging "[o]n information and belief" that the Wingate Defendants "were aware of the underlying facts, including Clarke's lack of injury," at the time they "took over the case," and that their subsequent statements regarding serious injury were "knowingly false" when made. FAC ¶¶ 105, 107, 110–12. As a basis for this knowledge, Uber alleges that the Wingate Defendants "were aware from interacting with their client that he was not significantly disabled," citing two of Clarke's social media pictures from 2022 (three years post-accident)—one of which indicates he had a birthday party and another which simply shows Clarke standing—as proof of his non-injury. *Id*. ¶¶ 107–08. Clarke's case is

still pending. Uber has made no allegations of fraud or bribery and has not moved for sanctions. Ex. 27.

***Zarrina Khalilova.*** Over nine years ago, on August 28, 2016, Zarrina Khalilova was riding in an Uber that was rear-ended by another vehicle. FAC ¶ 114. After the accident, she was taken to the emergency room via ambulance, where she received x-rays and was discharged with a prescription for pain medication and an order to follow up with a physician. *Id*. Uber alleges that Khalilova later went to see Dr. Reyfman "[a]t Banilov's direction," though Khalilova (whom Uber alleges is a victim of the scheme and not a perpetrator of it, FAC ¶ 298) testified under oath that her primary care physician, Dr. Kushnir, referred her to both physical therapy and to Dr. Reyfman. FAC ¶ 117; Ex. 44 at 54:10–16.

On April 5, 2017, Khalilova filed a lawsuit against the driver that crashed into her Uber car via her attorney Igor Tarasov. FAC ¶ 121; Ex. 40. Wingate substituted as Khalilova's counsel on September 13, 2017, and later filed an amended complaint adding Khalilova's Uber driver and Uber as defendants. FAC ¶ 123–24; Exs. 41–42. By this time, Khalilova had already received all surgeries from Drs. Gerling and Reyfman, and Uber does not allege Wingate was involved in coordinating, directing, or paying for Khalilova's medical treatment. FAC ¶¶ 117–20. Uber alleges Wingate made "knowingly false" statements about Khalilova's injuries in the amended complaint and subsequently filed bills of particulars detailing her injuries and the treatment she received prior to Wingate's representation. FAC ¶¶ 124, 126–27.

Uber moved for summary judgment in 2020 on the basis of fault, without contesting any of Khalilova's injuries. *See* Ex. 45. Ultimately, Khalilova's case settled on November 18, 2022, after years of discovery and Uber's "independent medical review." FAC ¶ 118; Ex. 47. Uber never claimed that Wingate committed fraud or misconduct or otherwise moved for sanctions. Ex. 39.

*Joshua Lopez.* Neither Wingate or Mr. Wechsler are involved in Mr. Lopez's case.

## II.    Non-Uber Personal Injury Suits

Uber amended its Complaint to include 14 additional cases pursued over a nine-year period. None of these cases was filed against Uber. And only seven of the additional cases were litigated by Wingate attorneys (with Mr. Wechsler involved in a mere two), either from the outset or later after substituting as counsel. Five of those cases settled or survived summary judgment, one was tried before a jury, and in another, Wingate requested to be relieved as counsel just weeks after entering an appearance. At no point did any state defendant (who had personal knowledge of the facts or participated in fulsome discovery—or both) allege that plaintiffs' counsel fabricated claims or evidence, filed fraudulent papers, or bribed a witness.

In addition, although Uber fails to mention it, nearly all of the cases included corroborating medical evidence from providers whom Uber does not allege are part of the scheme. Irina Vayman received two surgeries by non-defendant Dr. Cary Chapman and two other non-defendant physicians recommended that she receive surgical treatment for her injuries. Ex. 63 ¶ 9 (identifying two surgeries on August 19 and October 7, 2020); Ex. 64 at 81:4–20, 84:5–13, 98:19–25, 99:2–8 (identifying Dr. Chapman as the physician who performed the two surgeries and recommendations for surgery by Drs. Bachurina and Steinberg). Similarly, Alexandre Volcthenkov received surgery from non-defendant Dr. Buberman, and Sukhrob Tagiyev received plasma injections in his left shoulder from non-defendant Dr. Marcus. Ex. 72 ¶¶ 9–10; Ex. 87 ¶ 1. And in DeWayne Currence's case, multiple non-defendant physicians corroborated Currence's injuries and attributed them to his accident. *See, e.g.*, Ex. 93 ¶¶ 20–21, 28 (Dr. Grigorian); Ex. 94 ¶¶ 40–41, 45, 66–67, 71, 90–91, 195–96 (Dr. Adeosun).

In Rene Perez Rosario's case, Wingate entered the case more than a year after it was filed,

11

substituting for counsel (Tarasov), FAC ¶ 242, and moved to withdraw approximately six weeks later. Ex. 78-A. Other than initial discovery demands filed the day it entered the case, Wingate did not make a single substantive filing. *See* Ex. 77.

Finally, Wingate represented Alisher Ikramov—an Uber *driver* who was injured while working—in a personal injury lawsuit against the driver that hit him (not Uber). FAC ¶ 270, 273. Wingate began representing Ikramov only after he had filed a workers' compensation claim with the New York Workers' Compensation Board ("NYWCB"), while represented by counsel *not* alleged to be part of this scheme. Ex. 101. The NYWCB held at least one hearing and compensated Ikramov for lost wages and medical treatment for his injuries. Ex. 97 at 25:15–18, 26:14–28:23. And as in the cases outlined above, non-defendant physicians treated Ikramov's injuries and offered causal statements attributing his injuries to the accident. Ex. 98 (Dr. Gladstein); Ex. 99 at 3–4 (Dr. DiStasio); Ex. 100 (Drs. Touliopolous and DeMarco).

## **ARGUMENT**

### I.    **Uber Fails to State A RICO Claim Against Wingate or Jay Wechsler**

To state a RICO claim under 18 U.S.C. § 1962(c), "a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity," and (5) resulting "injury to business or property." *Lundy v. Cath. Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (internal quotations and citations omitted). Each element must be alleged sufficiently as to each defendant. *Id.* (affirming dismissal of RICO claims where plaintiffs failed to "allege[] what any particular Defendant did to advance the RICO scheme"). A civil RICO complaint "must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). And where, as here, the alleged predicate acts sound in fraud, a plaintiff must also satisfy Rule 9(b)'s heightened pleading requirements. *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d

159, 178–79 (2d Cir. 2004).

Courts in this District give civil RICO claims "particular scrutiny" at the pleading stage, *Spiteri v. Russo*, 2013 WL 4806960, at *45 (E.D.N.Y. Sept. 7, 2013), because civil RICO "is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Turner v. New York Rosbruch/Harnik, Inc.*, 84 F. Supp. 3d 161, 167 (E.D.N.Y. 2015). It is thus unsurprising that most civil RICO claims fail at the motion-to-dismiss stage. *See Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 220–21 (E.D.N.Y. 2014); *see also Gross v. Waywell*, 628 F. Supp. 2d 475, 480 (S.D.N.Y. 2009) (collecting statistics). This RICO action should be no exception: (A) it is at odds with clear Circuit precedent holding that litigation activities cannot serve as predicate RICO acts; (B) it does not meet RICO's standing requirements; and (C) it fails to satisfy any one of the required RICO elements. Any one of these failures dooms Uber's RICO claims.

### A.  Uber Cannot Transform Litigation Activity Into A RICO Suit

The Court should dismiss Uber's suit in its entirety because it seeks to transform quintessential "litigation activity" into RICO predicate acts. However, in a long line of cases, courts in this Circuit and others have held that, *as a matter of law*, "litigation activit[ies]," such as supposedly false litigation filings and witness bribery, "cannot act as . . . predicate offense[s] for a civil-RICO Claim." *Kim v. Kimm*, 884 F.3d 98, 104–05 (2d Cir. 2018) (filing of false declarations alleged to support mail fraud, wire fraud, and obstruction of justice predicates was litigation activity that "cannot constitute a viable RICO predicate act"); *see also Brock v. Zuckerberg*, 2021 WL 2650070, at *5 (S.D.N.Y. June 25, 2021) (concluding that plaintiffs' claims nevertheless fail "because they arise purely out of a litigation action"), *aff'd*, 2022 WL 1231044 (2d Cir. Apr. 27, 2022); *Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) (holding that defendants' "false statements in their various filings and in the course of testifying" did not support a RICO violation);

13

*Acres Bonusing, Inc. v. Ramsey*, 2022 WL 17170856, at *12 (N.D. Cal. Nov. 22, 2022) (dismissing civil RICO claims based on state-law bribery because "[a]t the end of the day, all of the conduct that plaintiffs complain of relates to the underlying [litigation]"); *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 69 (E.D.N.Y. 2020) (law firm's "disseminating false statements to [c]ourt with the intent to coerce plaintiff into settling" did not support RICO violation); *Curtis & Assocs. v. L. Offs. of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 174–75 (E.D.N.Y. 2010) (providing that litigation activities cannot be the basis for a RICO action and are more properly classified as abuse of process or malicious prosecution), *aff'd*, 443 F. App'x 582 (2d Cir. 2011). Uber does not plead the something *more*, as it must, to plausibly allege a RICO scheme. *Kim*, 884 F.3d at 104.

As the Second Circuit has recognized, allowing suits based on litigation misconduct would risk turning "every unsuccessful lawsuit" into "a retaliatory action" and thereby "inundate the federal courts with procedurally complex RICO pleadings." *Id*. Such suits also present "serious questions of comity," "erode the principles undergirding the doctrines of res judicata and collateral estoppel," and, as seems obviously intended here, chill litigants' access to courts. *Azima v. Dechert LLP*, 2024 WL 4665106, *19 (S.D.N.Y. Sept. 26, 2024).

Indeed, on the rare occasions that courts in this Circuit have sustained a RICO action based on litigation and litigation-adjacent activities, the conduct has involved a "more concerted abuse of the legal system" than what is alleged here. *Black v. Ganieva*, 619 F. Supp. 3d 309, 342 (S.D.N.Y. 2022), *aff'd*, 2023 WL 2317173 (2d Cir. Mar. 2, 2023); *Azima*, 2024 WL 4665106, at *21. For example, in *Sykes v. Mel Harris & Associates*, a group of defendants allegedly purchased multiple debt portfolios in bulk and pursued debt-collection actions in state court—**an average of 133 per day**—against debtholders that they intentionally did not serve with notice of the suit. 757 F. Supp. 2d 413, 419–20 (S.D.N.Y. 2010). The defendants then filed false affidavits of service

with the court and moved for default judgment when the debtholders failed to respond. *Id.* The gravamen of the RICO violation in *Sykes* was "the use of courts to obtain default judgments *en masse* against defendants who had not been served." *Rajaratnam*, 449 F. Supp. 3d at 71 (noting that "[t]he 'litigations' in *Sykes* were mere perfunctory steps to cash in" on debt portfolios). Likewise, in *Chevron Corp. v. Donziger*, Chevron alleged that plaintiffs and their attorney in an Ecuadorian lawsuit paid an expert to offer a report written by plaintiffs and then bribed the judge overseeing the case into issuing a multi-billion-dollar judgment against Chevron. 974 F. Supp. 2d 362, 460, 483, 501–503 (S.D.N.Y. 2014). There, the alleged expert and court bribery infected the "entire adversarial process." *Azima*, 2024 WL 4665106, at *21.

In *both* cases, the Second Circuit's expressed concerns in *Kim* were entirely inapplicable. In "*Sykes*[,] there was little chance of 'retaliatory action' by the non-appearing consumers, and the RICO action brought by those consumers did not risk eroding *res judicata* and collateral estoppel doctrines because default judgments typically are not preclusive." *Rajaratnam*, 449 F. Supp. 3d at 71. As for *Chevron*, "[a] decision secured by bribing a judge does not present the same claim preclusion, comity, and repose concerns," and "it would have been futile to direct the *Chevron* plaintiffs to seek redress in the same Ecuadorian court they allege was corrupted." *Azima*, 2024 WL 4665106, at *21.

*Sykes* and *Chevron* are thus easily distinguished exceptions to the general rule that courts will dismiss RICO actions premised on fraud or witness bribery allegations that fall short of the conduct in those cases, as do Uber's here. In *Rajaratnam*, this Court reasoned that although the plaintiff had alleged that the underlying state court action was facilitated by bribes paid to a witness, it had not alleged that the state court action was "based entirely on information or testimony provided by" that witness. 449 F. Supp. 3d at 72. It also emphasized that "a civil RICO action in

a neighboring federal district is not the appropriate mechanism to seek redress for false statements made in court filings by a litigation adversary." *Id*. And recently, in *Azima*, the magistrate judge recommended dismissal of a plaintiff's RICO claim premised, in part, on witness bribery allegations because "unlike allegations of a bribed judge or court expert in *Chevron*, the alleged bribes of witnesses here do not infect the entire adversarial process." 2024 WL 4665106, at *21.

The alleged conduct here does not implicate the rare circumstances presented in *Sykes* or *Chevron*. Uber has not alleged a completed deception "en masse" (i.e. 133 fraudulent cases *a day*) like in *Sykes* but rather the inconvenience of having to litigate five cases—one of which it has already prevailed in—that it now asserts are fraudulent. Aware of its original Complaint's legal shortfalls, Uber has seemingly done a 10-year docket search in an attempt to drum up additional exemplars for its far-fetched scheme. But those additional examples, none of which involve Uber and multiple of which remain pending before New York state courts, provide equally little basis for a RICO suit. Uber has not alleged that the New York state courts overseeing these cases are incapable of rooting out alleged fraud, as was the case in *Chevron*. New York state judges have the power to sanction false statements and frivolous conduct in their courts. *See, e.g.*, CPLR §§ 5015, 8303-a; N.Y. Comp. Codes R. & Regs. tit. 22, § 130-1.1. That Uber chose not to even raise concerns of fraud occurring in those courts does not give it license to do so here.

Moreover, Uber's own pleading undermines the notion that the allegations here rise to the level required to convert litigation conduct into a RICO action. Nearly all of the underlying cases involving Wingate include corroborating evidence, including causal statements, from physicians not alleged to be part of any scheme. *See supra* at 5–12. Thus, as was the case in *Rajaratnam*, Uber's Amended Complaint indicates that the underlying lawsuits are not "based entirely on information or testimony" induced by any of the lawyer and medical defendants. *See* 449 F. Supp.

3d at 72. Instead, the claimants' suits include the accounts of the Plaintiffs themselves, as well as evaluations and reports of additional physicians not involved in the scheme.

Uber's case presents the precise concerns that courts have articulated time and again about litigation-activity-based RICO suits. Uber seeks redress from this federal Court for alleged litigation misconduct that occurred—and is indeed allegedly *still occurring*—in proceedings pending before New York state tribunals. These types of litigation-based RICO actions "infringe on the narrowly tailored remedies carefully crafted by courts, state legislatures, and Congress for litigation misconduct," which Uber has not even attempted to avail itself of because it has not brought *any* of the allegations herein to the attention of the state court tribunals before whom it is *actively* litigating. *Azima*, 2024 WL 4665106, at *18 (internal quotations and citations omitted). Similarly, allowing such suit to progress could undermine res judicata and collateral estoppel principles. For example, the claimants could end up succeeding on their claims in state court, while this Court is being asked to, in essence, determine whether their success was legitimate. Uber should "seek redress for false statements made in court filings by a litigation adversary" in the state courts where those cases are still pending and not via "a civil RICO action in a neighboring federal district." *Rajaratnam*, 449 F. Supp. 3d at 72.

Finally, and perhaps most importantly, endorsing the type of claim brought by Uber would invite retaliatory RICO suits, which "would chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts." *Kim*, 884 F.3d at 104. That concern is magnified here, where Uber's resources drastically outmatch those of the five plaintiffs that sued it, the lawyers representing them, and the doctors who treated them. The availability of the civil RICO statute—i.e., "the litigation equivalent of a thermonuclear device," *Turner*, 84 F. Supp. 3d at 167—to Fortune 500 companies like Uber in response to personal injury

lawsuits will intimidate, and ultimately silence, prospective plaintiffs and their lawyers. Indeed, this is so clearly Uber's aim here. "The risks of excessive knock-on litigation and chilling core attorney activities exceed the deterrence benefit of extending RICO's reach to these acts." *Azima*, 2024 WL 4665106, at *26.

### B.  Uber Lacks RICO Standing

The Wingate Defendants incorporate Defendants Lavelle, Banilov, and Tarasov's ("LB&T") arguments for dismissal based on Uber's lack of standing under RICO. *See* LB&T MTD at 15–23 (no injury; damages are not sufficiently clear and definite; no proximate cause in light of Uber's independent-contractor based defenses, multi-step causal chain, and countersuits for indemnification and expenses) [8] Further, in every case involving both Uber and Wingate (Gorbacevska, Callum, Clarke, and Khalilova), the plaintiffs received corroborating treatment or evaluations from physicians who are not alleged to be part of any scheme. *See supra* at 5–10. Uber cannot allege its injuries were caused by false claims of serious injury or bribed physicians when the cases rest on additional evidence that is not alleged to be the product of bribes. LB&T MTD at 21–22 (citing *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132 (2d Cir. 2018)).

Uber also fails to adequately allege proximate cause because it fails to plausibly allege reliance on any of Wingate's supposedly false statements. *See, e.g.*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658–59 (2008) ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015) ("[M]ost RICO mail-fraud cases will nevertheless depend on establishing that someone. . . relied on the

---

[8] The Wingate Defendants also incorporate the statute of limitations argument in the LB&T motion to dismiss at 23–24.

defendant's misrepresentation.'") (internal citations omitted).[9]

In the cases of Plaintiffs Callum and Clarke, Uber makes no allegation that *anyone*, including Uber, relied on Wingate's allegedly false litigation filings (nor could it insofar as Uber consistently denied the Plaintiffs' state court claims).

As for Plaintiffs Gorbacevska and Khalilova, Uber's Amended Complaint has added only conclusory allegations of reliance that fall short of establishing proximate cause. In Khalilova's case, Uber alleges that it "relied on the false statements" about Khalilova's injuries in three state court filings "in deciding whether and for what amount to settle the claims." FAC ¶ 128. But Uber acknowledges that its settlement came after years of litigation and after it conducted its own "independent medical review" of Khalilova's case and "confirmed" that her asserted injuries were unsupported. *Id*. ¶ 118. Even if Uber's conclusory allegation of reliance were not undermined by its own pleading (it is), Uber cannot base an entire RICO case on a *single* settlement.

In Gorbacevska's case, Uber alleges that it reviewed and relied on "public filings" and documents received in discovery "for the purpose of evaluating its potential exposure and assessing the settlement value of the case." *Id*. ¶ 64. But Uber never alleges that it relied on Gorbacevska's claims *to its detriment or harm*—as it must. *See Piccone v. Bd. of Dirs. of Drs. Hosp. of Staten Island, Inc.*, 2000 WL 1219391, at *6 (S.D.N.Y. Aug. 28, 2000). To the contrary, Uber denied Gorbacevska's claims, declined to settle the case, and then successfully moved for summary judgment. FAC ¶ 36; Ex. 5; Ex. 12. "It defies common sense that plaintiff relied on statements he knew were false." *Rajaratnam*, 449 F. Supp. 3d at 73.[10]

---

[9] *See also Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*, 2021 WL 4437166, at *6 (S.D.N.Y. Sept. 28, 2021) ("[D]istrict courts in this circuit have observed that a showing of *some* reliance is functionally a prerequisite to establish proximate cause.") (emphasis in original).

[10] Unsurprisingly, Uber does not allege that anyone in the Hail Mary cases it added as part of its recent amendment relied on any allegedly false statements by Wingate. It has no basis to do so, given that it was not involved in a single one of those cases and has no knowledge of who relied on what.

### C. Uber Does Not Plausibly Allege the Wingate Defendants Committed Predicate Acts of Racketeering

Beyond these threshold failures, Uber also fails to plausibly allege the RICO predicate acts of fraud and bribery. Wingate and Mr. Wechsler incorporate the arguments set forth in the LB&T MTD at 26–28, and further detail the deficiencies in Uber's Amended Complaint below.

**_Fraud._** Having pled predicate acts that sound in fraud, Uber must satisfy Rule 9(b) and plead wire and mail fraud with particularity, including the details of the allegedly false statements, their materiality, and "facts that give rise to a strong inference of fraudulent intent." *First Cap.*, 385 F.3d at 178–179; *see also Curtis v. Greenberg*, 2021 WL 4340788, at *9, *12 (E.D.N.Y. Sept. 23, 2021).

Uber attributes approximately twenty-five false statements to Wingate or Mr. Wechsler, all of which are contained in supposedly false litigation filings across 10 of the 11 cases in the FAC involving Wingate (only four of which are against Uber). FAC. ¶¶ 64–67, 69–70, 91–92, 95, 106–12, 124–27, 162, 170, 206–07, 253–55, 265–69, 273, 275. As a threshold matter, however, a number of these allegedly false litigation filings do not contain any affirmative false statements of fact by the Wingate Defendants at all. For instance, all the bills of particulars filed by the Wingate Defendants set forth the *claimants' allegations* made upon information on belief. *See* Ex. 4 at 1 ("Plaintiff, by her attorneys, . . . alleges, upon information and belief . . ."); Exs. 31, 32, 86–88, 95 (same).

As to the limited number of statements that are (at best formulaically) attributable to the Wingate Defendants, Uber fails to plead why they are *material* false statements. "[A] misrepresentation is material to a fraud claim only if it is the type of misrepresentation likely to be deemed significant to a reasonable person" making a decision, such as to enter a transaction. *Paul Hobbs Imps. Inc. v. Verity Wines LLC*, 2023 WL 374120, at *6 (S.D.N.Y. Jan. 24, 2023)

20

(dismissing for, among other things, lack of materiality); *Greenberg*, 2021 WL 4340788, at *12 (same). Here, Uber identifies purportedly false statements but fails to allege how they could be material. For instance, Uber identifies the following in Mr. Wechsler's affirmation in Clarke's case as an allegedly false statement: "[t]his action was commenced to recover damages for serious and permanent personal injuries sustained by the plaintiff Cadeem Clarke, when he was involved in a motor vehicle accident on December 4, 2019." FAC ¶ 112; Ex. 34 at ¶ 3. But that statement was merely part of the background information noted in Mr. Wechsler's affirmations filed in support of a motion to strike Uber's answer because of a *discovery dispute*. Uber fails to plead how such a statement would have had any significance on the court's decision on the motion to strike, the merits of the case, or any party (let alone how it is, in fact, false).[11] Not only was the motion to strike *withdrawn* once the parties resolved their discovery dispute (and thus never considered by the court whatsoever), Ex. 35, but the only salient issue then for the court's consideration was whether Uber was complying with state court discovery obligations—not whether Mr. Wechsler accurately described the purpose for which the action "was commenced."

Likewise, Uber fails to explain why the discrepancy over whether Gorbacevska's Uber driver hit another car versus a large box that had fallen off a truck while moving at a high speed is material. Indeed, Uber moved for summary judgment *without even mentioning* the discrepancy. Ex. 9. The allegation that one car hit another—which Wingate's amended complaint merely repeated from the original complaint filed by former counsel—was corrected without consequence at Gorbachevska's deposition in May 2023 (if not before), wherein she testified that the Uber in

---

[11] As yet another example of Uber's failure to explain how certain statements are materially false, the allegedly false statement in Mr. Wechsler's affirmation in Gorbacevska's case—that she "was involved in a motor vehicle accident which resulted in multiple serious injuries," FAC ¶ 70; Ex. 6 ¶ 3—was part of the background information that Mr. Wechsler noted in in his affirmation filed in support of a ***motion to extend*** the deadline for a "note of issue"—a state court filing that declares a case is ready for trial.

which she was traveling hit a cardboard box.[12] Ex. 14 at 24:4–19

Uber also fails to allege "facts that give rise to a strong inference" that either Wingate or Mr. Wechsler acted with "fraudulent intent." *First Cap.*, 385 F.3d at 179. Even after the benefit of an amendment, Uber still makes vague, conclusory assertions, often "upon information and belief," that the Wingate Defendants' made "knowingly false" statements about the Plaintiffs' injuries. *See, e.g.*, FAC ¶¶ 65, 69–70, 105, 107, 110–12, 126–27, 207, 265.[13] Uber simply presumes the Wingate Defendants' knowledge and fraudulent intent without any factual basis to support it. *See Id*. ¶ 65 (alleging "it was apparent . . . from the face of the record" that no two-car collision occurred in Gorbacevska's case); *id*. ¶ 105 (alleging the Wingate Defendants "were aware of . . . Clarke's lack of injury" at the time they "took over the case"). In other cases, Uber pleads that Wingate "should have known" their filings were false, *id*. ¶ 96—a standard insufficient as a matter of law to allege mail and wire fraud, which require "a conscious knowing intent to defraud . . . and that the defendant contemplated or intended some harm to the property rights of the victim." *See, e.g.*, *Jun An v. Zhang*, 2013 WL 6503513, at *5 (S.D.N.Y. Dec. 6, 2013); *Browning Ave. Realty Corp. v. Rosenshein*, 774 F. Supp. 129, 143 (S.D.N.Y. 1991).

In any event, none of these allegations satisfies Rule 9(b) because the more straightforward innocent explanation—that the Wingate Defendants relied in good faith on information from their clients and, where applicable, information that had been developed during litigation prior to

---

[12] The statement in Wingate's Complaint about the accident was repeated from a pleading verified by Gorbacevska prior to Wingate's appearance in the case. *Compare* Ex. 2 ¶¶ 26–28 *with* Ex. 3 ¶ 44. In any event, based on Gorbacevska's own deposition, the discrepancy hardly leads to an inference of *fraud*, particularly where, as here, (1) the evidence showed that Gorbacevska's Uber car did in fact strike a large box while traveling on a highway, and (2) where Gorbacevska speaks and writes no English and even the Russian interpreter at her deposition, at times, had difficulty translating what she was saying. *See, e.g.*, Ex. 14 at (Tr. 9:10–11, 53:10–15).

[13] In fact, Uber has added an additional *30* allegations based "upon information and belief" (for a total of *68*) in the FAC. Courts allow parties to plead *facts* upon information and belief when those facts are "peculiarly within the opposing party's knowledge," but Uber treats this exception as a "license to base claims of fraud on speculation and conclusory allegations." *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 424 (E.D.N.Y. 2017) (internal citations omitted). This is not permitted under Rule 9(b), "especially in the context of RICO claims." *Id.*

Wingate joining the representation—undermines any "strong inference" of "fraudulent intent." *See Rouse v. Rouse*, 1990 WL 160194, at *5 (N.D.N.Y. Oct. 17, 1990) (finding no strong inference of fraudulent intent in the face of an innocent alternative explanation for motive and opportunity); *see also* LB&T MTD at 26 (citing *Turner*, 84 F. Supp. 3d at 169). Critically, all of the underlying plaintiffs Wingate represented—whom Uber does not allege are part of the scheme but rather are victims of it, FAC ¶ 298—testified under penalty of perjury that they suffered serious injuries as a result of their respective accidents.[14] Moreover, innocent physicians not alleged to be a part of the scheme corroborated those injuries and the causal nexus in nearly all cases in which Wingate was involved. *See supra* at 5–12.[15]

Further undermining any strong inference of fraudulent intent is Mr. Wechsler's and Wingate's withdrawal from representing Gorbacevska, as well as Wingate's withdrawal from representing Perez. In the case of Gorbacevska, Uber nonsensically claims that this withdrawal is, in fact, evidence of fraudulent intent because Mr. Wechsler withdrew only "when Gerling's deposition was noticed." ECF No. 52 at 6. But Dr. Gerling was Gorbacevska's treating physician *before* Mr. Wechsler and Wingate entered their appearances. FAC ¶¶ 55, 62. Mr. Wechsler therefore would have known from the start that Dr. Gerling would be deposed. It defies logic to suggest, as Uber does here, that Mr. Wechsler planned to commit fraud using Dr. Gerling's testimony but then abandoned that plan only because he learned that Dr. Gerling would be deposed.

The much more (indeed, only) reasonable explanation, even accepting the well-pled

---

[14] *See supra* n.3.

[15] Moreover, no "strong inference" of fraudulent intent arises from Uber's mere allegation that later Wingate joined a case to add resources for litigation and that they shared proceeds from a case when doing so. Such practice is permissible under New York rules. N.Y. R. Prof'l Conduct 1.5(g), 7.2(a)(2). Not only that, but in nine of 11 cases for which either Wingate or Mr. Wechsler were involved, Wingate appeared as counsel after the initial pleadings had already been filed by former counsel, with the information verified by the *plaintiffs* after visiting at least one doctor not alleged to be part of the enterprise. As Uber acknowledges, Wingate simply "repeated" claims of serious injury that had already been made. FAC ¶¶ 39–65, 83–92, 102–12, 121–127, 158–62, 165–170, 248–55, 259–68.

allegations as true, is this: Mr. Wechsler reviewed the dashcam video of the collision in the course of reviewing discovery and defending Gorbacevska's deposition and, upon determining there were unexplainable inconsistencies between Gorbacevska's account and the evidence, considered it improper to proceed with the case. Indeed, this is exactly what Wingate explained to the presiding court at the hearing on the motion to withdraw. *See* Ex. 15 at 2:9–13 ("Your Honor, we are asking to be relieved as Counsel based on a video that was exchanged, which makes us believe the accident didn't occur in the manner that the Plaintiff claims it occurred, and it would be unethical for us to go forward with the case at this time."). Uber claims this statement is "false and misleading" because the Wingate Defendants were aware of the video well before they withdrew, FAC ¶ 77, as if deciding to withdraw from representing a client based on a suspicion the client is lying to counsel is a trivial decision undeserving of investigation and discussion, particularly where the video *does* in fact show a high-speed collision (just not with a car) and where multiple medical professionals (including at least one not alleged to be a part of the scheme) opined that Gorbacevska suffered serious injuries. *See supra* at 5–6.[16] Notably, Uber's counsel raised *no* concerns about Wingate's stated reason for or timing of withdraw in response to Wingate's assertion at the hearing, notwithstanding its claimed concerns about Dr. Gerling's credibility.[17] The state court granted Mr. Wechsler's motion to withdraw without any finding of malintent on his or Wingate's part. *See* FAC ¶ 78; Ex. 11.

---

[16] In fact, after Gorbacevska's deposition, Mr. Wechsler filed for an extension for an upcoming deadline for a "note of issue" (a filing declaring the case is ready for trial). *See* Ex. 6. In its attempt to contrive some far-fetched scheme, Uber alleges that this extension request—which is entirely consistent with needing to evaluate a client's claims in the larger context of discovery—is itself a "false statement" because of how Mr. Wechsler described the matter in the request's preliminary paragraphs. *See* FAC ¶ 70.

[17] Uber's counsel filed an affidavit in opposition to Mr. Wechsler's motion to withdraw asking for additional information about the reason. Uber provided it had "concerns about the underlying grounds" for the motion because of similar motions filed by Wingate in other cases and because of an unrelated case filed against Dr. Gerling accusing him of filing fraudulent no-fault insurance charges. Ex. 10 at ¶¶ 4–6.

Wingate's lack of fraudulent intent is also readily apparent from the circumstances of its withdrawal from Perez's case. Wingate entered an appearance in Perez's case in September 2023, *two years* after the suit was filed, and moved to withdraw six weeks later. *See* Exs. 77, 78-A. Uber alleges that Wingate knew Perez had "staged the accident and was not injured" because at the time Wingate made its appearance, Perez had been named in a civil suit filed by Progressive Insurance nine months earlier accusing him of staging the accident. FAC ¶ 242. But if Wingate was aware at the time it entered its appearance that Perez was supposedly lying about the accident and was the subject of a civil lawsuit, there would be no reason for Wingate to so abruptly withdraw before taking any action in the case. The more plausible inference is that Wingate took on the representation unaware of the accusations against Perez and then moved to withdraw when it discovered (mere weeks later) that his account was in dispute. This shows the *opposite* of fraudulent intent.

Finally, Uber has failed to state predicate acts of mail and wire fraud because it has not plausibly alleged how a number of the allegedly false statements by Wingate or Mr. Wechsler were designed to obtain Uber's money or property, as is required by both statutes. *See Ciminelli v. United States*, 598 U.S. 306, 316–17 (2023); *Rajaratnam*, 449 F. Supp. 3d at 68 ("A scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with."). For instance, Uber does not allege how Wingate's stated basis for *withdrawing* from a case could even conceivably be targeted at Uber's property when the entire purpose of the statement was to terminate any litigation by it against Uber. *See also supra* at 21 & n.11 (discussing statements in discovery disputes).

**_Bribery_**. Uber has woefully failed to plead predicate acts of bribery against Wingate and Mr. Wechsler. The Wingate Defendants incorporate arguments set forth by Lavelle, Banilov, and

25

Tarasov in their motion to dismiss and advance the additional arguments below. *See* LB&T MTD at 27–28.

Uber alleges "[u]pon information and belief" that Gorbacevska's medical treatments were "coordinated and funded by the Banilov and Wingate Defendants, directly or indirectly," and that such funding was provided to "persons whom they knew or reasonably should have believed would be witnesses in the action and for the purpose of inducing false statements and testimony" from Reyfman and Gerling. FAC ¶ 45. Even after amendment, Uber fails to sufficiently allege to *whom* such payments were made (Reyfman? Gerling? A third party?) and bases its vague allegations "upon information and belief." Notably, Wingate did not even represent Gorbacevska until *after* she had already received the majority of her treatment from Dr. Reyfman's clinic and begun treatment with Dr. Gerling, undermining Uber's "information and belief" that the Wingate Defendants were in involved in her medical care and the funding thereof. FAC ¶¶ 46, 51, 55, 57, 62. And even if true that payment for a February 1, 2021 visit was going to be handled "through attorney"—as the medical record allegedly notes, see FAC ¶¶ 57, 72—it is not unlawful for a lawyer to pay for "medical diagnostic work" and related treatment in contingency cases. N.Y. R. Prof'l Conduct 1.8, cmt. 9B.

Uber also claims that Dr. Reyfman *and* his staff, as well as Dr. Gerling, must have been bribed because they provided "causation statements" attributing Gorbacevska's injuries to her accident. FAC ¶ 48. But several physicians who are not alleged to be in on the scheme across multiple of the so-called "fraudulent" cases provided the exact same causal statements. *See supra* at 5–12 (identifying non-defendant physicians' causal opinions). The fact that innocent doctors drew the same conclusions and made the same causal statements as the allegedly corrupted doctors renders unreasonable and implausible the inference Uber urges—that the corrupt doctors were

bribed to give false evidence.

Uber also alleges "upon information and belief" that Wingate paid bribes to Dr. Gerling in the non-Uber cases of Voltchenkov, Currence, and Ikramov. FAC ¶¶ 205, 264, 274. For example, Uber alleges "[o]n information and belief, Wingate paid Gerling, directly or indirectly" for Voltchenkov's surgery because he testified that "he had not paid out of pocket for any medical treatment," *Id.* ¶ 205. For Currence, Uber baldly alleges that "[u]pon information and belief" either "the Lavelle Defendants and/or the Wingate Defendants" paid Dr. Gerling for his surgery. *Id.* ¶ 264. Neither allegation is sufficient.

First, even if true, New York rules allow payments to physicians in contingency cases. N.Y. R. Prof'l Conduct 1.8, cmt. 9B. Second, and critically, while pleading facts "upon information and belief" is allowed where those facts are peculiarly within a defendant's knowledge, the plaintiff must still demonstrate that the facts *are* peculiarly within a defendant's knowledge and allege the "facts demonstrating the basis for the information and belief." *Williams v. Bank Leumi Tr. Co.*, 1997 WL 289865, at *3 (S.D.N.Y. May 30, 1997).[18] In the case of Currence, though, Uber makes the accusation without providing *any* facts demonstrating the basis for its belief—indeed, it does not even allege *which* Defendant paid the supposed bribe. FAC ¶ 264 ("and/or"). In the case of Voltchenkov, Uber relies on a snippet from his testimony to infer illicit payments from the lack of his "out of pocket expenses"—as if lawyer bribes and the plaintiff paying out of pocket are the only two options for someone to finance medical care. *Id.* ¶ 205.

Finally, Uber alleges that Dr. Gerling performed a "medically unnecessary" surgery on Ikramov because Wingate paid him to do so. *Id.* ¶ 274. Like nearly all the other plaintiffs allegedly

---

[18] *See also Constr. Tech., Inc. v. Lockformer Co.*, 704 F. Supp. 1212, 1232 (S.D.N.Y. 1989) (facts not "peculiarly accessible to defendants" where "others had at least some knowledge of the[] facts"), *abrogated on other grounds by Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir. 1996).

victimized by this far-fetched scheme, Ikramov's injuries were corroborated and treated by multiple physicians not alleged to have been bribed, *see supra* at 5–12, further undermining Uber's vague, unsupported allegations. In addition, the NYWCB evaluated Ikramov's claims of serious injury as part of Ikramov's workers' compensation claim—where he was represented by non-defendant attorneys—ahead of Wingate filing any suit. *See supra* at 12.[19]

Uber's claims of bribery are baseless and should be dismissed.

### D.  Uber Fails to Allege a Pattern of Racketeering Activity

Uber has not sufficiently alleged a "pattern of racketeering activity," which requires "both that the RICO predicates pose a threat of continuous criminal activity and that they be related to each other." *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017). Here, Uber fails to satisfy RICO's continuity and relatedness requirements. *See* LB&T MTD at 28–30. Moreover, the continuing nature of the so-called threat is undermined by Wingate's withdrawal from representing Gorbacevska once it discovered inconsistencies in its clients' accounts, as well as its move to withdraw from Perez's case just weeks after joining the representation. Finally, that the state court cases share (some) common participants and a general purpose to indeterminately help the alleged enterprise cannot suffice to show that the predicate acts are related to one another (horizontal relatedness). *See Reich*, 858 F.3d at 62; *Halvorssen v. Simpson*, 807 F. App'x 26, 29 (2d Cir. 2020).

### E.  Uber Fails to Allege Any RICO Enterprise, Much Less One in Which the Wingate Defendants Participated

Uber alleges three alternative theories of a RICO enterprise, hoping that one sticks: (1) Defendants are an association-in-fact enterprise (Count I); (2) Defendants are part of the Gerling Institute Enterprise (Count II); and (3) Defendants are part of the Pain Physicians NY Enterprise,

---

[19] It bears mentioning that, as Ikramov's employer, Uber would have been notified of the proceedings before the NYWCB and had the right to contest the decisions, including by filing an appeal. *See* https://tinyurl.com/mtxptays.

i.e., Dr. Reyfman's practice (Count III).[20] However, Uber has not successfully alleged any of the three enterprises. Nor has it alleged, as it must, that the Wingate Defendants participated in directing any of the alleged enterprises' affairs.

### i. *Uber does not plausibly allege an association-in-fact enterprise*

To adequately allege an association-in-fact enterprise, the complaint must describe "an ongoing organization . . . function[ing] as a continuing unit" with "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 942, 945–46 (2009) (internal quotations and citation omitted). The "purpose" element requires "a common purpose [to] engag[e] in a course of conduct," *United States v. Turkette*, 452 U.S. 576, 583 (1981), which the individuals "work together to achieve" *First Capital*, 385 F.3d at 174. In addition to these structural features, the alleged enterprise must be "separate from the pattern of racketeering activity." *First Cap.*, 385 F.3d at 173. Uber's allegations fall short.

Most strikingly, Uber fails to allege an association-in-fact because its own allegations belie its claim that Defendants "work[ed] together" and "functioned as a continuing unit." *First Cap.*, 385 F.3d at 174–75; *see also Turkette*, 452 U.S. at 583. Each of the personal injury cases referenced in the FAC involves a different combination of defendants, a different orchestrating entity, different lawyers and physicians who are not alleged to be part of any scheme, and a different sequence or pattern in which the purported predicate acts took place. *See supra* 5–12 (describing the disparate actors across the personal injury cases); *see also Rao v. BP Prods. N. Am., Inc.*, 589

---

[20] Notwithstanding pleading three theories, Uber fails to plead any real distinction between the three enterprises at all. There is "considerable overlap" between the three enterprises, with only the Lavelle Defendants omitted from the enterprise in Count I, Pain Physicians NY omitted from the enterprise in Count II, and the Gerling Institute omitted from the enterprise in Count III, but no other discernible distinctions in their background, structure, and composition. *See First Cap.*, 385 F.3d at 174 (evaluating two alleged enterprises as one because of the plaintiff's failure to plead meaningful differences). Nevertheless, all theories are addressed herein.

F.3d 389, 400 (7th Cir. 2009) ("The allegations to which Rao points, however, contain different actors for each event . . . These allegations . . . do not suggest a group of persons acting together for a common purpose or course of conduct."). Moreover, that the so-called "unit" also involved dozens of non-defendant physicians, non-defendant attorneys, *and even the 19 plaintiffs themselves*—all of whom would have had to be oblivious to the scheme (impossible, given Uber's allegations about how obvious the faked injuries were) or complicit (which Uber does not allege)—is emblematic of an enterprise structure that "courts have consistently and correctly rejected."[21] *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 302 (E.D.N.Y. 2017).

Moreover, Uber relies on alleged professional associations (and even then pled only on "information and belief") between lawyers and physicians as evidence of a criminal enterprise. *See* FAC ¶ 90 ("Upon information and belief, the Wingate firm and the Lavelle Defendants agreed to share proceeds with respect to this lawsuit in furtherance of the scheme."); *id.* ¶ 300 (describing relationships). But even if true, it is both ethical and normal course for attorneys to refer cases to one another and split fees according to their respective efforts, including by putting a lien on any respective settlement or verdict amount, as Uber alleges. FAC ¶¶ 63, 90, 161; *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999) ("Under New York law, it is well established that an agreement between attorneys for division of a legal fee is valid and is enforceable in accordance with terms set forth in agreement."); *see also* N.Y. R. Prof'l Conduct 7.2(a)(2). And a personal injury attorney referring a client to a physician is "no more problematic than an insurer limiting the performance of independent medical examinations to a discrete list of preferred doctors." *Oliveira v. 5462 125th Realty LLC*, 2024 WL 3654031, at *1 (Sup. Ct. N.Y. Cnty. July

---

[21] The Wingate cases in the FAC were prosecuted by at least eight different Wingate attorneys alone, all of whom must have been complicit in the alleged fraud if Plaintiffs' allegedly faked injuries were as "obvious" as Uber alleges. *See, e.g.*, FAC ¶¶ 50, 107, 126.

31, 2024)*; see also* N.Y. R. Prof'l Conduct 1.8, cmt. 9B. Uber cannot plausibly allege operation or management of a criminal enterprise by pointing to these common business practices. *See Kaczmarek v. Int'l Bus. Machs. Corp.*, 30 F. Supp. 2d 626, 630 (S.D.N.Y. 1998) (no operation or management alleged where company was simply conducting its own business affairs); *see also Abbott Lab'ys v. Adelphia Supply USA*, 2017 WL 57802, at *7 (E.D.N.Y. Jan. 4, 2017) (collecting cases). At best, the allegations show multiple law firms (including non-defendant law firms) referred a dozen or so cases to Wingate over the course of a decade—as is common and permissible—and that the Wingate Defendants took over the representation based on their clients' own accounts and information already developed in the case (none of which Uber has alleged the Wingate defendants knew to be false). Its allegations are insufficient to plead operation or management of a RICO enterprise. *See First Cap.*, 385 F.3d at 174 (requiring "solid information" in alleging association-in-fact enterprise).

Further, Uber fails to allege Defendants had a common purpose. It alleges that the purpose of Defendants' scheme was to "attempt to fraudulently induce larger settlements" from Uber. FAC ¶ 33. Yet Uber does not make any *factual* allegations that the Defendants were acting for the common benefit of *the enterprise*, as opposed to their own self-interests in providing legal services or medical care—just as were the dozens of non-conspiring, non-defendants who participated in the underlying state court cases. This is fatal to Uber's enterprise claims. *See Gurung v. MetaQuotes Ltd.*, 2024 WL 3849460, at *9 (E.D.N.Y. Aug. 16, 2024) (finding no common purpose in the face of "little more than a naked assertion devoid of further factual enhancement" and absent "a plausible basis for inferring that [the defendants] acted 'on behalf of the enterprise as opposed to . . . their individual self-interests'" (quoting *D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014))).

31

Finally, Uber has failed to plead an enterprise that is "separate from the pattern of racketeering activity." *First Cap.*, 385 F.3d at 173; *see also Moss*, 258 F. Supp. 3d at 304 (rejecting alternative enterprise theory where the complaint described members' roles without alleging "a coherent entity separate and apart" from the scheme (quoting *D. Penguin Bros.*, 587 F. App'x at 668)). As a result, Uber has not pled an association-in-fact enterprise.

#### ii.   *Uber fails to allege a legal enterprise*

A legal enterprise requires the same common purpose as an association-in fact enterprise. *See Turkette*, 452 U.S. at 583; *see also Lynn v. McCormick*, 760 F. App'x 51, 53 (2d Cir. 2019). A legal enterprise also requires "'that a nexus exist[s] between the enterprise and the racketeering activity that is being conducted.'" *D. Penguin Bros.*, 587 F. App'x at 667 (quoting *First Cap.*, 385 F.3d at 174). Uber fails to plausibly allege the elements of a legal enterprise. First, Uber fails to allege a common purpose. *See supra* at 31–32. Second, Uber leaves each of the alleged legal enterprises unconnected to multiple acts of alleged "racketeering." The Gerling Institute is not connected to two of the 19 cases, and Pain Physicians NY is not involved in nine of them. And in nearly every case Uber cites, non-defendant physicians provided corroborating evidence in support of the plaintiffs' legal claims but are *not* alleged to be members of the enterprise, further undermining the notion that the medical practices are the "nexus" of the alleged scheme through which the alleged Defendants' predicate acts were committed. *D. Penguin Bros.*, 587 Fed. App'x at 667. Thus, Uber does not plausibly allege, as it must, that Wingate or Mr. Wechsler (who themselves are not involved in all personal injury actions identified by Uber) "leveraged [the medical practices'] corporate structure[s] to perpetrate the fraud." *Id*.

#### iii.   *Uber fails to allege that the Wingate Defendants operated or managed any of the alleged enterprises*

Even assuming Uber had articulated a cognizable enterprise theory (which it has not), it

has not adequately alleged, as it must, that the Wingate Defendants participated "in the operation or management of the enterprise"—i.e., that they played "*some* part in directing [the enterprise's affairs." *Moss*, 258 F. Supp. 3d at 306 (emphasis in original) (citations omitted). This failure is fatal to Uber's RICO claim regardless of its theory of the alleged enterprise.

First, Uber has not sufficiently alleged that the Wingate Defendants directed the alleged association-in-fact enterprise. While Uber conclusorily alleges that "the Wingate Defendants were a leading organizer of this scheme," FAC ¶ 278, and, at times, "directed" certain plaintiffs' medical care, *see e.g.,* ¶ 202, it pleads no facts that plausibly support its conclusion. Neither Wingate nor Mr. Wechsler are involved whatsoever in eight of the 19 cases Uber alleges are part of the scheme, much less "leading" or "directing" them. *See supra* at 5–12. For the majority of those that either Wingate or Mr. Wechsler are involved, Uber acknowledges that the Wingate Defendants joined or substituted as counsel sometimes *years after* another law firm filed suit—and after most or all medical treatment was provided. [22] *Id.* Uber's own allegations thus undermine the notion that Wingate or Mr. Wechsler were "directing" the enterprise.

Second, Uber's allegations with respect to the Wingate Defendants' operation or management of the two legal enterprises are even more scant and deficient, with the only potential link being Uber's wholly deficient bribery allegations. Courts have emphasized how an "outsider['s]" actions rarely qualify as "operation or management" of the enterprise. *See Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 466–67 (S.D.N.Y. 1996). Although an outsider who bribes an insider could theoretically gain control of an enterprise through that insider, *id.*, Uber fails to plausibly allege that the Wingate Defendants committed

---

[22] Not only was Wingate not involved in arranging the majority of its clients medical care, but several plaintiffs testified under oath that they were referred to the defendant medical practices and physicians by friends, primary care providers, advertisements, and the like—not their attorneys. *See supra* at 5–12. And as noted above, a personal injury lawyer referring a client to a physician is facially permissible. *See supra* at 30–31.

bribery. The bribery allegations specifically involving the Wingate Defendants are virtually nonexistent. Uber connects the Wingate Defendants to payments for medical care in only a single Uber case (Gorbacevska), and even that connection is pure speculation based "upon information and belief" that fails to differentiate between the conduct of the Banilov Defendants, Wingate, and Mr. Wechsler. *See supra* at 26–27.[23] Likewise, the bribery allegations in the three non-Uber cases concern only alleged bribery by Wingate of Dr. Gerling (not Dr. Reyfman), and those allegations are entirely speculative and contradicted by the records in the underlying cases. Such bare pleading is insufficient to establish the Wingate Defendants' control over either medical practice enterprise.

## II.    Uber Fails To Allege A RICO Conspiracy

The Wingate Defendants incorporate LB&T's arguments herein. *See* L&B MTD at 31.

## III.    Uber Fails To Allege A Violation of New York's Judiciary Law

To proceed on a claim under New York Judiciary Law § 487, Uber must plead (1) deceit that is "extreme or egregious," (2) an intent to deceive, and (3) "actual damages caused by the deceit or collusion alleged." *Bryant v. Silverman*, 284 F. Supp. 3d 458, 471–72 (S.D.N.Y. 2018) (citations omitted). Further, the extreme or egregious conduct must be "a chronic, extreme pattern of legal delinquency." *Tacopina v. Kerik*, 2016 WL 1268268, at *6 (S.D.N.Y. Mar. 31, 2016). Finally, a "plaintiff's allegations of deceit or the intent to deceive must be pled with particularity." *Remler v. Cona Elder L., PLLC*, 2022 WL 4586243, at *6 (E.D.N.Y. Sept. 29, 2022).

Here, Uber's § 487 claim fails for the same reasons its fraud allegations fail: it has not sufficiently pleaded the Wingate Defendants' intent to deceive. *See supra* at 22–25. Further, the

---

[23] *See also* FAC ¶ 45 ("Upon information and belief, such treatments were coordinated and funded by the Banilov and Wingate Defendants, directly or indirectly. The Banilov and Wingate Defendants provided such funding, including excessive payments for unnecessary medical services, *to persons whom they knew or reasonably should have believed would be witnesses* in the action and for the purpose of inducing false statements and testimony from the Reyfman and Gerling Defendants regarding medical necessity and/or causation in violation of N.Y. Penal Law § 215 (bribery).") (emphasis added).

false filings Uber attributes to the Wingate Defendants are a far cry from "extreme or egregious" conduct actionable under the statute, much less a "chronic" pattern of such conduct. *Tacopina*, 2016 WL 1268268, at *6.[24] Uber's § 487 claim also fails because it does not plead any actual damages caused by Wingate or Mr. Wechsler's alleged conduct. As explained *supra* at 5–10, Uber's defenses have rested solely on vicarious liability and do not relate to the Wingate Defendants' allegedly false statements regarding the Plaintiffs' serious injuries. *See also* LB&T MTD at 31–32.[25]

## IV.    The Noerr-Pennington Doctrine Requires Dismissal

The Wingate Defendants incorporate LB&T's arguments for dismissal at p. 32–34.[26]

## CONCLUSION

For the reasons articulated herein, the Court should dismiss Uber's Amended Complaint with prejudice.

---

[24] *See also Remler*, 2022 WL 4586243, at *7 ("Even assuming that Cona's underlying state court litigation was a frivolous lawsuit intentionally pursued for the purpose of obtaining legal fees, the New York Court of Appeals recently confirmed that plaintiff cannot invoke sanctions under Judiciary Law § 487, given that other curative mechanisms are available to address the filing of frivolous lawsuits, such as litigation sanctions, attorney misconduct proceedings, and legal malpractice actions.") (citations omitted).

[25] *See also Cresswell v. Sullivan & Cromwell*, 771 F. Supp. 580, 587–88 (S.D.N.Y. 1991) (the damages element is not satisfied if the claimed damages are not traceable to defendant's fraud), *aff'd*, 962 F.2d 2 (2d Cir. 1992). Uber's conclusory allegations of damages are plainly insufficient.

[26] As with the other cases discussed in LB&T's motion to dismiss, Callum's case also was not a sham. *See supra* 6–8.

Dated: September 16, 2025
      New York, New York

Respectfully submitted,

**KOBRE & KIM LLP**
*/s/ Jonathan D. Cogan*
Jonathan D. Cogan
Michael J. Cinnamon
800 Third Avenue
New York, NY 10022
Telephone: +1 (212) 488 1200
jonathan.cogan@kobrekim.com
michael.cinnamon@kobrekim.com

Sydney S. Johnson (*pro hac vice*)
1919 M Street, NW Suite 410
Washington, D.C. 20036
Telephone: +1 (202) 664-1900
sydney.johnson@kobrekim.com

*Attorneys for Wingate, Russotti, Shapiro, Moses & Halperin, LLP and Jay Wechsler*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 16, 2025, I caused a copy of the foregoing document to be served to counsel for Plaintiff via email.

Dated: September 16, 2025          */s/ Jonathan D. Cogan*
      New York, New York          Jonathan D. Cogan

## <u>RULE 7.1(c) CERTIFICATION</u>

On September 2, 2025, Judge Orelia E. Merchant granted the Lavelle, Banilov, and Tarasov and Wingate Defendants' Letter Motion for Leave to File 10 excess pages. As such, Pursuant to Rule 7.1(c) of the Local Rules of the United States District Court for the Eastern District of New York and Judge Merchant's Individual Practices and Rules, I hereby certify that this brief complies with Rule 7.1(c) because it contains 12,484, exempting the caption, table of contents, table of authorities and required certificates, as permitted by Rule 7.1(c).

Dated: September 16, 2025                   */s/ Jonathan D. Cogan*
     New York, New York                   Jonathan D. Cogan